**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MEMPHIS CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself, its physicians and staff, and its patients; PLANNED PARENTHOOD OF TENNESSEE AND NORTH MISSISSIPPI, on behalf of itself, its physicians and staff, and its patients; KNOXVILLE CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself,  its physicians and staff, and its patients; FEMHEALTH USA, INC., d/b/a CARAFEM, on behalf of itself, its physicians and staff, and its patients; DR. KIMBERLY LOONEY, on behalf of herself and her patients; and DR. NIKKI ZITE, on behalf of herself and her patients, <br><br> Plaintiffs, <br><br> v. <br><br> HERBERT H. SLATERY III, Attorney General of Tennessee, in his official capacity; LISA PIERCEY, M.D., Commissioner of the Tennessee Department of Health, in her official capacity; RENE SAUNDERS, M.D., Chair of the Board for Licensing Health Care Facilities, in her official capacity; W. REEVES JOHNSON, JR., M.D., President of the Tennessee Board of Medical Examiners, in his official capacity; HONORABLE AMY P. WEIRICH, District Attorney General of Shelby County, Tennessee, in her official capacity; GLENN FUNK, District Attorney General of Davidson County, Tennessee, in his official capacity; CHARME P. ALLEN, District Attorney General of Knox County, Tennessee, in her official capacity; and TOM P. THOMPSON, JR., District Attorney General for Wilson County, Tennessee, in his official capacity, <br><br> Defendants. | CIVIL ACTION <br><br> CASE NO._____ <br><br> JUDGE_____ |

## <u>COMPLAINT</u>

Plaintiffs Memphis Center for Reproductive Health, Planned Parenthood of Tennessee

and North Mississippi, Knoxville Center for Reproductive Health, FemHealth USA, d/b/a

carafem, Dr. Kimberly Looney, and Dr. Nikki Zite (collectively, "Plaintiffs"), on behalf of

1

themselves, their staff and physicians, and their patients, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, and in support thereof allege the following:

## I.    PRELIMINARY STATEMENT

1.      In a direct affront to nearly five decades of Supreme Court precedent affirming the right to abortion, H.B. 2263/S.B. 2196 (the "Act") (attached as Exhibit A) is the culmination and most extreme of Tennessee's unrelenting efforts to deprive pregnant people of this right. All in pursuit of this unconstitutional end, the Act bans pre-viability abortion in a multitude of ways. The Act will become effective immediately upon the Governor's signature and the Act's bans will bar patients from receiving abortion care and will continually inflict irreparable harm on Plaintiffs' patients each and every day they remain in effect absent emergency relief from this Court.

2.      First, the Act criminalizes the provision of abortion as soon as a "fetal heartbeat" is detected and then at cascading gestational ages up through 24 weeks from the pregnant person's last menstrual period ("LMP")[1]:

a.  Act § 39-15-216(c)(1) bans abortion if there is a "fetal heartbeat";

b.  Act § 39-15-216(c)(2) bans abortion at and beyond 6 weeks LMP, unless there is no "heartbeat";

c.  Act § 39-15-216(c)(3) bans abortion at and beyond 8 weeks LMP;

d.  Act § 39-15-216(c)(4) bans abortion at and beyond 10 weeks LMP;

---

[1] Gestational age in the Act is "calculated from the first day of the last menstrual period of a pregnant woman." Act § 39-15-216(a)(3) (adopting definition in Tenn. Code Ann. § 39-15-211(a)(2)). Almost uniformly, clinicians measure pregnancy from the first day of the last menstrual period.

e.  Act § 39-15-216(c)(5), bans abortion at and beyond 12 weeks LMP;

f.  Act § 39-15-216(c)(6), bans abortion at and beyond 15 weeks LMP;

g.  Act § 39-15-216(c)(7), bans abortion at and beyond 18 weeks LMP;

h.  Act § 39-15-216(c)(8), bans abortion at and beyond 20 weeks LMP;

i.  Act § 39-15-216(c)(9), bans abortion at and beyond 21 weeks LMP;

j.  Act § 39-15-216(c)(10), bans abortion at and beyond 22 weeks LMP;

k.  Act § 39-15-216(c)(11), bans abortion at and beyond 23 weeks LMP; and

l.  Act § 39-15-216(c)(12), bans abortion at and beyond 24 weeks LMP (collectively, the "Cascading Bans").

3.  Acknowledging the unconstitutionality of these prohibitions, the Act contemplates that each of the Cascading Bans will be "found to be unenforceable" and replaced by each subsequent gestational age ban. Act § 39-15-216(h).

4.  Second, the Act criminalizes the provision of abortion if sought for any of the following reasons (collectively, the "Prohibited Reasons"):

a.  Act § 39-15-217(b) (banning abortion if sought "because of the sex of the" fetus);

b.  Act § 39-15-217(c) (banning abortion if sought "because of the race of the" fetus); and

c.  Act § 39-15-217(d) (banning abortion if sought "because of a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome in the" fetus) (collectively, the "Reason Bans").

5.  Existing Tennessee law already proscribes abortion after viability. Tenn. Code Ann. § 39-15-211(b)(1). Therefore, the *only* application of each of the Cascading Bans and the Reason Bans (collectively, the "Bans") is to unconstitutionally ban pre-viability abortions.

3

6.      Each of the Bans stands in direct contravention of longstanding Supreme Court precedent by prohibiting abortion prior to viability.

7.      The right to terminate a pregnancy "before viability is the most central principle of *Roe v. Wade*." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 871 (1992). Indeed, it is "a rule of law and a component of liberty" that "cannot [be] renounce[d]." *Id.* The Bans are a multi-pronged, all-out assault on this long established and deeply engrained right.

8.      The Act passed both legislative bodies and will go into effect as soon as it is signed by Governor Bill Lee. Such signature is a certainty given that the Governor submitted the Act to the legislature for consideration and he and his office have publicly lauded it as a "monumental step" toward making Tennessee "one of the most pro-life states in the country."[2]

9.      Plaintiffs seek declaratory and injunctive relief from the Bans on behalf of themselves, their physicians and staff, and their patients, under the United States Constitution and 42 U.S.C. § 1983.

10.     Without this relief, the Bans will immediately and irreparably harm Plaintiffs and their patients by eviscerating abortion in Tennessee with devastating effects. Plaintiffs will have no choice but to turn away pregnant people seeking this critical and time-sensitive medical care. Those seeking banned care will be forced to travel out of state if they are able. Those unable to do so will be forced to remain pregnant and give birth against their will or may resort to unsafe means to terminate their pregnancy.

## II.     JURISDICTION AND VENUE

11.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

---

[2] Tenn. Office of the Governor, *Gov. Bill Lee Introduces Comprehensive Pro-Life Legislation* (Jan. 23, 2020), https://www.tn.gov/governor/news/2020/1/23/gov--bill-lee-introduces-comprehensive-pro-life-legislation.html.

4

12.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

13.     Venue is appropriate under 28 U.S.C § 1391(b) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## III.    PLAINTIFFS

14.     Plaintiff Memphis Center for Reproductive Health is a non-profit organization that operates CHOICES, a women's health clinic in Memphis, Tennessee ("Choices Memphis"). In operation since 1974, Choices Memphis strives to empower individuals to make informed decisions about their reproductive health; the clinic offers a full range of sexual and reproductive health care, including gynecology care, fertility services, health care services for lesbian, gay, and transgender individuals, testing and treatment for sexually transmitted infections, HIV testing and referrals, midwifery care, medication abortions up to 11 weeks LMP and procedural abortions up to 16 weeks LMP. Choices Memphis provides more than 2,500 abortions in Tennessee per year. Choices Memphis sues on its own behalf and on behalf of its physicians, staff, and patients.

15.     Planned Parenthood of Tennessee and North Mississippi ("PPTNM") is a not-for-profit corporation operating health centers in Tennessee and Mississippi. For the last 75 years,[3] PPTNM's mission has been to provide accessible, affordable, and high-quality reproductive health care in Tennessee and Mississippi. PPTNM's philosophy of care is to provide non-

---

[3] PPTNM was formed in June 2018 by the merger of two prior Planned Parenthood entities: Planned Parenthood Greater Memphis Region ("PPGMR") and Planned Parenthood of Middle and East Tennessee ("PPMET").

5

judgmental sexual and reproductive health care to all, ensuring patients receive unbiased and complete information. In Tennessee, PPTNM's four health centers (two in Memphis, one in Nashville, and one in Knoxville) provide a wide range of reproductive and sexual health services to patients, including wellness visits (or "well-woman exams"), cancer screenings, birth control counseling, Human papillomavirus ("HPV") vaccines, annual gynecological exams, pregnancy care, contraception, adoption referral, miscarriage management, and abortion care. One Memphis health center, which is an ambulatory surgical treatment center ("ASTC"), provides medication abortion up to 11 weeks LMP and procedural abortion up to 19 weeks, 6 days LMP; the second Memphis health center and the Knoxville health center provide medication abortion up to 11 weeks LMP; and the Nashville health center, which is also an ASTC, provides medication abortion up to 11 weeks LMP and procedural abortion up to 19 weeks, 6 days LMP. PPTNM provides approximately 6,500 abortions in Tennessee per year. PPTNM's ASTCs face possible disciplinary and other penalties for violations of the Act. PPTNM sues on its own behalf and on behalf of its physicians, staff, and patients

      16.    Plaintiff Knoxville Center for Reproductive Health ("KCRH") is a non-profit reproductive health center that has been providing high-quality reproductive health care services to patients since 1975. KCRH is an ASTC and provides a range of reproductive health services, including cancer screenings, testing and treatment for sexually transmitted infections, medication abortions before 11 weeks LMP and procedural abortions before 15 weeks LMP. KCRH provides approximately 1,300 abortions in Tennessee each year. KCRH sues on its own behalf and on behalf of its physicians, staff, and patients.

      17.    Plaintiff carafem is a non-profit organization dedicated to providing women's reproductive health services. Carafem operates a health center in Mt. Juliet, Tennessee, that

provides information and low-cost options for most methods of birth control and testing for sexually transmitted infections, as well as medication abortion care up to 11 weeks LMP and procedural abortions up to 13 weeks, 6 days LMP. Carafem provided approximately 1,200 abortions in Tennessee last year, the first year they were open. Carafem expects to provide over 2,000 abortions to patients in Tennessee this year. Carafem sues on its own behalf and on behalf of its physicians, staff, and patients.

18.     Plaintiff Dr. Kimberly Looney is an obstetrician/gynecologist ("OB/GYN") licensed to practice in the State of Tennessee. She has been the Chief Medical Officer of Plaintiff PPTNM since 2019 and has provided care at PPTNM since 2008. Dr. Looney provides medication abortions at PPTNM up to 11 weeks LMP, and procedural abortions at PPTNM up to 19 weeks, 6 days LMP. Dr. Looney faces potential felony criminal prosecution, prison time, and monetary penalties and potential medical licensure penalties for violations of the Act. Dr. Looney sues on behalf of herself and her patients.

19.     Plaintiff Dr. Nikki Zite is a board-certified OB/GYN who is licensed to practice in the State of Tennessee. Dr. Zite practices at a hospital in Knoxville, Tennessee where she provides the full array of obstetric and gynecological care. As part of that practice, she provides pre-viability abortion care beyond 19 weeks, 6 days LMP in two limited circumstances as authorized by hospital policy: (1) for significant fetal indications or (2) for maternal health indications. Dr. Zite faces potential felony criminal prosecution, prison time, and monetary penalties and potential medical licensure penalties for violations of the Act. Dr. Zite sues on behalf of herself and her patients.

Case 3:20-cv-00501   Document 1   Filed 06/19/20   Page 7 of 34 PageID #: 7

## IV.  DEFENDANTS

20.     Defendant Herbert H. Slatery III is the Attorney General of Tennessee. He is responsible for defending Tennessee laws against constitutional challenge. *See* Tenn. Code Ann. § 8-6-109(b)(9). Further, he has exclusive authority to prosecute criminal violations in Tennessee's appellate courts. *See* Tenn. Code Ann. § 8-6-109(b)(2); *State v. Simmons*, 610 S.W.2d 141, 142 (Tenn. Crim. App. 1980). He is sued in his official capacity.

21.     Defendant Lisa Piercey, M.D., is the Commissioner of the Tennessee Department of Health, which is responsible for licensing and regulating ASTCs. *See* Tenn. Code Ann. § 68-11-202(a)(1). Dr. Piercey is sued in her official capacity.

22.     Defendant Rene Saunders, M.D., is the Chair of the Board for Licensing Health Care Facilities. The Board for Licensing Health Care Facilities has the authority to discipline ASTCs, for, among other things, permitting, aiding or abetting the commission of any illegal act in the ASTC or conduct or practice found by the board to be "detrimental to the health, safety, or welfare of the patients" of the ASTC. Tenn. Code Ann. § 68-11-207(a)(3); Tenn. Comp. R. & Regs. 1200-08-10-.03(1)(d). Dr. Saunders is sued in her official capacity.

23.     Defendant W. Reeves Johnson, Jr., M.D., is the President of the Tennessee Board of Medical Examiners. The Board of Medical Examiners is empowered to take disciplinary action against a physician who violates various laws and regulations including those "governing abortion." Tenn. Code Ann. § 63-6-214(b)(6). Physicians charged with violations of the Bans must notify the Board of Medical Examiners in writing within seven days of acquiring knowledge of those charges. Act §§ 39-15-216(g), 217(h). Dr. Johnson is sued in his official capacity.

8

24.     Defendant Amy Weirich is the District Attorney General for Shelby County. She is responsible for prosecuting all violations of the state criminal statutes occurring in Shelby County, which includes Memphis. Tenn. Code Ann. § 8-7-103. Violations of the Bans are Class C felonies, *see* Act §§ 39-15-216(b)(2), (c)(1)-(12), 217(f), and are punishable by imprisonment of 3 to 15 years and/or a fine not to exceed $10,000. *See* Tenn. Code Ann. § 40-35-111(b)(3). Ms. Weirich is sued in her official capacity.

25.     Defendant Glenn R. Funk is the District Attorney General for Nashville. He is responsible for prosecuting all violations of the state criminal statutes occurring in Metropolitan Nashville and Davidson County. *Id.* § 8-7-103. Violations of the Bans are Class C felonies, *see* Act §§ 39-15-216(b)(2), (c)(1)-(12), 217(f), and are punishable by imprisonment of 3 to 15 years and/or a fine not to exceed $10,000. *See* Tenn. Code Ann. § 40-35-111(b)(3). Mr. Funk is sued in his official capacity.

26.     Defendant Charme P. Allen is the District Attorney General for Knox County. She is responsible for prosecuting all violations of the state criminal statutes occurring in Knox County, which includes Knoxville. *Id.* § 8-7-103. Violations of the Bans are Class C felonies, *see* Act §§ 39-15-216(b)(2), (c)(1)-(12), 217(f), and are punishable by imprisonment of 3 to 15 years and/or a fine not to exceed $10,000. *See* Tenn. Code Ann. § 40-35-111(b)(3). Ms. Allen is sued in her official capacity.

27.     Defendant Tom P. Thompson, Jr., is the District Attorney General for Wilson County. He is responsible for prosecuting all violations of the state criminal statutes occurring in Wilson County, which includes Mt. Juliet. *Id.* § 8-7-103. Violations of the Bans are Class C felonies, *see* Act §§ 39-15-216(b)(2), (c)(1)-(12), 217(f), and are punishable by imprisonment of

3 to 15 years and/or a fine not to exceed $10,000. *See* Tenn. Code Ann. § 40-35-111(b)(3). Mr. Thompson is sued in his official capacity.

## V.   THE CHALLENGED LAWS

### A.  The Bans

The Cascading Bans

28.    Under the Cascading Bans, "any person shall not perform or induce, or attempt to perform or induce, an abortion" if a "fetal heartbeat" is detected, or if the embryo or fetus is at or beyond 6,[4] 8, 10, 12, 15, 18, 20, 21, 22, 23, or 24 weeks LMP. *See* Act §§ 39-15-216(c)(1)-(12).

29.    Tennessee already prohibits abortion after viability. Tenn. Code Ann. § 39-15-211(b)(1). Before performing an abortion after 20 weeks LMP, Tennessee law requires a physician to make a case-by-case determination regarding fetal viability. *Id.* § 39-15-212(a).

30.    The United States Supreme Court has defined viability as the point when, "in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support." *Colautti v. Franklin*, 439 U.S. 379, 388 (1979).

31.    Consistent with this definition, Tennessee law defines viability without reference to gestational age as that stage of fetal development when "in the physician's good faith medical judgment, based upon the facts known to the physician at the time," Tenn. Code Ann. § 39-15-

---

[4] Under the provision proscribing abortion at or beyond 6 weeks LMP, abortion is permitted—regardless of gestational age—if the "physician affirmatively determines and records . . . that, in the physician's good faith medical judgment, the [embryo or fetus] does not have a fetal heartbeat at the time of the abortion." Act § 39-15-216(c)(2). In making this "good faith medical determination, the physician shall utilize generally accepted standards of medical practice using current medical technology and methodology applicable to the gestational age of the [embryo or fetus] and reasonably calculated to determine the existence or non-existence of a fetal heartbeat." *Id.*

211(b)(2), "the unborn child is capable of sustained survival outside of the womb, with or without medical assistance." *Id.* § 39-15-211(a)(7).

32. The Act does not repeal the existing law banning abortion after viability. Act § 39-15-216(i)(2) ("This section shall not be construed as a repeal, either express or implied, of any provision of this part as it existed prior to the effective date of this act."). Therefore, the *only* application of the Cascading Bans will be to pre-viability abortions.

33. Tacitly acknowledging the unconstitutionality of this effort, the Act makes *each* of these pre-viability Cascading Bans expressly severable, stating that, if a court finds "any provision or provisions . . . unenforceable, unconstitutional, or invalid," then those provisions are "declared to be severable and the remainder of the section shall remain effective." *Id.* § 39-15-216(h).

The Reason Bans

34. Even though the Cascading Bans prohibit virtually all abortions *regardless of reason*, the Act nonetheless also proscribes abortions if sought for particular reasons. Under the Reason Bans, a person "shall not perform or induce, or attempt to perform or induce, an abortion upon a pregnant [person] if the person knows that the [person] is seeking the abortion because of" any of the following reasons:

    a. "a prenatal diagnosis, test, or screening indicating Down syndrome[5] or the potential for Down syndrome in the [fetus]," Act § 39-15-217(d);

    b. "the race of the [fetus]," *id.* § 39-15-217(c); or

---

[5] "Down syndrome" is defined by the Act as "a chromosome disorder associated either with an extra chromosome twenty-one or an effective trisomy for chromosome twenty-one." Act § 39-15-217(a)(2).

Case 3:20-cv-00501   Document 1   Filed 06/19/20   Page 11 of 34 PageID #: 11

c.   "the sex of the [fetus]," *id.* § 39-15-217(b) (collectively, the "Prohibited Reasons").

35.     Just like the Cascading Bans—in tacit acknowledgement that the Reason Bans are unconstitutional pre-viability bans—the Act makes each of the Reason Bans expressly severable, stating that, if a court finds "any provision or provisions . . . unenforceable, unconstitutional, or invalid," then those provisions are "declared to be severable and the remainder of the section shall remain effective." *Id.* § 39-15-217(i).

B. <u>The Bans Impose Severe Criminal Penalties and Threaten Licensure Actions.</u>

36.     Violation of any of the Bans[6] is a Class C felony, Act §§ 39-15-216(b)(2), (c)(1)-(12), 217(f), and is punishable by imprisonment of 3 to 15 years and/or a fine not to exceed $10,000. *See* Tenn. Code Ann. § 40-35-111(b)(3).

37.     Any physician charged with violating any of the Bans must report the charge to the Board of Medical Examiners in writing within seven calendar days of acquiring knowledge of the charge. Act §§ 39-15-216(g), 217(h). The relevant district attorney general must also promptly notify the Board of Medical Examiners of any violation of the Bans. *Id.* The Board of Medical Examiners is then empowered to take disciplinary action against a physician for violation of a law "governing abortion." Tenn. Code Ann. § 63-6-214(b)(6). The Board of Medical Examiners may impose a range of penalties, including private or public censure or reprimand, probation, license suspension, license revocation with leave to reapply, permanent licensure revocation, and civil monetary penalty. *See* Tenn. Code Ann. §§ 63-6-101(a)(3), 63-6-214(b); Tenn. Comp. R. & Regs. 0880-02-.12(1).

---

[6] The Act provides that "[a] person shall not be convicted of violating more than [one of the Cascading Bans] for any one (1) abortion that the person performed, induced, or attempted to perform or induce." Act § 39-15-216(d)(1).

Case 3:20-cv-00501   Document 1   Filed 06/19/20   Page 12 of 34 PageID #: 12

38. Moreover, based on such charge, the Tennessee Department of Health—through its Board for Licensing Health Care Facilities—may suspend or revoke Plaintiffs' ASTC licenses for "permitting, aiding or abetting the commission of any illegal act" within the ASTC or for "[c]onduct or practice found by the board to be detrimental to the health, safety, or welfare of the [ASTC's] patients." Tenn. Code Ann. § 68-11-207(a)(3); Tenn. Comp. R. & Regs. 1200-08-10-.03(1)(d).

C. The Bans Have Extremely Limited "Exceptions."

39. There are no exceptions to the Bans, including for cases of rape, incest, or *any* fetal conditions.

40. Instead, the Bans create an affirmative defense in the case of medical emergencies. Act §§ 39-15-216(e)(1), 217(e)(1). The medical emergency affirmative defense does not prevent criminal prosecutions of providers; it simply gives physicians an affirmative defense that they may assert in the event of prosecution. The physician bears the burden on this affirmative defense and must show, by a preponderance of the evidence, that the medical emergency defense applies. *See* Tenn. Code Ann. § 39-11-204(b), (e).

41. The medical emergency affirmative defense applies when, "in the physician's reasonable medical judgment, a medical emergency prevented compliance." Act §§ 39-15-216(e)(1), 217(e)(1).

42. A qualifying medical emergency is defined as "a condition that, in the physician's good faith medical judgment, based upon the facts known to the physician at the time, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create." *Id.* §§ 39-15-

13

216(a)(4), 217(a)(3) (incorporating Tenn. Code Ann. § 39-15-211(a)(3) by reference). Under the Bans, a medical emergency "does not include a claim or diagnosis related to the woman's mental health or a claim or diagnosis that the woman will engage in conduct which would result in her death or substantial and irreversible impairment of a major bodily function." *Id.* §§ 39-15-216(a)(4), 217(a)(3).

## VI.   FACTUAL ALLEGATIONS

### A. <u>Abortion is Safe, Common and Sought for Myriad Complex and Personal Reasons.</u>

43.     Abortion is one of the safest and most common medical procedures performed in the United States. There are generally two methods of providing abortion care: medication abortion and procedural abortion.[7]

44.     Medication abortion involves ingesting two medications—mifepristone, which in Tennessee must be dispensed in the clinic,[8] and misoprostol, which is taken 24 to 48 hours later at a location of the patient's choosing, typically at home. The pregnancy is passed outside the health clinic, in a process similar to miscarriage. The use of mifepristone in combination with misoprostol is evidence-based and widely used to terminate pregnancies up to 11 weeks (or 77 days) LMP.

45.     Up to 11 weeks LMP, patients wishing to terminate their pregnancy may choose between medication and procedural abortion. After 11 weeks LMP, only procedural abortion is available.

---

[7] The only other medically-proven method of abortion is induction. Induction abortion uses medications to induce labor in a hospital, but accounts for only a small percentage of abortions in the United States. Dr. Zite performs procedural and induction abortions at her hospital.

[8] In Tennessee, telemedicine is prohibited for abortion services, and medication abortion must be "administered or dispensed" to the patient in "the physical presence of her physician." Tenn. Code Ann. § 63-6-241.

14

46.     Although procedural abortion is often referred to as "surgical" abortion, it is not what is commonly understood to be surgery, as procedural abortion involves no incision, no need for general anesthesia, and no need for a sterile field. Procedural abortion involves the use of instruments to gently dilate (open) the cervix and evacuate the contents of the uterus. Procedural abortion is a straightforward and brief procedure; it is almost always performed in an outpatient setting and may at times involve local anesthesia or conscious sedation to make the patient more comfortable.

47.     Up to approximately 15 weeks LMP, procedural abortion is performed by the aspiration technique, which uses gentle suction to empty the uterus. After approximately 15 weeks LMP, physicians use the dilation and evacuation ("D&E") technique to adequately dilate the cervix and empty the uterus. Starting around 18 weeks LMP, procedural abortion is commonly performed as a two-day procedure because the patient has overnight dilation prior to the procedure.

48.     Nationwide, nearly one in four women will obtain an abortion by age forty-five.[9]

49.     In 2018, the last year for which statistics are currently available, 10,880 abortions were performed in Tennessee.[10]

50.     There is no typical abortion patient. Pregnant people seek abortions for a variety of deeply personal reasons, including familial, medical, and financial. Some have abortions

---

[9] *See* Guttmacher Inst., News Release, *Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates* (Oct. 19, 2017), https://www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.

[10] Tenn. Dep't of Health, Div. of Vital Records & Statistics, *Selected Induced Termination of Pregnancy (ITOP) Data, According to Age and Race of Woman, Tennessee and Department of Health Regions, Resident Data, 2018*, at 1 (2018), https://www.tn.gov/content/dam/tn/health/documents/vital-statistics/itop/ITOP2018.pdf (hereinafter "TN ITOP Report").

because they conclude that it is not the right time in their lives to have a child or to add to their families. Some decide to end a pregnancy because they want to pursue their education; some because they feel they lack the necessary economic resources, level of partner support or stability. Some decide to have an abortion because they do not want children at all.

51. Nearly 60 percent of abortion patients nationally already have at least one child.[11] Many also report plans to have children (or additional children) when they are older, financially able to provide for them, and/or in a supportive relationship with a partner so their children will have two parents.[12]

52. Three-fourths of abortion patients cite responsibility to other individuals (such as children or elderly parents), and many also say they cannot afford to become a parent or to add to their families, and that having a baby would interfere with work, school, or the ability to care for dependents.[13]

53. Some seek abortions because they are experiencing intimate partner violence and may face additional threats to their safety if their partner becomes aware of their pregnancy or desire for an abortion; many such patients fear that being forced to carry the pregnancy to term would further tether them to their abusers.

54. Some seek abortions because they have become pregnant as a result of rape.

---

[11] Jenna Jerman, Rachel K. Jones, & Tsuyoshi Onda, *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* at 7, 11, Guttmacher Inst. (May 2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.
[12] Stanley K. Henshaw & Kathryn Kost, *Abortion Patients in 1994-1995: Characteristics and Contraceptive Use*, 28 FAM. PLAN. PERSP. 140, 144 (1996), https://www.guttmacher.org/sites/default/files/pdfs/pubs/journals/2814096.pdf.
[13] Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37(3) PERSPECTIVES ON SEXUAL AND REPROD. HEALTH 110, 117 (Sept. 2005), https://www.guttmacher.org/journals/psrh/2005/reasons-us-women-have-abortions-quantitative-and-qualitative-perspectives.

16

55.     Some decide to have an abortion because of an indication or diagnosis of a fetal medical condition. Some families do not feel they have the resources—financial, medical, educational, or emotional—to care for a child with special needs or to simultaneously provide for the children they already have (including existing children with special needs).

56.     Some wish to terminate because they have received a diagnosis of a fetal condition such that the pregnancy will not result in a baby that could ever go home. While some may decide to carry such a pregnancy through delivery, others may decide that they wish to terminate the pregnancy.

57.     Down syndrome is the common name for a genetic condition, known as Trisomy 21, which results from an extra copy (full or partial) of the 21st chromosome.

58.     A variety of "screens" and more accurate diagnostic tests can help detect genetic, chromosomal, or structural conditions like Down syndrome. But most patients do not receive a confirmed Down syndrome diagnosis until well into the second trimester, generally at or after 15 weeks LMP.

59.     The American College of Obstetricians and Gynecologists ("ACOG"), the preeminent professional association for OB/GYNs, recommends that all patients, regardless of age, be offered the option of screening or diagnostic testing for fetal genetic disorders, and that patients with positive screening test results be offered counseling and diagnostic testing.

60.     Patients who receive a positive Down syndrome test result or diagnosis are typically referred to an OB/GYN that specializes in high-risk pregnancies and frequently a genetic counselor for counseling as well. Counseling is intended to provide comprehensive, objective, and individualized information that addresses both the scientific aspect of any test result or diagnosis (e.g., the reliability of specific test results) and the impacts of the results on

17

the patient and any family members who may be involved. A patient who learns of a Down syndrome or other fetal diagnosis faces a potentially complex decision that the patient should be able to make through self-reflection and discussion with anyone whom the patient chooses to involve in the process (such as a spouse, partner, friend, family member, or doctor). It is critical to some patients that they have the information and support they need to make this decision, and also the ability to terminate a pregnancy safely, if that is what they decide is best for them and their families.

61. Some abortion patients with high-risk pregnancies—because of advanced maternal age or some other underlying medical condition—have complications that lead them to end their pregnancies to preserve their own lives or health. In some of these situations, there is also a fetal diagnosis or potential fetal diagnosis. There are numerous maternal conditions that pose a substantial mortality risk in pregnancy, including pulmonary hypertension and maternal cardiac disease, some with mortality risks as high as 50 percent.

62. The decision to terminate a pregnancy for any reason or reasons is often motivated by a combination of diverse, complex, and interrelated factors that are intimately related to the individual woman's values and beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability.

B. The Cascading Bans Prohibit the Vast Majority of Pre-Viability Abortions.

63. Under decades of established precedent, no state interest is "strong enough to support a prohibition of abortion" prior to viability. *Casey*, 505 U.S. at 846. The Bans will do just that: ban the vast majority of pre-viability abortion in Tennessee.

64. A full-term pregnancy is approximately 40 weeks LMP.

18

65. Viability occurs when "there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support." *Colautti*, 439 U.S. at 388.

66. Viability is a determination that must be made by a physician, and it will vary from pregnancy to pregnancy, depending on a wide array of factors, including the health of the woman and the fetus. *Id.* (quoting *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 64 (1976)) (When "viability is achieved may vary with each pregnancy" and "the determination of whether a particular fetus is viable, is and must be, a matter for the judgment of the responsible attending physician.").

67. Under Tennessee law, a rebuttable presumption of viability is created at 24 weeks LMP. Tenn. Code Ann. § 39-15-211(b)(5).

68. The Cascading Bans prohibit abortion as soon as a "fetal heartbeat" is detected. The Act defines a "fetal heartbeat" as "cardiac activity or the steady and repetitive rhythmic contraction of the heart of a [fetus]." Act § 39-15-216(a)(2).[14]

69. In a typically developing embryo, cells that eventually form the basis for development of the heart later in pregnancy produce cardiac activity that is generally detectible—via ultrasound—beginning at approximately 6 weeks LMP.[15]

---

[14] *'Heartbeat Bills' Get the Science of Fetal Heartbeats All Wrong*, WIRED (May 4, 2019), https://www.wired.com/story/heartbeat-bills-get-the-science-of-fetal-heartbeats-all-wrong/ (quoting Jennifer Kerns, Director of Obstetrics and Gynecology Clinical Research, Zuckerberg San Francisco General Hospital, clarifying that the "heartbeat . . . at that stage of gestation" is merely "a group of cells with electrical activity" and that is "in no way . . . any kind of cardiovascular system").

[15] *See* Thomas Gellhaus, M.D., *ACOG Opposes Fetal Heartbeat Legislation Restricting Women's Legal Right to Abortion*, Am. Coll. Obstetricians & Gynecologists (Jan. 18, 2017), https://www.acog.org/news/news-releases/2017/01/acog-opposes-fetal-heartbeat-legislation-restricting-womens-legal-right-to-abortion.

70. Some individuals have fairly regular menstrual cycles, with a 4-week cycle being typical; others have regular cycles of different lengths; and still others have irregular cycles. In a person with regular monthly periods, fertilization typically occurs 2 weeks post-LMP—that is, 2 weeks after the first day of the last menstrual period. An individual with a highly regular, 4-week cycle would be 4 weeks LMP at the time of the first missed period.

71. Patients generally seek abortion care as soon as they are able, but the great majority of abortion patients are simply not able to confirm a pregnancy and schedule and obtain an abortion before fetal cardiac activity develops at approximately 6 weeks LMP.

72. Prior to and even after 6 weeks LMP, many individuals do not know they are pregnant—particularly those who have irregular cycles, who have certain medical conditions, who have been using contraceptives, or who are breastfeeding.

73. Even for those with highly regular 4-week cycles, 6 weeks LMP is a mere 2 weeks after they will have missed their period.

74. Moreover, Tennessee's existing regulations and restrictions already delay pregnant people's ability to access abortion care. To begin, Tennessee prohibits state Medicaid funding for abortion except in cases of rape, incest, or to save the patient's life. Tenn. Code Ann. § 9-4-5116. Similarly, Tennessee does not allow even private insurance coverage of abortion in state exchanges established by the Affordable Care Act. *Id.* § 56-26-134. As a result, those seeking abortion in the state often need to pay for the procedure out of pocket. Attempting to make financial arrangements to pay for an unexpected medical expense delays many patients' access to abortion care.

75.     Tennessee also prohibits the use of telemedicine for abortion even though 96 percent of Tennessee's counties lack health centers that perform abortion and 63 percent of Tennessee women live in those counties.[16] Tenn. Code Ann. § 63-6-241.

76.     Further compounding these issues, Tennessee has a mandatory delay law, which requires that patients seeking an abortion meet with a physician in person at least 48 hours before the abortion in order to receive certain state-mandated information. Tenn. Code Ann. § 39-15-202(a)-(h).[17] The mandatory delay law does not allow the physician to provide the information using teleconference or over the telephone, requiring patients to make a second, unnecessary trip to the provider.

77.     And, for patients who are minors, they must obtain parental consent before they can have an abortion, unless they first go to court and can persuade a judge to grant them a judicial bypass. Tenn. Code Ann. § 37-10-303.

78.     Unsurprisingly, the vast majority of abortions in Tennessee take place after 6 weeks LMP.

79.     At Choices Memphis in 2019, less than 5 percent of its patients who received an abortion did so before 6 weeks LMP. Choices Memphis provides abortion care only through 16 weeks LMP. No fetus is viable at 16 weeks LMP. Under the Bans, Choices Memphis will be prohibited from providing all abortion care except those sought before 6 weeks LMP.

---

[16] Rachel K. Jones, Elizabeth Witwer, & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2017* at 18, Guttmacher Inst. (Sept. 2019), https://www.guttmacher.org/sites/default/files/report_pdf/abortion-incidence-service-availability-us-2017.pdf.

[17] The 48-hour delay and in-person informed consent requirements have been challenged in another lawsuit; a decision in that case is pending. *See Adams & Boyle, P.C. v. Slatery*, No. 3:15-cv-00705 (M.D. Tenn. trial concluded Sept. 26, 2019).

80. At PPTNM's clinics in 2019, less than 2 percent of its patients who received an abortion did so before 6 weeks LMP. The latest any of PPTNM's clinics provide abortion care is 19 weeks, 6 days LMP. No fetus is viable at 19 weeks, 6 days LMP. Under the Bans, PPTNM will be prohibited from providing all abortion care except those sought before 6 weeks LMP.

81. At KCRH in 2019, less than 20 percent of its patients who received an abortion did so before 7 weeks LMP.[18] KCRH provides abortion care only before 15 weeks LMP. No fetus is viable at 15 weeks LMP. Under the Bans, KCRH will be prohibited from providing all abortion care except those sought before 6 weeks LMP.

82. At carafem in 2019, the majority of its patients who received an abortion did so before 7 weeks LMP.[19] Carafem provides abortion care only before 14 weeks LMP. No fetus is viable before 14 weeks LMP. Under the Bans, carafem will be prohibited from providing all abortion care except those sought before 6 weeks LMP.

83. After 19 weeks, 6 days LMP, abortion care in Tennessee is extremely limited and is offered only in the hospital setting.

84. Dr. Zite provides pre-viability abortion care, including after 19 weeks, 6 days LMP, pursuant to her hospital's practices. At her hospital, pregnancy termination may be offered prior to viability in two limited circumstances: (1) for significant fetal indications and (2) for maternal health indications.

85. Among the fetal conditions that may permit Dr. Zite to offer her patients pre-viability abortion care include cases in which the fetus lacks organs or organs that sufficiently develop for survival, such as when a fetus would be born without kidneys or with lungs that never

---

[18] KCRH does not track the number of abortions it provides before 6 weeks LMP.
[19] Carafem does not track the number of abortions it provides before 6 weeks LMP.

develop; or if the fetus has anencephaly, a lack of brain development, a hypoplastic left heart, catastrophic amniotic band syndrome, or severe skeletal dysplasia.

86. For maternal health indications, Dr. Zite may offer pre-viability abortion care only where the patient has a health condition that is sufficiently severe such that pregnancy termination is permitted under hospital policy. Hospital practice requires two physicians to agree that the patient has such a severe health condition. Some examples of the maternal health indications for which Dr. Zite may provide abortion care at her hospital are severe preeclampsia (very high blood pressure), maternal heart failure, inevitable abortion, and premature rupture of the membranes.

87. At Dr. Zite's hospital, patients are offered termination after a neonatologist, perinatologist, or maternal fetal medicine specialist determines that the fetus is not viable. For maternal health indications, if it is determined that the fetus is viable, the patient will either receive a caesarian section or labor will be induced and all life-saving measures will be taken.

88. Under the Bans, Dr. Zite will be prohibited from providing any of the abortion care she provides at her hospital unless it fits within the medical emergency affirmative defense.

89. Each of the Cascading Bans proscribes pre-viability abortions and therefore is unconstitutional.

90. Each of the Cascading Bans is also unconstitutional because it either arbitrarily proscribes abortions without regard to viability or usurps physician discretion by "plac[ing] viability . . . at a specific point in the gestation period," *Colautti*, 439 U.S. at 388 (quoting *Danforth*, 428 U.S. at 64), or by "proclaim[ing] one of the elements entering into the ascertainment of viability"—gestational age—the "single factor." *Id.* at 388-89.

C.  The Reason Bans Prohibit Pre-Viability Abortion and Are Unconstitutionally Vague.

91.     Each of the Reason Bans proscribes performing an abortion if the person performing the abortion "knows" it is being sought "because of" a Prohibited Reason. Act § 39-15-217(b)-(d).

92.     To the extent each of the Reason Bans prevents Plaintiffs from providing pre-viability abortion care, it proscribes some pre-viability abortions and is therefore unconstitutional.

93.     Moreover, the Reason Bans are also unconstitutionally vague. None of the Reason Bans specifies whether abortions are proscribed if the Prohibited Reason is the only reason, the main reason, a significant reason, one among many potential reasons, or even just a factor that an individual considered. Accordingly, Plaintiffs do not know what it means for an abortion to be sought "because of" a Prohibited Reason.

94.     The Tennessee Criminal Code defines the culpable mental state of "knowing" as "a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). Under this definition, Tennessee courts have allowed knowledge to be proven through circumstantial evidence. *See, e.g.*, *Wofford v. State*, 358 S.W. 2d 302, 304 (Tenn. 1962) (holding that actual knowledge is "a fact question which may be determined by the jury from circumstantial evidence under all the facts in the case").

95.     A patient's reasons for seeking abortion are often myriad and complex. As the Supreme Court has recognized, a patient's decision to seek an abortion is one of the "most intimate and personal choices a person may make in a lifetime, choices central to personal

24

dignity and autonomy, [and] central to the liberty protected by the Fourteenth Amendment." *Casey*, 505 U.S. at 851.

96.     Prior to performing an abortion, the Plaintiffs provide counseling designed not to favor any option over another, which means they listen to, support, and provide information to the patient, without indicating a specified course of action. That process is designed to ensure that patients feel comfortable sharing their concerns and issues with their clinician so that clinicians can provide them all of the information they need to make an informed choice among their options, including terminating the pregnancy; carrying the pregnancy to term and parenting; and carrying to term and placing the baby for adoption. In addition, the process is designed to ensure that the patient's choice is voluntary and not coerced.

97.     Although some of Plaintiffs' patients disclose at least some information about the reasons they are seeking an abortion during these non-directive discussions, Plaintiffs do not require that patients disclose any or all of their reasons for seeking an abortion, and many patients do not do so.

98.     When Plaintiffs' patients do disclose reasons, they mention a host of reasons, including that it is simply not the right time for them to have a child or that it would negatively impact their career, school, finances, existing children, or other relationships.

99.     At times, Plaintiffs' patients have merely asked about the sex of the fetus, or otherwise raised issues relating to the race or sex of the fetus. For example, Plaintiffs have treated patients experiencing racism from their families around a biracial relationship or who inquire about the sex of the fetus even after they have decided on having an abortion. Plaintiffs have also treated patients who have expressed concern over their own age and the pregnancy

25

risks that go with that, or concerns that the child may have genetic or developmental conditions or Down syndrome. It is unclear how the Reason Bans might be implicated in these situations.

100.    While Dr. Zite's hospital practice does not permit abortions solely on the basis of a diagnosis of Down syndrome, abortion may be offered if there are significant additional findings noted on an ultrasound that compromise intact survival or that indicate that the fetus will never achieve viability. For example, if Down syndrome is accompanied by other conditions like a cardiac defect or significant cystic hygromas, it is possible that a fetus diagnosed with Down syndrome would fall within hospital practice permitting an abortion. It is unclear how the Reason Bans might be implicated in these cases.

101.    It is also unclear what circumstances could after the fact be used to establish that a physician knew that an abortion was sought "because of" a Prohibited Reason because it is unclear what "because of" means under the Reason Bans. For example, if a patient mentions to a counselor that she is experiencing challenges caring for an existing child with Down syndrome, is that a circumstantial fact that could establish that the patient was seeking an abortion "because of" a potential for Down syndrome? What if a patient mentions to another patient in the waiting room that she already has three boys at home, and staff overhears this comment, is that a fact that could be used to establish that the physician knew the abortion was sought "because of" sex?

102.    Because of the uncertainty surrounding what the Reason Bans prohibit and how they will be enforced, and the severe personal cost including significant criminal penalties (up to 15 years in prison along with a $10,000 fine) and possible loss of licensure, Plaintiffs will be unable to provide abortions to any patient who ever even references any of the Prohibited Reasons, or whose condition is impacted in any way by one of the Prohibited Reasons. Otherwise, providing this care will expose Plaintiff physicians and Plaintiff health centers'

26

physicians to a risk of severe criminal penalty and licensure action and will expose Plaintiff health centers to loss of licensure.

103. Given these issues, each of the Reason Bans do not give Plaintiffs fair notice because they fail to provide "[a] person of ordinary intelligence" with "a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). By the same token, each of the Reason Bans does not provide "explicit standards for those who apply them" to avoid "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108; *see also Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); *Papachristou*, 405 U.S. at 170 (same). Each of the Reason Bans is therefore unconstitutionally vague.

D. The Medical Emergency Affirmative Defenses Are Unconstitutionally Vague.

104. Each of the Bans lacks a valid medical emergency exception.

105. Under the Bans, "medical emergency" is defined in terms of the "physician's *good faith* medical judgment, based upon the facts known to the physician at the time." Act §§ 39-15-216(a)(4), 217(a)(3) (incorporating Tenn. Code Ann. § 39-15-211(a)(3) by reference) (emphasis added). Consistent with other Tennessee abortion laws, *see, e.g.*, Tenn. Code Ann. §§ 39-15-202, 211, 212, this means that a physician's determination that there was a "medical emergency" will be evaluated subjectively.

106. However, under the language of the Bans, the medical emergency affirmative defense may be asserted only if "in the physician's *reasonable* medical judgment, a medical emergency prevented compliance with the provision." *See* Act §§ 39-15-216(a)(4), (e)(1), 217(a)(3), (e)(1) (emphasis added); Tenn. Code Ann. § 39-15-211(a)(3). Contrary to the definition of "medical emergency," this language means that a physician's medical emergency

27

determination will be evaluated against others' determinations of whether the physician acted reasonably—in other words, objectively.

107.    Thus, the Bans' medical emergency affirmative defense introduces an objective standard combined with what appears to be an otherwise subjective standard for medical emergency determinations. As a result, Plaintiffs do not understand how medical emergency determinations will be evaluated under the Bans. Moreover, because the Bans' affirmative defenses lack any scienter requirement for physicians' medical emergency determinations, physicians will be held strictly liable for even good faith determinations later found "unreasonable."

108.    Further, medical emergency determinations are often complex and subject to disagreement. As a result, Plaintiffs will be unable to provide care to patients in numerous "medical emergencies" because it is possible that other physicians may later challenge their good faith medical judgments as unreasonable, placing them at risk for severe criminal penalties.

109.    Thus, the Bans' medical emergency affirmative defenses marry an objective standard "with strict liability for even good faith determinations" that "'could have a profound chilling effect on the willingness of physicians to perform abortions,'" and they "threaten[] to inhibit the exercise of constitutionally protected rights." *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 205 (6th Cir. 1997) (quoting *Colautti*, 439 U.S. at 396).

110.    As the Sixth Circuit held under identical circumstances, this lack of clarity "renders these exceptions unconstitutionally vague, because physicians cannot know the standard under which their conduct will ultimately be judged." *Id.*

111.    Because each of the Bans lacks valid medical emergency exceptions, this also renders all of the Bans unconstitutional, "for the essential holding of *Roe* forbids a State to

28

interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." *Casey*, 505 U.S. at 880 (citing *Roe v. Wade*, 410 U.S. 113, 164 (1973)).

E. Without an Injunction, the Bans Will Inflict Irreparable Harm.

112. If the Bans are permitted to take effect, Plaintiffs' patients will be subjected to significant and irreparable constitutional, medical, emotional, and other harms for which no adequate remedy at law exists.

113. Specifically, the Cascading Bans will bar Plaintiffs from providing the vast majority of pre-viability abortions that their patients seek. Absent an injunction, Plaintiffs will have no choice but to turn away patients in need of abortion care once fetal cardiac activity is detected at approximately 6 weeks LMP (or at any of the later gestational ages in the cascade, to the extent earlier gestations are struck down).

114. Some of Plaintiffs' patients will be prevented from obtaining abortion care entirely and will be forced to carry their pregnancies to term against their will—for some, even in the face of significant health risks that nevertheless would not qualify as a "medical emergency" under the Bans. Indeed, some of Plaintiffs' patients may not receive care even when their physicians in good faith believe they are experiencing "medical emergencies" because physicians will be prevented by threat of serious criminal penalty from providing care under the exception's narrow, vague terms.

115. Some of Plaintiffs' patients will attempt to seek abortions via unsafe means. Others will be forced to delay seeking an abortion (increasing the risk to their health and well-being) and will have to attempt to obtain care in other states (and face all the associated economic and logistical burdens).

116. The burden of the Cascading Bans will fall most acutely on the neediest patients, because financial resources often dictate how quickly patients are able to receive the abortion care they seek. The overwhelming majority of Plaintiffs' patients are poor or low income, and Tennessee data shows that the majority of abortion patients in the state are non-white. These are the very communities that stand to be harmed the most by the Cascading Bans.

117. The Reason Bans, if they take effect, would prohibit Plaintiffs' patients from obtaining pre-viability abortions if the provider "knows" that a patient's abortion decision is "because of" a Prohibited Reason.

118. Moreover, because it is unclear what "because of" means in this context, Plaintiffs will be unable to provide abortion care to any patient who even references or whose care implicates one of the Prohibited Reasons lest they risk 15 years in prison, a $10,000 fine and more.

119. Plaintiffs wish to continue providing safe and compassionate pre-viability abortion care to patients who have decided to terminate their pregnancies, regardless of their reason for doing so.

## VII. CLAIMS FOR RELIEF

### COUNT I

### (Substantive Due Process – Bans)

120. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 119.

121. By prohibiting pre-viability abortions, the Bans violate Plaintiffs' patients' rights to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT II

### (Substantive Due Process – Bans)

122.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 119.

123.    By failing to include valid medical emergency exceptions, the Bans violate Plaintiffs' patients' rights to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT III

### (Due Process/Vagueness – Reason Bans)

124.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 119.

125.    By failing to give Plaintiffs fair notice of how to comply with the mandates of the Reason Bans, and by imposing severe criminal penalties, the Reason Bans are unconstitutionally vague and violate Plaintiffs' right to due process as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT IV

### (Due Process/Vagueness – Medical Emergency Affirmative Defense)

126.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 119.

127.    By failing to give Plaintiffs fair notice of how to ensure their conduct falls within the medical emergency affirmative defenses to the Bans, and by imposing severe criminal penalties, the medical emergency affirmative defenses are unconstitutionally vague and violate

Plaintiffs' right to due process as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## VIII.    REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A.    Immediately issue a temporary restraining order and/or preliminary injunction, later to be made permanent, restraining Defendants, their employees, agents, and successors in office from enforcing the Bans to the extent those provisions apply to pre-viability abortions;

B.    Enter a judgment declaring that the Bans are unconstitutional as applied to pre-viability abortions, under the Fourteenth Amendment to the United States Constitution and in violation 42 U.S.C. § 1983;

C.    Award Plaintiffs their reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

D.    Grant such other or further relief as the Court deems just, proper, and equitable.

32

Dated: June 19, 2020

Respectfully submitted,

/s/ Thomas Castelli
Thomas H. Castelli (No. 24849)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorney for Plaintiffs*

Jessica Sklarsky*
Rabia Muqqadam*
Francesca Cocuzza*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Tel: (917) 637-3600
Fax: (917) 637-3666
jsklarsky@reprorights.org
rmuqqadam@reprorights.org
fcocuzza@reprorights.org

*Attorneys for Memphis Center for Reproductive Health and Nikki Zite, M.D., M.P.H.*

Susan Lambiase*
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4405
Fax: (212) 247-6811
susan.lambiase@ppfa.org

*Attorney for Planned Parenthood of Tennessee and North Mississippi and Kimberly Looney, M.D.*

33

Anjali Dalal*
Andrew Beck*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
adalal@aclu.org
abeck@aclu.org

*Attorneys for Knoxville Center for Reproductive
Health and Femhealth USA, Inc.*

\* Application for admission *pro hac vice*
forthcoming

34