**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MEMPHIS CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself, its physicians and staff, and its patients; PLANNED PARENTHOOD OF TENNESSEE AND NORTH MISSISSIPPI, on behalf of itself, its physicians and staff, and its patients; KNOXVILLE CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself, its physicians and staff, and its patients; FEMHEALTH USA, INC., d/b/a CARAFEM, on behalf of itself, its physicians and staff, and its patients; DR. KIMBERLY LOONEY, on behalf of herself and her patients; and DR. NIKKI ZITE, on behalf of herself and her patients, | CIVIL ACTION<br><br>CASE NO. 3:20-cv-00501<br><br>JUDGE CAMPBELL |

       Plaintiffs,

       v.

HERBERT H. SLATERY III, Attorney General of Tennessee, in his official capacity; LISA PIERCEY, M.D., Commissioner of the Tennessee Department of Health, in her official capacity; RENE SAUNDERS, M.D., Chair of the Board for Licensing Health Care Facilities, in her official capacity; W. REEVES JOHNSON, JR., M.D., President of the Tennessee Board of Medical Examiners, in his official capacity; HONORABLE AMY P. WEIRICH, District Attorney General of Shelby County, Tennessee, in her official capacity; GLENN FUNK, District Attorney General of Davidson County, Tennessee, in his official capacity; CHARME P. ALLEN, District Attorney General of Knox County, Tennessee, in her official capacity; and TOM P. THOMPSON, JR., District Attorney General for Wilson County, Tennessee, in his official capacity,

       Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

    I.     THE ACT'S PRE-VIABILITY ABORTION BANS ..................................................... 2

    II.    ABORTION CARE IN TENNESSEE.............................................................................. 4

    III.   IMPACT OF THE BANS ON ABORTION CARE IN TENNESSEE ............................ 7

        A.    The Bans Will Prohibit the Vast Majority of Pre-Viability Abortion Care .................. 7

        B.    The Reason Bans Do Not Make Clear What Pre-Viability Abortion Care They
             Prohibit. .................................................................................................................... 9

        C.    The Bans Will Chill the Provision of Abortion Care in Medical Emergencies........... 11

    IV.   THE BANS WILL IMMEDIATELY AND IRREPARABALY HARM PLAINTIFFS'
         PATIENTS. ................................................................................................................. 13

ARGUMENT ......................................................................................................................... 13

    I.     APPLICABLE LEGAL STANDARDS ........................................................................ 13

    II.    PLAINTIFFS WILL SUCCEED ON THE MERITS.................................................... 14

        A.    The Bans Unconstitutionally Proscribe Pre-Viability Abortion Care......................... 14

        B.    The Reason Bans Are Unconstitutionally Vague. ...................................................... 17

        C.    The Bans Are Unconstitutional Because They Do Not Have Valid Medical
             Emergency Exceptions. ............................................................................................. 20

    III.   ABSENT AN INJUNCTION, PLAINTIFFS AND THEIR PATIENTS WILL SUFFER
         IRREPARABLE HARM.............................................................................................. 22

    IV.   THE BALANCE OF HARMS FAVORS INJUNCTIVE RELIEF................................ 23

    V.    THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF INJUNCTIVE
         RELIEF. ....................................................................................................................... 24

    VI.   A BOND IS NOT NECESSARY IN THIS CASE........................................................ 24

CONCLUSION ...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*,
 796 F.3d 636 (6th Cir. 2015) ............................................................ 14, 25

*Am. Civil Liberties Union of Ky. v. McCreary Cty.*,
 354 F.3d 438 (6th Cir. 2003) .................................................................. 23

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
 698 F.3d 885 (6th Cir. 2012) .................................................................. 25

*Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*,
 714 F.3d 424 (6th Cir. 2013) .................................................................. 25

*Bellotti v. Baird*,
 443 U.S. 622 (1979) ................................................................................ 23

*Carhart v. Stenberg*,
 192 F.3d 1142 (8th Cir. 1999), *aff'd*, 530 U.S. 914 (2000) .................... 16

*Chamber of Commerce of U.S. v. Edmondson*,
 594 F.3d 742 (10th Cir. 2010) ............................................................... 24

*Colautti v. Franklin*,
 439 U.S. 379 (1979) ...................................................................... 7, 15, 21

*DesJarlais v. State, Office of Lieutenant Governor*,
 300 P.3d 900 (Alaska 2013), *reh'g denied* ............................................ 16

*Doe v. Bolton*,
 410 U.S. 179 (1973) ................................................................................ 15

*Edwards v. Beck*,
 786 F.3d 1113 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 895 (2016) ....... 16

*Gonzales v. Carhart*,
 550 U.S. 124 (2007) ................................................................................ 14

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972) ................................................................................ 18

*Guam Soc'y of Obstetricians & Gynecologists v. Ada*,
 962 F.2d 1366 (9th Cir. 1992), *cert. denied*, 506 U.S. 1011 (1992) ....... 16

Case 3:20-cv-00501   Document 7   Filed 06/22/20   Page 3 of 35 PageID #: 97

*Hope Clinic v. Ryan*,
　195 F.3d 857 (7th Cir. 1999) ................................................................22

*In re Initiative Petition No. 349, State Question No. 642*,
　838 P.2d 1 (Okla. 1992), *cert. denied*, 506 U.S. 1071 (1993) ...................16

*In re Initiative Petition No. 395, State Question No. 761*,
　286 P.3d 637(Okla. 2012), *cert. denied*, 568 U.S. 978 (2012) ..................16

*Isaacson v. Horne*,
　716 F.3d 1213 (9th Cir. 2013), *cert. denied*, 571 U.S. 1127 (2014).................. 15, 16

*Jackson Women's Health Org. v. Dobbs*,
　945 F.3d 265 (5th Cir. 2019) .................................................................16

*Jackson Women's Health Org. v. Dobbs*,
　951 F.3d 246 (5th Cir. 2020) .................................................................16

*Jane L. v. Bangerter*,
　102 F.3d 1112 (10th Cir. 1996), *cert. denied*, 520 U.S. 1274 (1997)......................16

*Kolender v. Lawson*,
　461 U.S. 352 (1983) ......................................................................... 18, 20

*Leonardson v. City of E. Lansing*,
　896 F.2d 190 (6th Cir. 1990) .................................................................20

*Little Rock Family Planning Servs. v. Rutledge*,
　397 F. Supp. 3d 1213 (E.D. Ark. 2019) ..............................................17

*Mich. State A. Philip Randolph Inst. v. Johnson*,
　833 F.3d 656 (6th Cir. 2016) ............................................................ 23, 25

*MKB Mgmt. Corp. v. Stenehjem*,
　795 F.3d 768 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 981 (2016)...........................16

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
　55 F.3d 1171 (6th Cir. 1995) .................................................................25

*Papachristou v. City of Jacksonville*,
　405 U.S. 156 (1972).............................................................................20

*Planned Parenthood Ariz., Inc. v. Humble*,
　753 F.3d 905 (9th Cir. 2014) .................................................................23

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,

iv

822 F.2d 1390 (6th Cir. 1987) ....................................................................................... 24

*Planned Parenthood of Cent. Mo. v. Danforth*,
428 U.S. 52 (1976) ........................................................................................................ 15

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*,
265 F. Supp. 3d 859 (S.D. Ind. 2017), *aff'd*, 888 F.3d 300 (7th Cir. 2018),
*and cert. denied in part and granted in part, judgment rev'd in part on other grounds*
*sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) ................... 17

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*,
888 F.3d 300 (7th Cir. 2018) ........................................................................................ 17

*Planned Parenthood of Se. Pa. v. Casey*,
505 U.S. 833 (1992) ........................................................................................... *passim*

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
738 F.3d 786 (7th Cir. 2013) ........................................................................................ 23

*Preterm-Cleveland v. Himes*,
940 F.3d 318, (6th Cir. 2019), *reh'g en banc granted, opinion vacated*,
944 F.3d 630 (6th Cir. 2019) ........................................................................................ 16

*Preterm-Cleveland v. Yost*,
394 F. Supp. 3d 796 (S.D. Ohio 2019) ....................................................................... 29

*Roe v. Wade*,
410 U.S. 113 (1973) .............................................................................................. 14, 23

*Sojourner T. v. Edwards*,
974 F.2d 27 (5th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993) .............................. 16

*State v. Briggs*,
343 S.W.3d 106 (Tenn. Crim. App. 2010) ................................................................. 21

*Taubman Co. v. Webfeats*,
319 F.3d 770 (6th Cir. 2003) ........................................................................................ 23

*United States v. Caseer*,
399 F.3d 828 (6th Cir. 2005) ................................................................................. 18, 20

*W. Ala. Women's Ctr. v. Williamson*,
900 F.3d 1310 (11th Cir. 2018) .................................................................................. 22

*Whole Woman's Health v. Hellerstedt*,
136 S. Ct. 2292 (2016) ......................................................................................... 14, 17

*Wofford v. State*,
  358 S.W. 2d 302 (Tenn. 1962).................................................................................19

*Women's Med. Prof'l Corp. v. Voinovich*,
  130 F.3d 187 (6th Cir. 1997), *cert. denied*, 523 U.S. 1036 (1998) ....................16, 20

*Wyo. Nat'l Abortion Rights Action League v. Karpan*,
  881 P.2d 281 (Wyo. 1994).....................................................................................16

**Statutes**

Tenn. Code Ann. § 9-4-5116 ......................................................................................8

Tenn. Code Ann. § 37-10-303 ....................................................................................9

Tenn. Code Ann. § 39-11-204 ..................................................................................12

Tenn. Code Ann. § 39-11-301 ..................................................................................21

Tenn. Code Ann. § 39-15-202 ..............................................................................8, 12

Tenn. Code Ann. § 39-15-211 .........................................................................*passim*

Tenn. Code Ann. § 39-15-212 ....................................................................................6

Tenn. Code Ann. § 40-35-111 ....................................................................................4

Tenn. Code Ann. § 56-26-134 ....................................................................................8

Tenn. Code Ann. § 63-6-101 ......................................................................................4

Tenn. Code Ann. § 63-6-214 ......................................................................................4

**Rules and Regulations**

Tenn. Comp. R. & Regs. 0880-02-.12 .......................................................................4

Tenn. Comp. R. & Regs. 1200-08-10-.03 ..................................................................4

**Other Authorities**

H.B. 2263/S.B. 2196 § 39-15-214 .............................................................................7

vi

H.B. 2263/S.B. 2196 § 39-15-216 ................................................................................3

H.B. 2263/S.B. 2196 § 39-15-217 ..........................................................................4, 21

Tenn. Office of the Governor, *Gov. Bill Lee Introduces Comprehensive Pro-Life Legislation* (Jan. 23, 2020), https://www.tn.gov/governor/news/2020/1/23/gov--bill-lee-introduces-comprehensive-pro-life-legislation.html................................................................2

Tenn. Dep't of Health, Div. of Vital Records & Statistics, *Selected Induced Termination of Pregnancy (ITOP) Data, According to Age and Race of Woman, Tennessee and Department of Health Regions, Resident Data, 2018*, at 1 (2018) https://www.tn.gov/content/dam/tn/health/documents/vital-statistics/itop/ITOP2018.pdf .........5

## PRELIMINARY STATEMENT

In the early morning hours of June 19, 2020, the Tennessee legislature passed House Bill 2263 / Senate Bill 2196 (the "Act"). The Act is the culmination of the state's relentless efforts to eliminate abortion within its borders through a multitude of pre-viability bans.[1] The Bans will go into effect as soon as the Act is signed by Governor Bill Lee. Absent intervention by this Court, the bans will immediately inflict irreparable harm on Plaintiffs' patients each and every day they remain in effect by depriving Plaintiffs' patients of their constitutional right to abortion.

First, the Act criminalizes the provision of abortion care as soon as fetal cardiac activity develops—typically around 6 weeks from the pregnant person's last menstrual period ("LMP")[2]—and then, upon the invalidation of that ban, at a series of specified points in the first and second trimesters, irrespective of fetal viability (the "Cascading Bans"). Act §§ 39-15-216(c)(1)-(12), (h). Second, the Act also criminalizes the provision of abortion care where the provider "knows" that an abortion is being sought "because of" the race or sex of the fetus, or "a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome" (the "Reason Bans") (together with the Cascading Bans, the "Bans"). *Id.* §§ 39-15-217(b)-(d). Physicians who violate the Bans are subject to severe criminal penalties that include lengthy prison sentences and hefty monetary penalties, and place their medical licenses at risk.

The Bans unquestionably proscribe abortion prior to viability, in violation of decades of clear and unwavering Supreme Court precedent. In fact, this is the Bans' *only* application. Tennessee already prohibits abortion to the fullest extent permitted under the Constitution

---

[1] The Act also institutes other requirements that are not being challenged in this lawsuit. *See* Act §§ 39-15-215, 218.

[2] In the medical context, pregnancy is measured from the first day of a patient's LMP. A full-term pregnancy is approximately forty weeks LMP. Looney Decl. ¶ 2 n.1; Norton Decl. ¶ 10.

1

through a preexisting ban on post-viability abortion (which Plaintiffs do not challenge), and the Act explicitly does nothing to disturb that ban. Tenn. Code Ann. § 39-15-211(b)(1); Act §§ 39-15-216(i)(2), 217(j)(2). While this alone necessitates injunctive relief, the Bans also suffer from other fatal constitutional infirmities, including vagueness and lack of adequate medical emergency exceptions.

Governor Lee introduced the Act to the Tennessee legislature, lauding it as a "monumental step" in making Tennessee "one of the most pro-life states in the country."[3] As soon as the Governor signs the bill—which is a certainty—the Bans will force Plaintiffs to turn away nearly all their patients seeking abortion. Enforcement of the Bans will violate Plaintiffs' patients' constitutional right to abortion and Plaintiffs' constitutional right to not be governed by vague laws, causing both Plaintiffs and their patients immediate and irreparable harm. As such, Plaintiffs respectfully request that the Court act expeditiously and grant Plaintiffs' request for immediate injunctive relief.

## STATEMENT OF FACTS

### I. THE ACT'S PRE-VIABILITY ABORTION BANS

The Act brazenly defies clear Supreme Court precedent by instituting numerous pre-viability abortion bans.[4] First, the Cascading Bans prohibit abortion as soon as a "fetal

---

[3] Tenn. Office of the Governor, *Gov. Bill Lee Introduces Comprehensive Pro-Life Legislation* (Jan. 23, 2020), https://www.tn.gov/governor/news/2020/1/23/gov--bill-lee-introduces-comprehensive-pro-life-legislation.html.

[4] In a misguided effort to overcome this binding precedent, the Act includes numerous legislative findings—ostensibly to support Tennessee's interest in banning pre-viability abortions. *See, e.g.*, Act § 39-15-214(a)(1)-(77). While these findings contain a multitude of errors, Plaintiffs address only those findings relevant to the issue before this Court—viability (since no state interest is "strong enough to support a prohibition of abortion" before viability). *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992).

2

heartbeat"[5] is detected, and then—upon the invalidation of that ban—at or after 6, 8, 10, 12, 15, 18, 20, 21, 22, 23, and 24 weeks LMP.[6] *See* Act §§ 39-15-216(c)(1)-(12). Second, the Reason Bans prohibit abortion when the provider "knows" the abortion is being sought "because of" the race or sex of the fetus, or "a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome." *Id.* §§ 39-15-217(b)-(d).

Underscoring the complete unconstitutionality of the Bans is the fact that their *only* application is to pre-viability abortion. Tennessee law already prohibits abortion after viability, and the Bans explicitly do not repeal this existing post-viability ban. *See* Tenn. Code Ann. § 39-15-211(b)(1); Act §§ 39-15-216(i)(2), 217(j)(2) ("This section shall not be construed as a repeal, either express or implied, of any provision of this part as it existed prior to the effective date of this act.").

The Bans criminalize the provision of abortion in all cases, including rape, incest, and lethal fetal conditions—irrespective of whether the embryo or fetus is viable. The Bans only create affirmative defenses to criminal prosecution if "in the physician's reasonable medical judgment, a medical emergency prevented compliance with the provision." Act §§ 39-15-216(e)(1), 217(e)(1).

These affirmative defenses do not cover many serious medical conditions that would place the pregnant person's health at serious risk, simply because the condition is not acute

---

[5] "Fetal heartbeat" is defined as "cardiac activity or the steady and repetitive rhythmic contraction of the heart of a[ fetus]." Act § 39-15-216(a)(2). Referring to embryonic cardiac activity as a "fetal heartbeat" is misleading both because it is simply a group of cells with electrical activity (not any kind of cardiovascular system) and an embryo does not develop into a fetus until approximately 9 weeks LMP. Looney Decl. ¶ 9.
[6] Under the Cascading Bans, abortion is still permitted at 6 weeks LMP if "the physician affirmatively determines and records in the pregnant [person's] medical record that, in the physician's good faith medical judgment, the [embryo or fetus] does not have a fetal heartbeat at the time of the abortion." Act § 39-15-216(c)(2).

3

enough to "necessitate" an "immediate" abortion. Zite Decl. ¶ 18. By definition, "medical emergency" includes only those conditions that, "in the physician's good faith medical judgment, based upon the facts known to the physician at the time, so complicate[] the [person]'s pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant [person] or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant [person] that delay in the performance or inducement of the abortion would create." Act §§ 39-15-216(a)(4), 217(a)(3) (incorporating Tenn. Code Ann. § 39-15-211(a)(3) by reference). Further, the Bans specify that "a medical emergency does not include a claim or diagnosis related to the [pregnant person's] mental health or a claim or diagnosis that the [pregnant person] will engage in conduct which would result in her death or substantial and irreversible impairment of a major bodily function." *Id.* §§ 39-15-216(a)(4), 217(a)(3).

A physician's violation of any of the Bans is a Class C felony, *id.* §§ 39-15-216(b)(2), (c)(1)-(12), 217(f), imposing severe criminal penalties, including imprisonment of 3 to 15 years and/or a fine not to exceed $10,000. *See* Tenn. Code Ann. § 40-35-111(b)(3). Violation of the Bans likewise subjects physicians to licensure penalties, including revocation, *see* Tenn. Code Ann. §§ 63-6-101(a)(3), 63-6-214(b); Tenn. Comp. R. & Regs. 0880-02-.12(1), and subjects health centers licensed as ambulatory surgical treatment centers ("ASTCs") to licensure penalties, Tenn. Code Ann. § 68-11-207(a)(3); Tenn. Comp. R. & Regs. 1200-08-10-.03(1)(d); *see also* Looney Decl. ¶ 12; Rovetti Decl. ¶ 8.

## II.    ABORTION CARE IN TENNESSEE

There are generally two methods of providing abortion care: medication abortion and procedural abortion. Looney Decl. ¶ 14. Medication abortion typically involves the ingestion of

two medications—mifepristone and misoprostol—which cause the patient to pass the pregnancy at a place of her choosing, in a process similar to miscarriage. *Id.* Procedural abortion involves the use of instruments to gently dilate the cervix and evacuate the contents of the uterus. *Id.* ¶ 16. Procedural abortion is a brief and straightforward procedure; it involves no incision, no need for general anesthesia, and is almost always performed in an outpatient setting. *Id.*

In Tennessee, an abortion may be obtained at one of eight outpatient health centers[7] or, under limited circumstances, in a hospital. Terrell Decl. ¶ 10; Zite Decl. ¶¶ 8-10. At any of these providers, consistent with Tennessee law, abortion is not provided once a fetus has attained viability. Tenn. Code Ann. § 39-15-211(b)(1). None of the eight outpatient health centers in Tennessee provides abortion care beyond 19 weeks, 6 days LMP—a point in pregnancy at which no fetus is viable. Grant Decl. ¶ 2; Looney Decl. ¶ 18; Rovetti Decl. ¶ 2; Terrell Decl. ¶ 8; *see* Norton Decl. ¶¶ 9, 20.

After 19 weeks, 6 days LMP, pre-viability abortion may be accessed in a hospital in Tennessee. Plaintiff Dr. Nikki Zite provides pre-viability abortion care at a hospital in Knoxville in two limited circumstances, pursuant to hospital policy. Zite Decl. ¶¶ 8-10. First, Dr. Zite can offer abortion care for significant fetal indications. These fetal conditions include cases in which the fetus lacks organs or organs that will sufficiently develop for survival, such as when a fetus would be born without kidneys or with lungs that never develop; or if the fetus has anencephaly,

---

[7] Plaintiffs Choices, PPTNM, KCRH, and carafem represent seven of the eight outpatient health centers, and they provide the vast majority of the more than 10,000 abortions performed in Tennessee each year. *See* Grant Decl. ¶ 15; Looney Decl. ¶ 21; Rovetti Decl. ¶ 2; Terrell Decl. ¶ 9; Tenn. Dep't of Health, Div. of Vital Records & Statistics, *Selected Induced Termination of Pregnancy (ITOP) Data, According to Age and Race of Woman, Tennessee and Department of Health Regions, Resident Data, 2018*, at 1 (2018), https://www.tn.gov/content/dam/tn/health/documents/vital-statistics/itop/ITOP2018.pdf (indicating that 10,880 abortions were performed in Tennessee in 2018).

5

a lack of brain development, hypoplastic left heart syndrome, catastrophic amniotic band syndrome, and severe skeletal dysplasia. *Id.* ¶ 11. Often such conditions cannot be diagnosed prior to approximately 15 to 20 weeks LMP, and even after a diagnosis, many patients choose to pursue follow-up tests and to consult with multiple professionals to ensure they make the right decision for them. Looney Decl. ¶ 35.

Second, Dr. Zite may offer pre-viability abortion care for maternal health indications. Zite Decl. ¶ 15. These patients are experiencing serious health conditions such as severe preeclampsia (very high blood pressure), heart failure, inevitable abortion, or premature rupture of the membranes. *Id.* ¶ 15. Others may have pre-existing health conditions whose risks are heightened by the ongoing pregnancy or may have serious conditions brought on by the pregnancy itself. *Id.* ¶¶ 14-15.

In either of these two circumstances, patients are offered termination after a neonatologist, perinatologist, or maternal fetal medicine specialist determines that the fetus is not viable.[8] Zite Decl. ¶ 16. Ultimately, whether any particular fetus is or ever will be viable depends on a physician's assessment of multiple factors, including the gestational age of the fetus; the size and sex of the fetus; diagnosed fetal health conditions; plurality of birth (singleton v. multiple); maternal comorbidities; whether antenatal corticosteroids are administered; and whether the delivery occurs at a Level III or IV neonatal intensive care unit ("NICU"), among others. Norton Decl. ¶ 11.[9] The point at which viability occurs differs from pregnancy to pregnancy, and some fetuses are never viable. Looney Decl. ¶ 20; Norton Decl. ¶¶ 9, 16, 19.

_____

[8] Case-by-case assessments of viability are mandated under Tennessee law for all abortions performed after 20 weeks LMP. Tenn. Code Ann. § 39-15-212.
[9] The Act's legislative findings suggest that viability occurs at 22 to 23 weeks LMP. *See* Act §§ 39-15-214(a)(37), (41). These findings are medically incorrect. Norton Decl. ¶¶ 21-22. The

## III.    IMPACT OF THE BANS ON ABORTION CARE IN TENNESSEE

### A.  The Bans Will Prohibit the Vast Majority of Pre-Viability Abortion Care.

Without an injunction, the Bans will prohibit Plaintiffs from providing pre-viability abortion care to nearly all of their patients. Grant Decl. ¶¶ 8-9; Looney Decl. ¶¶ 23-24, 38; Rovetti Decl. ¶¶ 9-10; Terrell Decl. ¶¶ 7, 14; Zite Decl. ¶¶ 17, 21-22. In a typically developing embryo, cells that eventually form the basis for development of the heart later in pregnancy produce cardiac activity that is generally detectible via ultrasound beginning at approximately 6 weeks LMP.[10] Looney Decl. ¶ 9. Patients generally seek abortion care as soon as they are able, but the great majority of abortion patients are simply not able to confirm a pregnancy and schedule and obtain an abortion before 6 weeks LMP. Looney Decl. ¶¶ 26-31 & n.11.

Prior to and even after 6 weeks LMP, many individuals do not know they are pregnant—particularly those with irregular cycles, who have certain medical conditions, who have been using contraception, or who are breastfeeding. Looney Decl. ¶ 26; Rovetti Decl. ¶ 14. In a person with regular monthly periods, fertilization typically occurs 2 weeks post-LMP—that is, 2 weeks

---

extraordinarily rare survival of infants at these ages does not reflect a "reasonable likelihood of the fetus' sustained survival outside the womb." *Colautti v. Franklin*, 439 U.S. 379, 388 (1979); Norton Decl. ¶ 22. In all events, as the Supreme Court has made clear, viability is not the same for every pregnancy, but is a determination that must be made by "the attending physician on the particular facts of the case before him [or her]," and a State may not adopt "weeks of gestation" or any other factor as the determinant of viability. *Colautti*, 439 U.S. at 388-89.

[10] The Act's legislative findings concerning the relevance of fetal cardiac activity conflate the concepts of a viable pregnancy and fetal viability. Norton Decl. ¶ 23. The findings state that "[t]he presence of a fetal heartbeat is the best indicator of a *viable pregnancy*," and that the "detectability of a fetal heartbeat is a strong predictor of survivability to term, especially if the heartbeat is present at eight (8) weeks gestational age or later." Act § 39-15-214(a)(15) (emphasis added). But the viability of a *pregnancy* is distinct from the viability of the *fetus*. Norton Decl. ¶ 23. In common medical parlance, a "viable pregnancy" means only that the fetus is currently alive—*i.e.*, has not miscarried or died—and this has no bearing on whether there is a reasonable likelihood of the fetus' sustained survival outside the womb at that stage of pregnancy, *id.*, which is the legal definition of viability.

7

after the first day of the last menstrual period. Looney Decl. ¶ 27; Rovetti Decl. ¶ 14. Thus, even for those with highly regular, 4-week cycles, 6 weeks LMP is a mere 2 weeks after they will have missed their period. Looney Decl. ¶ 27; Rovetti Decl. ¶ 14.

Moreover, Tennessee's existing array of regulations and restrictions further delay pregnant people's ability to access abortion care. Grant Decl. ¶ 18; Looney Decl. ¶ 33; Rovetti Decl. ¶ 14; Terrell Decl. ¶ 11. To begin, Tennessee prohibits coverage for abortion, except in cases of rape, incest or to save the patient's life by both state Medicaid and private insurance in state exchanges established by the Affordable Care Act. Tenn. Code Ann. §§ 9-4-5116, 56-26-134. Given that the vast majority of Plaintiffs' patients are low-income, it is difficult for them to raise the money to pay for the procedure and related expenses out of pocket. Grant Decl. ¶ 18; Looney Decl. ¶ 30; Rovetti Decl. ¶ 17; Terrell Decl. ¶¶ 9, 25.

Tennessee also prohibits the use of telemedicine for abortion even though 96 percent of Tennessee's counties lack an abortion clinic and 63 percent of Tennessee women live in those counties. Tenn. Code Ann. § 63-6-241. And, Tennessee has a mandatory delay law, which requires patients seeking an abortion to meet with a physician in person at least 48 hours before the abortion in order to receive certain state-mandated information. *Id.* § 39-15-202(a)-(h). As a result, patients must make a second, medically unnecessary trip to the clinic. Grant Decl. ¶ 18; Looney Decl. ¶ 33; Rovetti Decl. ¶¶ 14; Terrell Decl. ¶ 10. Further, for patients who are minors, they must obtain parental consent before they can have an abortion, unless they first go to court and persuade a judge to grant them a judicial bypass. Tenn. Code Ann. § 37-10-303.

Given the challenges of identifying pregnancy at such early gestations and the existing landscape of abortion access in Tennessee, the vast majority of abortions in Tennessee take place after 6 weeks LMP. Grant Decl. ¶ 16 (the majority of carafem's patients); Looney Decl. ¶¶ 21-22

8

(more than 98% of PPTNM's patients); Rovetti Decl. ¶ 13 (more than 80% of KCRH's patients receive an abortion after 6 weeks, 6 days weeks LMP); Terrell Decl. ¶ 14 (approximately 95% of Choices' patients). The Cascading Bans therefore will prohibit the overwhelming majority of abortions in Tennessee.

Moreover, they will also prohibit Dr. Zite from providing pre-viability abortion care to her patients. Zite Decl. ¶¶ 17, 21-22. This is true even for maternal health indications where the threat to her patient's health is serious, and may worsen over time, if the condition has yet to become acute enough to fit within the narrow medical emergency affirmative defense. *Id.* ¶¶ 18-22. For these patients, Dr. Zite will be forced to wait until the patient's health deteriorates to the point that the patient experiences a health crisis—contrary to the standard of care and placing the patient's health at serious and unnecessary risk. *Id.* ¶¶ 21-22.

And, to the extent the Cascading Bans do not prohibit all pre-viability care, the Reason Bans will also independently prohibit some pre-viability care. As discussed *infra*, Plaintiffs will be unable to provide pre-viability abortion care to their patients whenever any of the prohibited reasons is implicated. Thus, the Reason Bans will also deprive some of their patients of the ability to choose abortion prior to viability. Grant Decl. ¶ 19; Looney Decl. ¶ 49; Rovetti Decl. ¶ 24; Terrell Decl. ¶ 26.

## B. The Reason Bans Do Not Make Clear What Pre-Viability Abortion Care They Prohibit.

Individuals seek abortion for a multitude of deeply personal reasons. Looney Decl. ¶ 39; Rovetti Decl. ¶ 12; Terrell Decl. ¶¶ 16-17. The decision to terminate a pregnancy is motivated by a combination of diverse, complex, and interrelated factors. These factors are related to the individual's values, beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability. *See* Looney Decl. ¶¶ 39, 42-43; Rovetti Decl. ¶

9

12; Terrell Decl. ¶¶ 16-18; Zite Decl. ¶¶ 13, 23. Whatever the reasons, each person's decision to have an abortion is unique to that person and based on her own complex personal circumstances and values.

Given the deeply personal nature of the decision, it is often difficult, if not impossible, for another person to truly know why an individual seeks an abortion. Looney Decl. ¶ 44; Terrell Decl. ¶ 16. In this context, Plaintiffs do not understand what it means for an abortion to be sought "because of" the race or sex of the fetus, or "a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome." Grant Decl. ¶ 21; Looney Decl. ¶ 44; Rovetti Decl. ¶ 23; Terrell Decl. ¶¶ 20-23. Plaintiffs do not understand whether abortion is prohibited when a prohibited reason is the only reason, the main reason, a significant reason, one among many potential reasons, or even just a factor that an individual considered. Grant Decl. ¶ 21; Looney Decl. ¶ 45; Rovetti Decl. ¶ 23; Terrell Decl. ¶ 19.

Prior to performing an abortion, Plaintiffs provide counseling designed not to favor any option over another, which means they listen to, support, and provide information to the patient, without directing the course of action. Looney Decl. ¶ 40; Rovetti Decl. ¶¶ 25-28; Terrell Decl. ¶ 17. Consistent with Plaintiffs' missions and best medical practices, Plaintiffs do not require that patients disclose their reasons for seeking an abortion. Grant Decl. ¶ 22; Looney Decl. ¶ 41; Rovetti Decl. ¶ 25; Terrell Decl. ¶ 17. During this counseling, some of Plaintiffs' patients disclose at least some information about the considerations that have informed their decision-making, and many patients do not do so. Looney Decl. ¶ 41; Rovetti Decl. ¶¶ 23, 27; Terrell Decl. ¶ 17.

At times, Plaintiffs' patients have raised issues relating to the race or sex of the fetus, without presenting them as "reasons" for the abortion. Grant Decl. ¶ 22; Looney Decl. ¶ 46;

Rovetti Decl. ¶ 23; Terrell Decl. ¶ 20. For example, Plaintiffs have treated patients experiencing racism from their families around a biracial relationship or who inquire about the sex of the fetus during an ultrasound. Grant Decl. ¶ 22; Looney Decl. ¶ 46; Rovetti Decl. ¶ 23; Terrell Decl. ¶ 20. Plaintiffs have also treated patients who have expressed concern about their own advanced age or any possible fetal condition as a result of that age, or who have raised concerns over the possibility of Down syndrome—among many other feelings these patients may express, including how the pregnancy may affect their existing children or their current life circumstances. Grant Decl. ¶ 22; Looney Decl. ¶¶ 47-48; Rovetti Decl. ¶ 23; Terrell Decl. ¶ 21. Likewise, Dr. Zite may also perform an abortion where a diagnosis of Down syndrome is accompanied by other diagnoses (such as cardiac conditions), which may collectively inform the patient's decision to have an abortion. Zite Decl. ¶ 12.

By the terms of the statute, it is unclear whether the Reason Bans prohibit abortions in any of these situations. Because of the uncertainty surrounding what the Reason Bans prohibit and how they will be enforced, combined with the extreme criminal penalties (up to 15 years in prison along with a $10,000 fine), Plaintiffs will be unable to provide pre-viability abortions to any patient where a prohibited reason is ever referenced or implicated. Grant Decl. ¶¶ 20, 23; Looney Decl. ¶ 49; Rovetti Decl. ¶ 24; Terrell Decl. ¶ 23.

**C. The Bans Will Chill the Provision of Abortion Care in Medical Emergencies.**

To the extent care may be provided in "medical emergencies," in many circumstances, the Bans will prevent physicians from providing care even when required by their best medical judgment. Zite Decl. ¶¶ 18-22. The medical emergency affirmative defenses are available only if, "in the physician's reasonable medical judgment, a medical emergency prevented compliance." Act §§ 216(e)(1), 217(e)(1). This means that whether any physician will be protected by one of

11

the affirmative defenses may ultimately depend on another's interpretation of whether the medical emergency determination was reasonable—rather than the physician's own best medical judgment.[11] And, because it is an affirmative defense, the burden will on the physician to prove, by the preponderance of the evidence, that the defense applies. *See* Tenn. Code Ann. § 39-11-204(b), (e).

Because medical emergencies are complex and susceptible to dispute, a physician's good faith medical emergency determination could easily be challenged by another physician after the fact. Zite Decl. ¶¶ 21-22. This risk is heightened in a state like Tennessee where so many physicians are openly opposed to abortion. Looney Decl. ¶ 37; Zite Decl. ¶ 21

Further, the medical emergency affirmative defenses do not provide a scienter requirement to alleviate this risk. For example, they do not indicate that the defenses will be available so long as medical emergency determinations are not made recklessly or knowingly. Instead, physicians will be strictly liable for determinations made in good faith, based on their medical judgment, whenever a factfinder determines after-the-fact that the determination was "unreasonable," exposing physicians to risk of severe criminal penalties. Fearing these severe penalties, physicians will be unable to provide care in some cases, despite their good faith belief that a "medical emergency" warrants it, subjecting their patients to extreme health risks with potentially dire consequences. Zite Decl. ¶¶ 19-22.

---

[11] Notably, this is the only provision in the entire Tennessee abortion code for which a physician's ability to seek the protection of a medical emergency exception or affirmative defense depends on an objective evaluation of that assessment. In every other case, a physician may invoke the exception or defense so long as the determination was made in the "physician's *good faith* medical judgment," based on the facts known to the physician at the time. *See, e.g.*, Tenn. Code Ann. §§ 39-15-202, 211, 212 (emphasis added).

12

## IV. THE BANS WILL IMMEDIATELY AND IRREPARABALY HARM PLAINTIFFS' PATIENTS.

As soon as Governor Bill Lee signs the Bans into law, the Bans will immediately impose severe harms on Plaintiffs' patients. Those who are denied abortion care will either be forced to travel out of state for care; to continue their pregnancies against their will; or, to resort to unsafe means to terminate their pregnancies. Grant Decl. ¶¶ 8-9, 16, 19; Looney Decl. ¶ 38; Rovetti Decl. ¶¶ 15, 22; Terrell Decl. ¶ 26; Zite Decl. ¶ 24.

Most of Plaintiffs' patients are poor or low-income, already parents, and struggle to access transportation, childcare, and time off work, in addition to other challenges they face accessing healthcare generally, so many will be forced to carry to term against their will or to resort to unsafe means to terminate their pregnancies. Grant Decl. ¶ 18; Looney Decl. ¶¶ 30-31, 38; Rovetti Decl.¶ 17; Terrell Decl. ¶ 26. These outcomes are each incredibly harmful. Grant Decl. ¶ 19; Looney Decl. ¶ 37; Rovetti Decl.¶ 15, 21-22; Terrell Decl. ¶ 26. Being denied an abortion will harm patients' health, their existing families, their financial and educational goals, and their ability to gain independence from abusive and unsafe circumstances. Looney Decl. ¶ 38; Rovetti Decl. ¶¶ 15, 21-22, 29; Terrell Decl. ¶ 26; Zite Decl. ¶¶ 23-24.

## ARGUMENT

## I. APPLICABLE LEGAL STANDARDS

Plaintiffs seek a temporary restraining order and/or preliminary injunction to prevent the Bans from inflicting constitutional, medical, emotional, and other harm on Plaintiffs and their patients. In ruling on such a motion, the Court considers four factors, all of which weigh heavily in Plaintiffs' favor: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be

13

served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (internal quotation marks omitted).

## II.    PLAINTIFFS WILL SUCCEED ON THE MERITS.

The Bans violate the Constitution in several ways, and Plaintiffs have a strong likelihood of success on each of their claims.

### A.  The Bans Unconstitutionally Proscribe Pre-Viability Abortion Care.

For nearly fifty years, the Supreme Court has repeatedly and unequivocally held that, under the Due Process Clause of the Fourteenth Amendment, a state may not ban abortion prior to viability. *Casey*, 505 U.S. at 846, 871; *Roe v. Wade*, 410 U.S. 113, 163-64 (1973);[12] *accord Isaacson v. Horne*, 716 F.3d 1213, 1217, 1221 (9th Cir. 2013), *cert. denied*, 571 U.S. 1127 (2014) (stating the Supreme Court has been "unalterably clear regarding one basic point": "a woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable"). In setting this rule, the Supreme Court recognized "the urgent claims of the woman to retain the ultimate control over her destiny and her body, claims implicit in the meaning of liberty," *Casey*, 505 U.S. at 869, and the fundamental right of a woman to the decisional autonomy to shape her own place in society, regardless of the State's vision of a woman's role. *Id.* at 852.

Binding Supreme Court precedent also establishes that a state may not dictate when viability occurs based on a single factor such as gestational age. "[I]t is not the proper function of

_____

[12] *See also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016) (reaffirming that a provision of law is constitutionally invalid if it bans abortion "before the fetus attains viability" (quoting *Casey*, 505 U.S. at 878)); *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) ("assum[ing]" the principle that, "[b]efore viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy'" (quoting *Casey*, 505 U.S. at 879)); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (declining to "revisit" the legal principles reaffirmed in *Casey* that "before 'viability . . . the woman has a right to choose to terminate her pregnancy'" (quoting *Casey*, 505 U.S. at 870)).

14

the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period. The time when viability is achieved may vary with each pregnancy . . . ." *Colautti*, 439 U.S. at 388 (quoting *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 64 (1976)). As the Supreme Court explicitly stated:

> Because [viability] may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus.

*Id.* at 388-89. Rather, "the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician." *Id.* at 388 (quoting *Danforth*, 428 U.S. at 64). "State regulation . . . must allow the attending physician 'the room he needs to make his best medical judgment.'" *Id.* at 397 (quoting *Doe v. Bolton*, 410 U.S. 179, 192 (1973)).

Given this unwavering line of Supreme Court precedent, every federal appellate court or state high court faced with a law prohibiting abortions before viability, with or without exceptions, has ruled that it violates the Fourteenth Amendment. Further, the Supreme Court has affirmed or denied certiorari in each one of those cases it has been asked to review.[13] In

---

[13] *See MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 773 (8th Cir. 2015) (striking down ban on pre-viability abortions at 6 weeks with exceptions), *cert. denied*, 136 S. Ct. 981 (2016); *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015) (striking down ban on pre-viability abortions at 12 weeks with exceptions), *cert. denied*, 136 S. Ct. 895 (2016); *Isaacson*, 716 F.3d at 1217, 1231 (striking down ban on pre-viability abortions at 20 weeks with exceptions), *cert. denied*, 571 U.S. 1127 (2014); *Carhart v. Stenberg*, 192 F.3d 1142, 1151 (8th Cir. 1999) (striking down ban on "the most common procedure" used to perform abortions after 13 weeks), *aff'd*, 530 U.S. 914, 922 (2000); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997) (same), *cert. denied*, 523 U.S. 1036 (1998); *Jane L. v. Bangerter*, 102 F.3d 1112, 1114, 1117-18 (10th Cir. 1996) (striking down ban on pre-viability abortions at 22 weeks with exceptions), *cert. denied*, 520 U.S. 1274 (1997); *Sojourner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992) (striking down ban on all abortions with exceptions), *cert. denied*, 507 U.S. 972 (1993); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368-69 (9th Cir. 1992) (same), *cert. denied*, 506 U.S. 1011 (1992); *cf. DesJarlais v. State, Office of Lieutenant Governor*, 300

15

particular, federal appellate courts have unanimously struck state laws that seek to fix viability, or otherwise limit access to abortion, based on a specific gestational age.[14]

Similarly, attempts to ban pre-viability abortion based on the patient's reasons for seeking an abortion have been uniformly rejected.[15] The central principle underlying the privacy right and liberty interests recognized in *Roe*, *Casey*, and *Whole Woman's Health* is that it is for the individual, not the State, to decide whether to terminate a pre-viability pregnancy. As the Court made abundantly clear in *Casey*:

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is

---

P.3d 900, 904-05 (Alaska 2013) (invalidating proposed pre-viability ban on all abortions with exception for "necessity"), *reh'g denied*; *In re Initiative Petition No. 395, State Question No. 761*, 286 P.3d 637, 637-38 (Okla. 2012) (invalidating proposed definition of a fertilized egg as a "person" under due process clause), *cert. denied*, 568 U.S. 978 (2012); *Wyo. Nat'l Abortion Rights Action League v. Karpan*, 881 P.2d 281, 287 (Wyo. 1994) (ruling proposed ban on abortions would be unconstitutional); *In re Initiative Petition No. 349, State Question No. 642*, 838 P.2d 1, 7 (Okla. 1992) (striking down proposed abortion ban with exceptions), *cert. denied*, 506 U.S. 1071 (1993).

[14] *See, e.g.*, *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (per curiam) (ban after detection of fetal cardiac activity which typically occurs at 6 weeks LMP); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 274 (5th Cir. 2019) (15-week ban); *MKB Mgmt. Corp.*, 795 F.3d at 773 (ban after detection of fetal cardiac activity which typically occurs at 6 weeks LMP); *Edwards*, 786 F.3d at 1117 (12-week ban); *Isaacson*, 716 F.3d at 1217, 1231 (20-week ban); *Jane L.*, 102 F.3d at 1114, 1117-18 (22-week ban).

[15] *See also Preterm-Cleveland v. Himes*, 940 F.3d 318, 323 (6th Cir. 2019) (invalidating Ohio reason ban because a state may not prohibit abortion prior to viability regardless of the "the state's purported reason for prohibiting a woman from obtaining an abortion"), *reh'g en banc granted, opinion vacated,* 944 F.3d 630 (6th Cir. 2019); *Little Rock Family Planning Servs. v. Rutledge*, 397 F. Supp. 3d 1213, 1275 (E.D. Ark. 2019) (granting preliminary injunction against Arkansas reason ban because the ban "clearly violates well-established Eighth Circuit and Supreme Court precedent holding that a woman may terminate her pregnancy prior to viability, and that the State may not prohibit a woman from exercising that right solely upon the basis on which a woman makes her decision"); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 265 F. Supp. 3d 859, 867 (S.D. Ind. 2017) ("[I]t is a woman's right to choose an abortion that is protected, which, of course, leaves no room for the State to examine, let alone prohibit, the basis or bases upon which a woman makes her choice."), *aff'd*, 888 F.3d 300 (7th Cir. 2018), *and cert. denied in part and granted in part, judgment rev'd in part on other grounds sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019).

16

the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

505 U.S. at 851. "Nothing in the Fourteenth Amendment or Supreme Court precedent allows the State to invade this privacy realm to examine the underlying basis for a woman's decision to terminate her pregnancy prior to viability." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 307 (7th Cir. 2018) (permanently enjoining Indiana law prohibiting abortions based solely on diagnosis or potential diagnosis of Down syndrome or other enumerated disability, or sex, race, color, national origin, or ancestry of the embryo/fetus), *cert. denied in part and granted in part, judgment rev'd in part on other grounds sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019).

Both the Cascading Bans and the Reason Bans unquestionably prohibit abortion prior to viability. Given the State's preexisting and unchallenged post-viability ban and the fact that there is no abortion care in Tennessee after viability, that is the Bans' *only* function. The Cascading Bans also impermissibly usurp physician discretion and attempt to move the viability line earlier by limiting access to abortion based on specific gestational ages while the Reason Bans attempt to dispense with the viability framework altogether—both ignoring the Supreme Court's clear edict that *no* state interest is "strong enough to support a prohibition of abortion" prior to viability. *Casey*, 505 U.S. at 846. Based on this extensive and binding precedent, Plaintiffs have an extremely strong likelihood of success on the merits of their claims that the Bans unconstitutionally prohibit abortion prior to viability.

## B. The Reason Bans Are Unconstitutionally Vague.

While the Reason Bans are unconstitutional because they prohibit abortion before viability, they are also unconstitutional for the independent reason that they fail to provide

17

Plaintiffs adequate notice of what conduct is prohibited and are therefore vague. It is well-settled that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The Supreme Court has long cautioned that "laws must provide explicit standards for those who apply them," because "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). "Vague laws are subject to particular scrutiny when criminal sanctions are threatened or constitutional rights are at risk." *United States v. Caseer*, 399 F.3d 828, 835 (6th Cir. 2005); *accord Voinovich*, 130 F.3d at 205 (applying this principle in the context of abortion and explaining that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights") (internal quotation marks omitted).

The Reason Bans clearly fail this test. They prohibit abortions where a provider "knows" that the abortion is sought "because of" a prohibited reason. The Reason Bans do not make clear whether the law targets abortions where the prohibited reason is the patient's sole reason, a primary reason, or one motivating factor among many. Individuals seek abortion for a multitude of deeply personal and often complex reasons, making it impossible for Plaintiffs to "know" exactly why (or why not) any given patient is seeking care.

Compounding the vagueness problem further, it is unclear which circumstances could support a determination that a Plaintiff "knew" her patient sought an abortion "because of" one of the prohibited reasons, particularly since Tennessee law allows for findings of knowledge to

18

be supported by circumstantial evidence, *see Wofford v. State*, 358 S.W. 2d 302, 304 (Tenn. 1962). Given this uncertainty, Plaintiffs reasonably fear prosecution based on any potential that a prohibited reason plays any part in a patient's decision-making—which may be as little as a patient's oblique reference to the sex of her fetus, the race of her partner, or her own age. *See* Grant Decl. ¶¶ 20-22; Looney Decl. ¶¶ 45-49; Rovetti Decl. ¶¶ 23-24; Terrell Decl. ¶¶ 20-23.

As a consequence, the Reason Bans create two dangers that are the hallmarks of unconstitutionally vague statutes. First, the absence of explicit standards "in practice leaves the definition of its terms to law enforcement, and thereby invites arbitrary, discriminatory and overzealous enforcement." *Leonardson v. City of E. Lansing*, 896 F.2d 190, 198 (6th Cir. 1990) (internal quotation marks omitted). Given the prevalence of hostility toward abortion and abortion providers in Tennessee, *see* Looney Decl. ¶ 37; Zite Decl. ¶ 21, the risk facing Plaintiffs here is especially great. *See Kolender*, 461 U.S. at 358 (a law is vague where it "allows policemen, prosecutors, and juries to pursue their personal predilections") (internal quotation marks omitted); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (vague laws risk discriminatory enforcement "against particular groups deemed to merit [prosecuting officials'] displeasure"). Second, as a result of their ambiguous standards and heavy criminal penalties, the Reason Bans will require Plaintiffs to deny care to any patient who references any of the prohibited reasons or whose condition is impacted in any way by any one of them, thereby inhibiting Plaintiffs' patients' exercise of their constitutional right to pre-viability abortion. *See Casey*, 505 U.S. at 871; *Caseer*, 399 F.3d at 835.

The Reason Bans are therefore constitutionally invalid for the additional reason that their absence of explicit standards renders them impermissibly vague.

19

**C. The Bans Are Unconstitutional Because They Do Not Have Valid Medical Emergency Exceptions.**

While the Bans are unconstitutional under a long line of Supreme Court precedent because they prohibit abortion before viability—and no exceptions could render them valide— that Bans are also unconstitutional for the independent reason that they lack valid medical emergency exceptions. And, without valid exceptions, the Bans violate "the essential holding of *Roe*," which "forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." *Casey*, 505 U.S. at 880. In *Women's Med. Prof'l Corp. v. Voinovich*, the Sixth Circuit held that a medical emergency exception is unconstitutionally vague, warranting the invalidation of the underlying statute, where it contains an unclear standard such that "physicians cannot know the standard under which their conduct will ultimately be judged." 130 F.3d 187, 205 (6th Cir. 1997). Specifically, the Sixth Circuit held that where a statute "impos[es] criminal liability without a mental culpability requirement," and contains both "subjective and objective elements in that a physician must believe that the abortion is necessary and his belief must be objectively reasonable to other physicians," it fails to put physicians on notice about what conduct will meet the exception and is unconstitutionally vague. *Id.* at 203-04. The Sixth Circuit further explained that the "uncertainty induced" by "[t]he objective standard combined with strict liability for even good faith determinations, 'could have a profound chilling effect on the willingness to perform abortions.'" *Id.* at 205 (quoting *Colautti*, 439 U.S. at 396).

The Bans reflect these same deficiencies. Just as in *Voinovich*, the Bans' medical emergency affirmative defenses lack any scienter element for medical emergency

determinations, holding physicians strictly liable for "unreasonable" determinations.[16] *See* p. 12 *supra*; *see also Voinovich*, 130 F.3d at 205 ("[I]n this area of the law, scienter requirements are particularly important."). Further, like the statute in *Voinovich*, the medical emergency provisions contain both subjective and objective elements. "Medical emergency" is defined in terms of the "physician's good faith medical judgment," Act §§ 39-15-216(a)(4), 217(a)(3) (incorporating definition in Tenn. Code Ann. § 39-15-211(a)(3)), but a physician may assert this affirmative defense only if "in the physician's reasonable medical judgment, a medical emergency prevented compliance with the provision," *id.* §§ 39-15-216(e)(1), 217(e)(1).

And, as a result of this infirm combination and the extreme criminal penalties, physicians will be chilled from providing abortion care despite their good faith beliefs that such care is warranted by a "medical emergency." Zite Decl. ¶¶ 18-22; *cf. W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1329 (11th Cir. 2018); *Hope Clinic v. Ryan*, 195 F.3d 857, 889 (7th Cir. 1999) (Posner, J., dissenting) ("What physician would be fool enough, or hero enough, to risk a criminal prosecution in order to explore the precise meaning and outer bounds of [the law], even if the risk is small?"), *cert. granted, judgment vacated, remanded*, 530 U.S. 1271 (2000). The chilling is particularly severe here because a "determination of whether a medical emergency . . . exists . . . is fraught with uncertainty and susceptible to being subsequently disputed by others." *Voinovich*, 130 F.3d at 205; *see also* Zite Decl. ¶¶ 21-22. Indeed, it is

---

[16] Reasonableness does not equate to scienter. Under Tennessee law, outside of strict liability, the lowest level of scienter allowed is criminal negligence, Tenn. Code Ann. § 39-11-301. Criminal negligence is "[s]omething more than a failure to exercise due or reasonable care" that "elevate[s] tortious carelessness to the level of criminal conduct." *State v. Briggs*, 343 S.W.3d 106, 110-11 (Tenn. Crim. App. 2010); *see also* Tenn. Code Ann. § 39-11-106(a)(5) (defining criminal negligence as a "gross deviation from the standard of care"). Reasonableness, therefore, is insufficient to add a scienter requirement to a strict liability statute.

"especially troublesome in the abortion context" "where there is such disagreement" because "it is unlikely that the prosecution could not find a physician willing to testify that the physician did not act reasonably." *Voinovich*, 130 F. 3d at 205; *see also* Zite Decl. ¶¶ 21-22.

As a result, the Bans' medical emergency affirmative defense is unconstitutionally vague under a direct application of *Voinovich*, 130 F.3d at 205, and the Bans are thus unconstitutional for this additional reason. *Casey*, 505 U.S. at 880.

## III. ABSENT AN INJUNCTION, PLAINTIFFS AND THEIR PATIENTS WILL SUFFER IRREPARABLE HARM.

The Bans will take effect immediately upon Governor Lee's signature, and the vast majority of patients seeking abortion in Tennessee will be instantly unable to receive this constitutionally protected care. Because it is clear that the Bans impair both Plaintiffs' and Plaintiffs' patients' rights guaranteed by the Fourteenth Amendment to the United States Constitution, it *per se* effects irreparable injury and should be enjoined.

As the Sixth Circuit has long made clear, "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 445 (6th Cir. 2003); *accord Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed.") (internal quotation marks omitted); *Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) ("[T]he loss of constitutional rights for even a minimal amount of time constitutes irreparable harm.").

Furthermore, because the choice to have an abortion "simply cannot be postponed, or it will be made by default with far-reaching consequences," *Bellotti v. Baird*, 443 U.S. 622, 643 (1979), the presumption of irreparable harm applies with particular force where the threatened or impaired right is the fundamental right to abortion, *see, e.g.*, *Planned Parenthood Ariz., Inc. v.*

22

*Humble*, 753 F.3d 905, 911 (9th Cir. 2014); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 795-96 (7th Cir. 2013). This is because, as *Roe* recognized, forcing women to carry unwanted pregnancies to term immensely harms them, including by undermining their ability to control their own futures and often by harming their existing families. 410 U.S. at 153.

The Bans will eliminate the choice to have an abortion for most pregnant people in Tennessee. Further, the Bans will enact unconstitutionally vague provisions that fail to alert Plaintiffs as to what conduct is proscribed, further constricting the provision of care, especially in emergencies. For these reasons, the Bans impose irreparable harm and must be enjoined.

## IV.     THE BALANCE OF HARMS FAVORS INJUNCTIVE RELIEF.

Plaintiffs and their patients unquestionably face far greater irreparable harm while the Bans are in effect than Defendants would face if their enforcement were enjoined and the status quo—the legality of abortion—maintained. As discussed above, the Bans will cause pregnant people in Tennessee profound and irreparable harm.

By contrast, Tennessee will suffer no harm if it is ordered not to enforce laws that are plainly unconstitutional under decades of Supreme Court precedent. *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (concluding no substantial harm to city would result from enjoining enforcement of ordinance, finding it "questionable" whether the government "has any 'valid' interest in enforcing" an unconstitutional law); *see also Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (defendant "does not have an interest in enforcing a law that is likely constitutionally infirm"). The balance of harm thus weighs decisively in Plaintiffs' favor, further demonstrating that preliminary injunctive relief is necessary and appropriate.

23

## V.  THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF INJUNCTIVE RELIEF.

Finally, enjoining the Bans serves the public interest. As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. Civil Liberties Union Fund of Mich.*, 796 F.3d at 649 (alteration in original) (internal quotation marks omitted); *accord Mich. State*, 833 F.3d at 669 (same); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) ("the public interest is promoted by the robust enforcement of constitutional rights."). The only way to prevent the public harm resulting from this far-reaching, ongoing constitutional violation is to enjoin enforcement of the Bans.

## VI.  A BOND IS NOT NECESSARY IN THIS CASE.

Finally, this Court should waive the Federal Rule of Civil Procedure 65(c) bond requirement. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (affirming district court decision to require no bond "because of the strength of [the plaintiff's] case and the strong public interest involved"); *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 804 (S.D. Ohio 2019) (waiving bond). This Court should use its discretion to waive the bond requirement here, where the relief sought will result in no monetary loss to Defendants.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction.

24

Dated: June 22, 2020

Respectfully submitted,


*/s/ Thomas Castelli*
Thomas H. Castelli (No. 24849)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorney for Plaintiffs*

Jessica Sklarsky*
Rabia Muqqadam*
Francesca Cocuzza*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Tel: (917) 637-3600
Fax: (917) 637-3666
jsklarsky@reprorights.org
rmuqqadam@reprorights.org
fcocuzza@reprorights.org

*Attorneys for Memphis Center for Reproductive
Health and Dr. Nikki Zite, M.D., M.P.H.*

Susan Lambiase*
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4405
Fax: (212) 247-6811
susan.lambiase@ppfa.org

*Attorney for Planned Parenthood of Tennessee and
North Mississippi and Kimberly Looney, M.D.*

Anjali Dalal*
Andrew Beck*
American Civil Liberties Union Foundation

25

125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
adalal@aclu.org
abeck@aclu.org

*Attorneys for Knoxville Center for Reproductive Health and Femhealth USA, Inc.*

\* Application for admission *pro hac vice* forthcoming

26

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and correct copy of the foregoing has been served by e-mail according to instructions from the Attorney General's Office to tnattygen@ag.tn.gov and by U.S. Mail on the following on the 22nd day of June 2020:

Herbert H. Slatery III
Attorney General for the State of Tennessee
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207

Lisa Piercey, M.D.
Commissioner of the Tennessee Department of Health
710 James Robertson Parkway
Nashville, TN 37243

Rene Saunders, M.D.
Chair of the Board for Licensing Health Care Facilities
665 Mainstream Drive, 2nd floor
Nashville, TN 37243

W. Reeves Johnson, Jr., M.D.
President of the Tennessee Board of Medical Examiners
665 Mainstream Drive, 2nd Floor
Nashville, TN  37243

Amy P Weirich
District Attorney General of Shelby County, Tennessee
201 Poplar Ave., Suite 301
Memphis, TN 38103

Glenn Funk
District Attorney General of Davidson County, Tennessee
222 2nd Ave N #500
Nashville, TN 37201

Charme P. Allen
District Attorney General of Knox County, Tennessee
City County Building 400 Main Street
Suite 168
Knoxville, TN 37902

Tom P Thompson, Jr.
District Attorney General for Wilson County, Tennessee
119 South College St.
Lebanon, TN 37087

/s/Thomas H. Castelli
Thomas H. Castelli

28