**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

MEMPHIS CENTER FOR REPRODUCTIVE
HEALTH, on behalf of itself, its physicians and
staff, and its patients; PLANNED
PARENTHOOD OF TENNESSEE AND
NORTH MISSISSIPPI, on behalf of itself, its
physicians and staff, and its patients;
KNOXVILLE CENTER FOR
REPRODUCTIVE HEALTH, on behalf of
itself, its physicians and staff, and its patients;
FEMHEALTH USA, INC., d/b/a CAREFEM,
on behalf of itself, its physicians and staff, and
its patients; DR. KIMBERLY LOONEY, on
behalf of herself and her patients; and DR.
NIKKI ZITE, on behalf of herself and her
patients,
Plaintiffs,

v.

HERBERT H. SLATERY III, Attorney General
of Tennessee, in his official capacity; LISA
PIERCEY, M.D., Commissioner of the
Tennessee Department of Health, in her official
capacity; RENE SAUNDERS, M.D., Chair of
the Board for Licensing Health Care Facilities,
in her official capacity; W. REEVES
JOHNSON, JR.,M.D., President of the
Tennessee Board of Medical Examiners, in his
official capacity; HONORABLE AMY P.
WEIRICH, District Attorney General of Shelby
County, Tennessee, in her official capacity;
GLENN FUNK, District Attorney General of
Davidson County, Tennessee, in his official
capacity; CHARME P. ALLEN, District
Attorney General of Knox County, Tennessee,
in her official capacity; and TOM P.
THOMPSON, JR., District Attorney General for
Wilson County, Tennessee, in his official
capacity,
Defendants.

CIVIL ACTION
CASE NO. 3:20-cv-00501
JUDGE CAMPBELL

---

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

---

1

Defendants Herbert H. Slatery III, Lisa Piercey, Rene Saunders, W. Reeves Johnson, Jr., Amy P. Weirich, Glenn Funk, Charme P. Allen, and Tom P. Thompson, Jr., in their official capacities only, oppose Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction. (D.E. 6). The Motion should be denied because Plaintiffs have not carried their heavy burden to establish an entitlement to the "extraordinary and drastic remedy" of preliminary relief. *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1977)).

## BACKGROUND

On June 19, 2020, the General Assembly passed House Bill 2263/Senate Bill 2196 (the "Bill") by overwhelming majorities in both Houses to further the State's interests in protecting and respecting the life of unborn children, protecting maternal health, preventing fetal pain, protecting the integrity of the medical profession, promoting human dignity, and preventing discrimination. *See* House Bill 2263 (attached as Exhibit A); HB 2263 Votes, http://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB2263. Plaintiffs seek to prevent two parts of the Bill from becoming effective:[1] the "gestational-age provisions," (Ex. A, § 39-15-216), and the "non-discrimination provision," (Ex. A, § 39-15-217).

### A. Gestational-Age Provisions of the Bill

Under the gestational-age provisions, "a person shall not perform or induce, or attempt to perform or induce, an abortion upon a pregnant woman whose unborn child has a fetal heartbeat," (Ex. A, § 39-15-216(c)(1)), or, in the alternative, "upon a pregnant woman whose unborn child"

---

[1] The Bill, which was signed by the House Speaker and Lieutenant Governor on June 30, 2020, will become effective when signed by the Governor; the Bill is not effective as of the date on which this Response is filed.

2

is eight, ten, twelve, fifteen, eighteen, twenty, twenty-one, twenty-two, twenty-three, or twenty-four weeks gestational age or older (Ex. A, § 39-15-216(c)(3)-(12)).[2] Each provision is severable, so that "[i]f any provision . . . or the application thereof to any person, circumstance, or period of gestational age is found to be unenforceable," the other provisions will remain in effect. (Ex. A, § 39-15-216(h).)

The General Assembly made detailed factual findings in support of the gestational-age provisions. It found that, in the years after *Roe v. Wade*, 410 U.S. 173 (1973), "there have been substantial advances in scientific methods and medical technology that have significantly expanded knowledge and understanding of prenatal life and development, and the effects of abortion on the physical and psychological health of women." (Ex. A, § 39-15-214(a)(4).) Those advances have dramatically reduced the gestational age at which a preterm infant can survive; with appropriate care and treatment, preterm infants as young as 21 weeks and 4 days can survive. (Ex. A, § 39-15-214(a)(35)-(42).) Moreover, "[a] growing body of medical evidence and literature" now "supports the conclusion that an unborn child may feel pain from around eleven (11) to twelve (12) weeks gestational age, or even as early as five and a half (5 ½) weeks." (Ex. A, § 39-15-214(a)(23)-(24).) The General Assembly found that a fetal heartbeat is "medically significant," "can be detected as early as six (6) to eight (8) weeks gestational age," and "is the best indicator of a viable pregnancy." (Ex. A, § 39-15-214(a)(7)-(15).) When that fetal heartbeat is detected

---

[2] The Bill also prohibits abortions at six weeks gestational age unless "the physician affirmatively determines and records in the pregnant woman's medical record that, in the physician's good faith medical judgment, the unborn child does not have a fetal heartbeat at the time of the abortion." (Ex. A, § 39-15-216(c)(2).)

3

between eight- and twelve-weeks gestational age, "approximately ninety eight percent (98%) of naturally conceived pregnancies" carry to term. (Ex. A, § 39-15-214(a)(16).)

The General Assembly also determined that Tennessee has legitimate, substantial, and compelling interests in "valuing and protecting unborn children," "protecting the physical and mental health of the mother," "promoting human dignity," "encouraging childbirth over abortion," "safeguarding an unborn child from the serious harm of pain by an abortion method that would cause the unborn child to experience pain," and in "protecting the integrity and ethics of the medical profession." (Ex. A, § 39-15-214(a)(70)-(76).) The gestational-age provisions were enacted to further those interests. (Ex. A, § 39-15-214(b)(3)-(5).)

It is an affirmative defense to prosecution for violation of the gestational-age provisions that "in the physician's reasonable medical judgment, a medical emergency prevented compliance with the provision." (Ex. A, § 39-15-214(e)(1).) "Medical emergency" means "a condition that, in the physician's good faith medical judgment, . . . so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman." Tenn. Code Ann. § 39-15-211(a)(3). (*See also* Ex. A, § 39-15-216(a)(4).)

**B.      Non-Discrimination Provision of the Bill**

The non-discrimination provision prohibits "a person" from performing an abortion "if the person knows that the woman is seeking the abortion" because of the sex or race of the unborn child or "because of a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome in the unborn child." (Ex. A, § 39-15-217(b)-(d).) Like the gestational-age provisions, the non-discrimination provision is severable (Ex. A, § 39-15-217(i)),

and it is subject to the same medical-emergency affirmative defense (Ex. A, § 39-15-217(a)(3), (e)).

The non-discrimination provision was likewise supported by detailed legislative findings. The General Assembly found that, historically, abortion has been used to achieve eugenic goals and is rooted "not in equality but in discrimination based on age, sex, and disability." (Ex. A, § 39-15-214(a)(54).) The "individualized nature of abortion creates a significant risk that prenatal screening tests and new technologies will be used to eliminate children with unwanted characteristics." (Ex. A, § 39-15-215(a)(59).) The General Assembly found "substantial evidence from across the globe and in the United States that the elimination of children with unwanted characteristics is already occurring." (Ex. A, § 39-15-215(a)(60).) The abortion rate for children diagnosed with Down syndrome approaches one-hundred percent in some European countries and is sixty-seven percent in the United States, and sex-selective abortions are a significant problem in Asia and among certain populations in the United States. (Ex. A, § 39-15-215(a)(16).) The General Assembly found that discrimination based on race, gender, and disability is repugnant to the United States and Tennessee Constitutions and that "[t]he integrity and public respect of the medical profession are significantly harmed by physician involvement in practices that . . . facilitate discrimination." (Ex. A, § 39-15-214(a)(63), (69).) The non-discrimination provision was enacted to further the State's interests in preventing discrimination, promoting human dignity, and protecting the integrity of the medical profession, among other interests. (Ex. A, §§ 39-15-214(a)(72), (76)-(77), 39-15-214(b)(6).)

## C.    Plaintiffs' Challenges to Gestational-age and Non-discrimination Provisions

Plaintiffs—abortion clinics and physicians who perform abortions—filed a Complaint on June 19, 2020, challenging the gestational-age and non-discrimination provisions of the Bill. (D.E.

5

1).  They allege that the provisions violate the substantive due process rights of their patients by "prohibiting pre-viability abortion" and "failing to include valid medical emergency exceptions." (D.E. 1, pp. 30-31.)  They also challenge the non-discrimination provision and the medical-emergency affirmative defenses as unconstitutionally vague.  (D.E. 1, p. 30-31.)  On June 22, 2020, Plaintiffs moved for a temporary restraining order and/or preliminary injunction to "block[] enforcement of the [challenged provisions] as to pre-viability abortion." (D.E. 6, p. 2-3.)

## ARGUMENT

The preliminary relief Plaintiffs are seeking is an "'extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Glowco,* 958 F.3d at 539 (emphasis in original) (quoting *Mazurek*, 520 U.S. at 972).  To determine whether such extraordinary relief is warranted, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause a substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). Because Plaintiffs have not made the requisite clear showing that they are entitled to preliminary relief, their motion for a temporary restraining order and/or preliminary injunction should be denied.

## I.     Plaintiffs Are Unlikely to Succeed on the Merits.

A woman's right to abortion is not absolute; it does not entitle her "to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses." *Roe v. Wade*, 410 U.S. 113, 153 (1973).  To the contrary, the State has "legitimate interests from the

outset of the pregnancy in," among other interests,[3] "protecting the health of the woman and the life of the fetus that may become a child," *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992), and "regulating the medical profession in order to promote respect for life, including life of the unborn," *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007).

Plaintiffs are unlikely to succeed on the merits of their constitutional claims because the challenged provisions are permissible means of furthering these and other important government interests. Plaintiffs also lack standing to assert the substantive due process rights of their patients.

### A. Plaintiffs Lack Standing to Assert the Rights of Their Patients.

A plaintiff's standing to sue is never assumed; the plaintiff must prove standing in the same way as other elements on which the plaintiff bears the burden of proof. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). One of the three elements Plaintiffs must prove to establish the "irreducible constitutional minimum" of standing is the "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560. But they cannot satisfy this requirement with respect to their substantive due process claims because abortion providers "do not have a due process right to perform abortions." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 910 (6th Cir. 2019) (en banc).

Nor can Plaintiffs sue on behalf of their patients. Third-party standing is the "exception rather than the rule." *South Carolina v. Regan*, 465 U.S. 367, 380 (1984). A plaintiff may assert the rights of a third party only when (1) the plaintiff has a "close" relationship with the third party; and (2) some "hindrance" affects the third party's ability to protect his or her own interests.

---

[3] The Supreme Court has never provided "an exhaustive list of state interests implicated by abortion." *Stenberg v. Carhart*, 530 U.S. 914, 961 (2000) (Kennedy, J., dissenting).

7

*Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Neither requirement is met here. Plaintiffs have not identified any specific patients who will be harmed by the Bill, let alone established that they have a "close" relationship with those patients. A hypothetical relationship with "unascertained" future clients is not enough to satisfy the "close" relationship requirement. *Kowalski*, 543 U.S. at 131 (concluding that the requirement of a "close relationship" was not met where attorney plaintiffs sought to assert the rights of "unascertained" future clients); *see also id.* ("The attorneys before us do not have a 'close relationship' with their alleged 'clients'; indeed, they have no relationship at all."). Just as an "*existing* attorney-client relationship is . . . quite distinct from the *hypothetical* attorney-client relationship[,]" an *existing* doctor-patient relationship is also "quite distinct" from a *hypothetical* doctor-patient relationship. *Id.* at 130-31. Indeed, Plaintiffs' own filings indicate that most of the Plaintiffs do not perform abortions past many of the gestational-age restrictions in the Bill. (D.E. 7, PageID # 106; D.E. 8-01, PageID # 145; D.E. 8-04, PageID # 39; D.E. 8-5, PageID # 248.)[4] Patients who would seek abortions at those gestational ages are not even *hypothetical* patients of Plaintiffs. Plaintiffs clearly lack the requisite "close relationship" to assert the rights of those patients.

Plaintiffs also have not shown that any "hindrance" affects their patients' ability to protect their own interests. *See id.* at 129. Nor could they. Individual plaintiffs can and do challenge

---

[4] Plaintiff Memphis Center for Reproductive Health performs abortions only up to 16.4 weeks LMP. https://memphischoices.org/medical-services/abortion-services/surgical-abortion-services/. Plaintiff Planned Parenthood of Tennessee and North Mississippi and its Chief Medical Officer Plaintiff Looney perform abortions up to 19.6 weeks LMP at the Nashville location and one Memphis location. (D.E. 1, PageID # 5-7.) Planned Parenthood's first Memphis location provides abortions up to 19.6 weeks LMP, the second up to 11 weeks LMP. (D.E. 1, PageID # 6.) Planned Parenthood's Knoxville location provides medication abortions up to 11 weeks LMP. (D.E. 1, PageID # 6.) Plaintiff Knoxville Center for Reproductive Health provides abortions up to 15 weeks LMP. (D.E. 1, PageID # 6). Plaintiff Carafem provides abortions up to 13.6 weeks LMP (D.E. 1, PageID # 6-7.) Plaintiff Zite only performs abortions "after 19.6 weeks LMP, in the hospital in a small set of circumstances." (D.E. 8-3, PageID # 206.)

abortion regulations. *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) (per curiam); *Doe v. Parson*, 368 F. Supp. 3d 1345 (E.D. Mo. 2019).

Although the Sixth Circuit has held that abortion providers may assert the substantive due process rights of their patients, *see, e.g.*, *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 & n.4 (6th Cir. 1987), the Supreme Court has not squarely resolved that question. The issue was before the Supreme Court in *June Medical Servs. LLC v. Russo*, --- S. Ct. ---, No. 18-1323, 2020 WL 3492640 (U.S. June 29, 2020), but a plurality of the Court held that the State had "waived th[e] argument" that the providers in that case lacked standing. *Id.* at *8 (plurality op.); *see also id.* at *30 (Thomas, J., dissenting) (noting that the plurality "dodge[d] the question"). To the extent the plurality opinion discussed third-party standing, that discussion is only dicta. *See, e.g.*, *United States v. Taylor*, Nos. 12-3806, 12-3807, 2013 WL 8700995, at *6 (6th Cir. Apr. 16, 2013) (noting that, because an issue was waived, "[a]ny resolution" of that issue "would be dicta"). The only case in which the Supreme Court has squarely considered whether abortion providers have third-party standing to challenge an abortion regulation is *Singleton v. Wulff*, 428 U.S. 106 (1976), but the Court's decision in *Wulff* was badly fractured and the controlling concurrence did not broadly endorse third-party standing in abortion cases. *See June Medical*, --- S. Ct. ---, 2020 WL 3492640, at *34 (Thomas, J., dissenting); *see also EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 814 (6th Cir. 2020) (Bush, J., dissenting) (explaining that *Wulff* should not be read "so broadly to confer third-party standing virtually any time an abortion provider seeks to invalidate an abortion regulation").

Even if Plaintiffs have third-party standing to assert the substantive due process rights of their patients, they still would lack standing to challenge the race and sex categories of the non-discrimination provision. To establish standing, a plaintiff must assert "an invasion of a legally

protected interest" that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. But the Complaint does not allege that any patients have sought—or will seek in the future—an abortion because of the race or sex of the unborn child. Because Plaintiffs' patients do not face "actual or imminent" injury from the non-discrimination provision's race and sex categories, it follows that Plaintiffs lack standing to challenge those categories on their patients' behalf.

Plaintiffs also lack a cause of action under 42 U.S.C. § 1983 to assert the substantive due process rights of their patients. Under § 1983, a person who acts under color of state law and deprives another person of his constitutional or federal rights "shall be liable *to the party injured*." 42 U.S.C. § 1983 (emphasis added). Thus, § 1983 "authorizes suit by anyone alleging that he has been deprived of rights under the Constitution or federal law, and by no one else." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. Section 1983 "incorporates, but without exceptions" the rule that "the plaintiff may not assert the rights of third parties." *Id.* So even if Plaintiffs have standing, they nevertheless lack a cause of action to challenge the non-discrimination or gestational-age provisions on substantive due process grounds.

## B. The Non-Discrimination Provision Does Not Violate a Woman's Right to Abortion.

In Count I, Plaintiffs allege that the non-discrimination provision violates their patients' right to abortion "[b]y prohibiting pre-viability abortions." (D.E. 6.) But the non-discrimination provision does not prohibit pre-viability abortions; it simply prohibits doctors from performing abortions that they know are sought for *discriminatory reasons*. Because the non-discrimination

provision advances legitimate—indeed, compelling—state interests and does not substantially burden access to abortion, preliminary relief is not warranted.

### 1. The non-discrimination provision does not prohibit pre-viability abortions.

Plaintiffs characterize the non-discrimination provision as a "ban" on pre-viability abortions, but the only abortions the non-discrimination provision prohibits are those performed by a doctor who *knows* the abortion is sought *because of* the race, sex, or Down syndrome diagnosis of the unborn child. The provision does not prevent a woman from obtaining an abortion for one of those reasons, so long as she does not disclose the reason to the abortion provider. It simply prohibits doctors from knowingly facilitating eugenic abortions.

As Justice Thomas recently explained in his concurring opinion in *Box v. Planned Parenthood of Ind. & Ky, Inc.*, 139 S. Ct. 1780 (2019), *Casey* "did not decide whether the Constitution requires States to allow eugenic abortions," *id.* at 1792 (Thomas, J., concurring). To the contrary, the constitutionality of laws [that prohibit doctors from performing discriminatory abortions] remains an open question." *Id.* Indeed, a case challenging a similar non-discrimination provision in Ohio is currently pending before the en banc Sixth Circuit. *See Preterm-Cleveland v. Himes*, No. 18-3329 (oral argument held Mar. 11, 2020). And numerous judges have opined that such laws are likely constitutional under current precedent. Judge Batchelder dissented from the panel decision in *Preterm-Cleveland* and would have upheld Ohio's non-discrimination provision under the undue burden standard. *See Preterm-Cleveland v. Himes*, 940 F.3d 318, 326 (6th Cir. 2019) (Batchelder, J., dissenting), *opinion vacated and rehearing en banc granted*, 944 F.3d 630 (6th Cir. 2019). And Judge Easterbrook, in an opinion joined by Judges Sykes, Barrett, and Brennan, has explained that "[n]one of the [Supreme] Court's abortion decisions holds that states are powerless to prevent abortions designed to choose the sex, race, and other attributes of

11

children." *Planned Parenthood of Ind. & Ky., Inc.v. Comm'r of Ind. Dep't of Health*, 917 F.3d 532, 536 (Easterbrook, J., dissenting from denial of reh'g en banc).

Because the non-discrimination provision is not a total ban on pre-viability abortions, but instead a regulation limiting the conditions under which abortions may be performed, it is subject to the undue burden standard. *See Gonzales*, 550 U.S. at 156 (applying undue burden standard to uphold law banning a particular method of pre-viability abortion).[5]    Under that standard, regulations of pre-viability abortions that "do not pose a substantial obstacle to abortion access are permissible, so long as they are 'reasonably related' to a legitimate state interest." *June Medical*, --- S. Ct. ---, 2020 WL 3492640, at *23 (Roberts, C.J., concurring in judgment) (quoting *Casey*, 505 U.S. at 878 (plurality opinion);[6] *see also Gonzales*, 550 U.S. at 156. The Supreme Court adopted the undue burden standard in *Casey* as a less restrictive alternative to strict scrutiny, which "undervalue[d]" the State's interests. 505 U.S. at 875.

Significantly, Plaintiffs do not allege in their Complaint or argue in their Motion that the non-discrimination provision is unconstitutional under the undue burden standard. (*See generally*

---

[5] Even if Plaintiffs' characterization of the non-discrimination provision as a prohibition of pre-viability abortions were accurate, that should not end this Court's analysis. It is well settled that even fundamental constitutional rights may be curtailed when necessary to further compelling government interests. *See, e.g.*, *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) (noting that "[t]he right to associate for expressive purposes is not . . . absolute"). The right to obtain a pre-viability abortion should not be elevated above other constitutional rights. To the extent *Casey* held to the contrary, it should be overruled.

[6] In *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016), the Supreme Court held that the undue burden standard requires courts to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." The Chief Justice's concurring opinion in *June Medical*, which is controlling because it provided the narrowest grounds for the Court's decision, expressly rejected this benefits vs. burdens balancing test and reiterated that, under the undue burden standard, abortion restrictions that "d[o] not impose a substantial obstacle [are] constitutional," regardless of their benefits. *June Medical*, --- S. Ct. ---, 2020 WL 3492640, at *23-25 (Roberts, C.J., concurring in judgment).

12

D.E. 1, PageID# 1-34.)    And well they should not.  The non-discrimination provision plainly furthers government interests that are legitimate, substantial, and compelling, and it does not pose a substantial obstacle to abortion access for a large fraction of women seeking pre-viability abortions.

### 1. The non-discrimination provision advances legitimate, substantial, and compelling state interests.

The General Assembly enacted the non-provision discrimination based on detailed findings that abortion is rooted in the eugenics movement and that, in both the United States and internationally, abortion can be, and is, used to discriminate against unborn children because of race, gender, or disability.  (Ex. A, § 39-15-214(a)(56)-(62).)  Plaintiffs do not and cannot dispute these factual findings.   The link between the eugenics movement and abortion is well established, and "a growing body of evidence suggests that eugenic goals are already being realized through abortion."  *Box*, 139 S. Ct. at 1787 (Thomas, J., concurring).

The eugenics movement—which by the 1920's was "widely embraced" by leading intellectuals in the United States, *Box*, 139 S. Ct. at 1785—sought to eliminate populations it deemed "unfit," including racial minorities and individuals with disabilities.  *Id.* at 1783-86 (Thomas, J., concurring) (citations omitted).  Forced sterilization, a practice the Supreme Court regrettably approved in *Buck v. Bell*, 274 U.S. 200 (1927), was a preferred method of achieving this goal.  (Ex. B, Curlin Decl., ¶¶ 13, 46, 56; Ex. C, Sullivan Decl., ¶ 12.)   Birth control and abortion were also "promoted as means of effectuating eugenics."  *Box*, 139 S. Ct. at 1787. Planned Parenthood founder Margaret Sanger argued that birth control could be used to reduce the "ever increasing, unceasingly spawning class of human beings who should never have been born at all."  *Box*, 139 S. Ct. at 1783-84 (citing Sanger, Pivot of Civilization 187, 189 (1922)).  Some abortion advocates urged the legalization of abortion for the very purpose of eugenics, and Planned

13

Parenthood President Alan Guttmacher urged the use of abortion to prevent the birth of disabled children. *Box*, 139 S. Ct. at 1789-90 (citing A. Guttmacher, Babies by Choice or by Chance, 186-188 (1959)).

Today, the widespread use of prenatal screening tests has "heightened the eugenic potential for abortion." *Box*, 139 S. Ct. at 1784. (Ex. C, Sullivan Decl., ¶ 4; Ex. D, Curlin Decl., ¶¶ 47, 55.) And there is substantial evidence that abortion is in fact being used to eliminate children with unwanted characteristics. The abortion rate for children diagnosed in utero with Down syndrome is nearly 100% in Iceland, 90-100% in the United Kingdom, 96% in France, and 61-91% in the United States. (Ex. C, Sullivan Decl., ¶¶ 8-10.)[7] Sex-selective abortions are common in Asia, leading to millions of "missing" women, significant gender imbalances, and the devaluation and dehumanization of women. *Box*, 139 S. Ct. at 1787 (citing M. Hvistendahl, Unnatural Selection: Choosing Boys Over Girls, and the Consequences of a World Full of Men, 5-6 (2011)). Sex-selective abortions are also common among certain populations in the United States. (Ex. B, Curlin Decl., ¶ 40.)

The Bill's non-discrimination provision plainly furthers the State's interest in preventing discrimination—an interest that is not only legitimate, but compelling. *See, e.g., N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 n.5 (1988) (recognizing the State's 'compelling interest' in combating invidious discrimination").[8] The provision prohibits abortion providers from

---

[7] The very existence of "wrongful birth" claims leaves no doubt that some women choose to abort unborn children diagnosed with a disability. *See Smith v. Gore*, 728 S.W.2d 738, 741 (Tenn. 1987) (explaining that a wrongful birth action seeks to "recover damages for the birth of an impaired child when the impairment results . . . because the defendant failed to diagnosis or discover a genetic defect . . . in the parents or the infant in time *to obtain a eugenic abortion*" (emphasis added)).

[8] The non-discrimination provision would even satisfy traditional strict scrutiny analysis because it is "narrowly tailored" to the State's interest in preventing discrimination. *Kanuszewski v. Mich.*

knowingly carrying out discriminatory abortions and sends a clear message to the public that aborting an unborn child based on his or her race, sex, or Down syndrome diagnosis is antithetical to principles of equality. The non-discrimination provision is of a piece with other state laws that prohibit discrimination based on race, sex, and disability in employment and numerous other contexts. *See, e.g.*, Tenn. Code Ann. §§ 4-21-101; 8-50-103 to 104.

The non-discrimination provision also furthers the State's interests in "protecting the integrity and ethics of the medical profession" and promoting human dignity. *See Gonzalez*, 550 U.S. at 157. The General Assembly found that the integrity of the medical profession is "significantly harmed by physician involvement in practices that . . . facilitate discrimination." (Ex. A, § 39-15-214(69).) Experts in public bioethics and medical ethics agree. Abortion for discriminatory purposes is contrary to the Hippocratic Oath's duty of non-maleficence and the concept of ontological personalism which ascribes moral value to every person, regardless of mental or physical factors. (Ex. C, Sullivan Decl., ¶¶ 18-22; Ex. D, Snead Decl. ¶¶17-21, 24-26; Ex. B, Curlin Decl. ¶¶ 51-55.) Moreover, there is evidence that discrimination based on a diagnosis of Down syndrome is a significant problem in the medical profession that warrants a regulatory response. For many years, medical professionals recommended that infants with Down syndrome be institutionalized—or, worse yet, left to die—rather than provided with appropriate medical care. (Ex. B, Curlin Decl. ¶¶ 26-27, 47.)[9] Even though children with Down syndrome

---

*Dep't of Health and Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (internal quotation marks omitted).

[9] The life expectancy of individuals with Down syndrome has increased significantly over the past few decades "owing to reduced institutionalization and improved access to medical care." Angela P. Presson, et al., *Current Estimate of Down Syndrome Population Prevalence in the United States*, J. Pediatrics 2013 Oct; 163(4): 1163-68.

15

today experience very positive outcomes with appropriate care and treatment, medical professionals often pressure expectant mothers who receive a Down syndrome diagnosis to have an abortion and fail to provide them with accurate information about the child's prognosis. (Ex. E, Platte Decl., ¶ 11-12.; Ex. F, Blythewood Decl., ¶¶ 6-12.)[10] When abortion providers take the further step of aborting a child when they know the abortion was sought because of the child's Down syndrome diagnosis, they directly contribute to "negative and inaccurate stereotypes" and "societal indifference" toward individuals with disabilities. *Washington v. Glucksberg*, 521 U.S. 702, 732 (1997) (internal quotation marks omitted). By prohibiting this conduct, the Bill directly furthers the State's interest in protecting the integrity of the medical profession and affirms the inherent dignity and worth of every individual. (Ex. D, Snead Decl. ¶¶ 28-33; Ex. C, Sullivan Decl., ¶ 22.)

> ### 2. The non-discrimination provision does not pose a substantial obstacle to abortion.

Because the non-discrimination provision furthers the State's interests, it must be upheld unless it has the "effect of placing a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878 (plurality opinion). And because Plaintiffs have challenged the non-discrimination provision on its face, Plaintiffs must also show that the provision poses a substantial obstacle in a "large fraction of the cases in which the

---

[10] The General Assembly enacted the Down Syndrome Information Act of 2018, Tenn. Code Ann. § 68-1-1303 to -1304, to ensure that parents and health care providers receive current, evidence-based information about Down syndrome.

16

[provision] is relevant." *Casey*, 505 U.S. at 895; *see also Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 369 (6th Cir. 2006).[11] Plaintiffs cannot carry that burden.

It bears repeating that the non-discrimination provision prohibits physicians from performing abortions only when they *know* that the abortion is being sought because of the race, sex, or Down syndrome diagnosis of the unborn child. But physicians are under no duty to *inquire* about a patient's reasons for seeking the abortion, and Plaintiffs acknowledge that they "do not require that patients disclose any or all of their reasons for seeking an abortion" and that "many patients do not do so." (D.E. 1, PageID# 25.) Tellingly, Plaintiffs provide no data regarding how frequently their patients have disclosed a prohibited reason for obtaining an abortion, nor do they estimate how many women might do so after the non-discrimination provision becomes effective (a figure that would presumably be even less). They allege only that some patients have "inquired about the sex of the fetus . . . after they have decided on having an abortion" or discussed "experiencing racism from their families around a biracial relationship." (D.E. 1, PageID # 25-26.) As explained below, however, *see* pp. 29, *infra*, the non-discrimination provision does not prohibit physicians from performing an abortion when a patient merely mentions the words "sex" or "race."

Because Plaintiffs cannot carry their burden to show that the non-discrimination provision would present a substantial obstacle to *any* woman seeking an abortion, let alone a "large fraction" of women for whom the provision is relevant, Plaintiffs are unlikely to prevail on the merits of

---

[11] In other contexts, to prevail on a facial challenge, a plaintiff must show that there is "no set of circumstances under which [the law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Supreme Court noted in *Gonzales* that the standard for facial challenges in the abortion cases "has been a subject of some question." 550 U.S. 167. While the State's position is that the *Salerno* standard should apply, Plaintiffs here fail to satisfy even the less stringent "large fraction" standard.

17

their facial challenge. It follows that they are not entitled to the "extraordinary and drastic remedy" of preliminary relief. *Glowco*, 958 F.3d at 539.

### C. The Gestational-Age Provisions Do Not Violate a Woman's Right to Abortion.

In Count I, Plaintiffs allege that *all* of the Bill's gestational-age provisions are unconstitutional because they "prohibit[] pre-viability abortions." (D.E. 1, PageID # 30.) Plaintiffs are unlikely to succeed on the merits of this claim. The gestational-age provisions do not "prohibit" women from making the "ultimate decision" to obtain a pre-viability abortion and therefore are subject to the undue burden standard. *Casey*, 505 U.S. at 879. At least some of the gestational-age provisions survive that standard because they further compelling state interests and do not pose a substantial obstacle to abortion access for a "large fraction" of women seeking pre-viability abortions in Tennessee. *Id.* at 895.

#### 1. The gestational-age provisions do not prohibit women from obtaining a pre-viability abortion.

The Supreme Court held in *Casey* that the undue burden standard is the appropriate means of reconciling the State's interest[s] with the woman's constitutionally protected liberty." 505 U.S. at 876. Plaintiffs attempt to avoid application of the undue burden standard by arguing that *all* of the Bill's gestational age limitations are unconstitutional because they "prohibit[ ] pre-viability abortions." (D.E. 1, PageID # 30; D.E. 7, PageID # 108-110.) But that characterization is inaccurate. The gestational-age provisions regulate the *timing* of abortion; they do not prohibit pre-viability abortions altogether.

The State acknowledges that, under *Casey*, "a State may not *prohibit* any woman from *making the ultimate decision* to terminate her pregnancy before viability." 505 U.S. at 879 (emphasis added). However, the Supreme Court has never considered the constitutionality of a law restricting the availability of abortion after a certain gestational age or decided whether such

18

a law should be evaluated under the undue burden standard. Tacitly recognizing this fact, Plaintiffs rely on cases from *other jurisdictions* to support their assertion that gestational-age provisions are prohibitions of pre-viability abortions, not regulations that are subject to the undue burden standard. (D.E. 7, PageID # 109-110, n.14.)

Although some circuits have adopted Plaintiffs' position, most circuits, including the Sixth Circuit, have not yet addressed the issue of whether gestational-age provisions prohibit or merely regulate pre-viability abortions.[12] This Court is not bound by, and should not follow, decisions from other jurisdictions that have expanded the holding of *Casey*. *See Botello v. Tenn. Dep't of Corr.*, No. 3:18-cv-00549, 2018 WL 3818020, at *2 n.2 (M.D. Tenn. 2018) ("The Court is not bound by the decisions of courts in other Circuits." (citing *Terry v. Tyson Farms, Inc.*, 604 F.2d 272, 278 (6th Cir. 2010))). *Casey* holds only that "a State may not *prohibit* any woman from making the *ultimate decision* to terminate her pregnancy before viability." 505 U.S. at 879 (emphasis added). The Bill's gestational-age provisions do not "prohibit" a woman from deciding *whether* to seek a pre-viability abortion; they merely regulate *when* she must make that decision.[13]

The Sixth Circuit has reviewed laws that could be characterized as "bans" of a particular category of pre-viability abortions under the undue burden standard rather than invalidating them outright as prohibitions of pre-viability abortion. In *Planned Parenthood Southwest Ohio Region*

---

[12] A divided panel of the Sixth Circuit recently invalidated a Kentucky law that the district court had found "effectively banned" the standard dilation and evacuation procedure after 13 weeks LMP. *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 960 F.3d 785, 792 (6th Cir. 2020). In evaluating the constitutionality of the law, the court treated it as a regulation of pre-viability abortions, not a prohibition, and applied the undue burden standard. *Id.* at 795.

[13] Time, place, and manner restrictions on the exercise of fundamental rights are nothing new. They are routinely upheld in First Amendment cases. *See, e.g.*, *Hynes v. Metro. Gov't of Nashville and Davidson Cty.*, 478 F. Supp. 9, 11 (M.D. Tenn. 1979) (citing *Cox v. New Hampshire*, 312 U.S. 569, 574 (1940)).

19

*v. DeWine*, the Sixth Circuit upheld an Ohio law that effectively imposed "a total ban on medical abortions" by "mak[ing] mifepristone unavailable to women between 50 and 63 days LMP." 696 F.3d 490, 508 (6th Cir. 2012) (Moore, J., dissenting in part). The court did not treat this "method ban" as an unconstitutional "prohibition" of pre-viability abortions. Instead, "[b]ecause jurisprudence from the Supreme Court and [the Sixth Circuit] d[id] not clearly address a method ban comparable" to the one at issue in that case, the court applied "the more general undue-burden standard" and upheld the law. *Id.* at 514, 516 (McKeague, J., concurring in part and writing for the majority in Part VI). This Court should follow the Sixth Circuit's lead and review the gestational-age provisions under the undue burden standard.

Because the gestational-age provisions regulate the timing of abortion, rather than prohibiting pre-viability abortions altogether, they are subject to the undue burden standard. And they survive that standard because "they are 'reasonably related' to a legitimate state interest" and "do not pose a substantial obstacle to abortion access." *June Medical*, --- S. Ct. ---, 2020 WL 3492640, at *23 (Roberts, C.J., concurring in judgment).

### 2. The gestational-age provisions advance legitimate, substantial, and compelling state interests.

The gestational-age provisions directly further the State's interests in protecting the life of the unborn and the health of expectant mothers, preventing fetal pain, promoting human dignity, and protecting the integrity of the medical profession. The importance of these interests cannot be disputed. The Supreme Court and the Sixth Circuit have repeatedly recognized the State's significant interest in protecting the life of the unborn. *See, e.g.*, *Gonzales*, 550 U.S. at 157 ("[T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus[.]"); *Casey*, 505 U.S. at 876 ("[T]here is a substantial state interest in potential life throughout pregnancy."); *EMW Women's Surgical Center, P.S.C. v. Beshear*, 920 F.3d 421, 428

20

(6th Cir. 2019) ("We have long understood *Casey* as marking a shift toward greater respect for States' interest[ ] in . . . protecting unborn life."). Indeed, "[a] central premise" of the Court's adoption of the undue burden standard in *Casey* was that "precedents after *Roe* had 'undervalue[d] the State's interest in potential life.'" *Gonzales*, 550 U.S. at 124 (quoting *Casey*, 505 U.S. at 873 (plurality opinion)). The State's interest in protecting the health of expectant mothers is also well established. *See Casey*, 505 U.S. at 846 (recognizing the State's "legitimate interest[] from the outset of the pregnancy in protecting the health of the woman").

The State's interest in "preventing gratuitous pain to the unborn" is also "unquestionably legitimate (if not compelling)." *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 280 (5th Cir. 2019) (Ho, J., concurring in judgment). "Preventing fetal pain is part and parcel" of the State's interest in protecting the life of the unborn. *Friedlander*, 960 F.3d at 795. It is also part and parcel of the State's related interests in promoting human dignity and protecting the integrity of the medical profession. *See Gonzales*, 550 U.S. at 157 (noting that "there can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession'" (quoting *Glucksberg*, 521 U.S. at 731).

The General Assembly correctly found that the gestational-age provisions directly further these interests. The later gestational-age provisions, in particular, further the State's interests in protecting the life of the unborn, preventing fetal pain, promoting human dignity, and protecting the integrity of the medical profession by restricting abortions that could cause unborn children pain. The scientific literature on fetal pain is "entirely uncontested" and "unambiguously indicates" that by 10 to 12 weeks LMP, "a human fetus develops neural circuitry capable of detecting and responding to pain." (Ex. G, Condic Decl., ¶¶ 8, 19-20; Ex. H, Pierucci Decl., ¶¶

31-35, 40.)[14]  By 14 to 20 weeks LMP, "spinothalamic circuitry develops that is capable of supporting a conscious awareness of pain."  (Ex. G, Condic Decl., ¶¶ 8, 42.)  That is why fetal surgeons routinely use anesthesia and analgesia for unborn children as young 18 weeks LMP.  (Ex. G, Condic Decl., ¶ 43; Ex. H, Pierucci Decl., ¶¶ 27-30.)

Plaintiffs typically use the "dilation and evacuation technique" to perform abortions after 15 weeks LMP, a point at which unborn children are capable of experiencing pain.  (D.E. 1, PageID # 15.)  This technique, also known as "dismemberment abortion," involves a physician "tearing apart and extracting piece-by-piece from the uterus what was until then a living unborn child." *West Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1313 (11th Cir. 2018).  The gestational-age provisions that restrict abortion after 15 weeks LMP—when this "brutal and inhumane procedure," *id.* (quoting *Gonzales*, 550 U.S. at 157), becomes common—plainly further the State's related interests in protecting unborn life and preventing fetal pain.

Restricting abortion after unborn children are capable of feeling pain also furthers the State's interests in promoting human dignity and protecting the integrity and ethics of the medical profession.   "It is a universally shared and foundational norm of medical ethics and bioethics that health care providers and researchers have an obligation of beneficence towards patients, human subjects, and other individuals.  This norm incorporates the classical Hippocratic injunction to 'do no harm' (sometimes called the 'duty of nonmaleficence')."  (Ex. D, Snead Decl. ¶¶ 24-27; Ex. C, Sullivan Decl., ¶¶ 18-19.)  "[D]espite continuing disagreement about the ethics, law, and public policy concerning abortion generally, there is broad agreement that the ethical duty to avoid

---

[14] Even if the scientific evidence regarding fetal pain were in dispute, that would be no reason to second-guess the General Assembly's actions. The Supreme Court has made clear that state legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *June Medical*, --- S. Ct. ---, 2020 WL 3492640, at *24 (Roberts, J., concurring in judgment) (quoting *Gonzales*, 550 U.S. at 163).

inflicting cruel, inhumane, and degrading treatment on others extends even to unborn children who are slated for abortion."  (Ex. D, Snead Decl. ¶ 27.)  This "broad agreement" is international in scope.  Only seven countries in the world permit elective abortions after 20 weeks LMP.[15]  Only 17 countries in the world permit abortions without any restrictions after 12 weeks LMP.[16]  As the General Assembly correctly found, "[t]he integrity and public respect of the medical profession are significantly harmed by physician involvement in practices that have been rejected by the international community, facilitate discrimination, or otherwise create a disdain for life." (Ex. A, § 39-15-214(a)(69)).  Indeed, the original Hippocratic Oath forbade a physician from providing an abortion; so too did the first version of the World Medical Association's Declaration of Geneva, which required "maintain[ing] the utmost respect for human life, from the time of conception, even under threat." (Ex. B, Curlin Decl., ¶¶ 11-14.)

The later gestational-age provisions also further the State's interest in protecting and unborn life by restricting abortions at a point when the unborn child could be viable.  The point of viability has decreased significantly since *Roe* and *Casey* were decided.  With active treatment, children born as early as 22 weeks can survive.  (Ex. H, Pierucci Decl., ¶ 11.)  Further, gestational age alone is an imperfect indicator of viability; the cumulative predictive values of birth weight, sex, maternal steroids, and whether the pregnancy is a multiple pregnancy outperform gestational age alone.  (Ex. H, Pierucci Decl., ¶ 12.)  This is critical given the ease at which gestational age can be miscalculated.  (Ex. H, Pierucci Decl., ¶ 15.)  And in the nearly fifty years since *Roe v.*

---

[15]  Baglini, Angelina, *Gestational Limits on Abortion in the United States Compared to International Norms*, American Reports Series, The Charlotte Losier Institute, Issue 6, Feb. 2014.

[16]  *See* The World's Abortion Laws, Ctr. for Reprod. Rights (July 2014), http://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/AbortionMap 2014.PDF; Guttmacher Institute. (March 2018). Abortion Worldwide 2017: Uneven Progress and Unequal Access, https://www.guttmacher.org/report/abortion-worldwide-2017.

*Wade*, modern medical advances have reduced the gestational age at which a child can survive to well-below the original third trimester threshold. (Ex. H, Pierucci Decl., ¶ 14.)

Finally, all the gestational-age provisions further the State's interest in protecting the health of expectant mothers. The General Assembly correctly found that abortions performed at any gestational age pose a risk to the mother's health by increasing the likelihood of subsequent preterm birth and placenta previa, life-threatening hemorrhage, postpartum hemorrhage, and cesarean delivery. (Ex. A, § 39-15-214(a)(43)).[17] Women who receive abortions are also at high risk of adverse mental health outcomes. (Ex. A, § 39-15-214(a)(49).)[18]

In short, all of the gestational-age provisions further the State's interests in protecting maternal health, protecting and showing respect for the life of the unborn, protecting the integrity of the medical profession, and promoting human dignity, and the strength of these interests increases as the gestational age increases. The later gestational-age provisions—particularly those that apply after 15 weeks LMP—additionally further the State's interest in preventing fetal pain.

---

[17] John M. Thorp, Jr. et al., *Long-Term Physical and Psychological Health Consequences of Induced Abortion: Review of the Evidence*, 58 Obstetrical & Gynecological Surv. 67, 77 (2002).

[18] Sharain Suliman et al., *Comparison of Pain, Cortisol Levels, and Psychological Distress in Women Undergoing Surgical Termination of Pregnancy Under Local Anesthesia Versus Intravenous Sedation*, 7 BMC Psychiatry 24 (2007); *see also* Paul Stam, *Woman's Right to Know Act: A Legislative History*, 28 Issues L. & Med. 3, 33 (2012); Priscilla K. Coleman, *Abortion and Mental Health: Quantitative Synthesis and Analysis of Research Published 1995-2009*, 199 Brit. J. Psychiatry 180, 182 (2011); Joseph W. Dellapenna, *Dispelling the Myths of Abortion History* (2006); Priscilla K. Coleman et al., *Induced Abortion and Anxiety, Mood, and Substance Abuse Disorders: Isolating the Effects of Abortion in the National Comorbidity Survey*, 43 J. Psychiatric Res. 770, 771-73 (2009); Natalie P. Mota et al., *Associations Between Abortion, Mental Disorders, and Suicidal Behavior in a Nationally Representative Sample*, 55 Can. J. Psychiatry 239, 244-45 (2010); David C. Reardon & Philip G. Ney, *Abortion and Subsequent Substance Abuse*, 26 Am. J. Drug & Alcohol Abuse 61, 66-68 (2000); David C. Reardon et al., *Substance Use Associated with Unintended Pregnancy Outcomes in the National Longitudinal Survey of Youth*, 30 Am. J. Drug & Alcohol Abuse 369, 377 (2004).

24

And the provisions that apply after an unborn child could be viable given the current state of medical technology are even more directly related to the State's interest in protecting unborn life.

### 3. The gestational-age provisions do not pose a substantial obstacle to abortion access.

Because Plaintiffs' challenge to the gestational-age provisions is a facial one, they must show that the provisions "present a substantial obstacle to obtaining an abortion for a large fraction of the women for whom the restrictions are relevant." *Taft*, 468 F.3d 361 at 369. The Sixth Circuit has "found that a large fraction exists when a statute renders it *nearly impossible* for the women actually affected by an abortion restriction to obtain an abortion." *Id.* at 373 (citing *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997)) (emphasis added). Plaintiffs cannot satisfy that standard.

Plaintiffs argue that the gestational-age limitations "prohibit Plaintiffs from providing pre-viability abortion care to nearly all of their patients." (D.E. 7, PageID # 108.) They present a general, blanket argument as to all of the gestational-age provisions and ask for injunctive relief to prevent all eleven provisions from becoming effective. (D.E. 6, PageID # 88.) But because each gestational-age provision is severable from the others, and because injunctive relief must be narrowly tailored to a plaintiff's purported harm, *see Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 323 (2006), this Court should instead evaluate the constitutionality of each provision separately and ask whether each provision poses a substantial obstacle to a "large fraction" of affected women.

In applying the "large fraction" test, this Court should use as the denominator all women seeking pre-viability abortions, since those are the women affected by the gestational-age provisions. *See Taft*, 468 F.3d at 369. And the numerator should be based on data regarding the

25

gestational ages at which abortions are currently obtained in Tennessee. The chart below summarizes this data:

| Gestation in Weeks[19] | % | Cum. % |
|---|---|---|
| Under 6 | 12.62% | 12.62% |
| 6-7 | 36.53% | 49.15% |
| 8-9 | 24.12% | 73.27% |
| 10-11 | 12.75% | 86.01% |
| 12-14 | 10.02% | 96.03% |
| 15-17 | 2.09% | 98.12% |
| 18-19 | 0.26% | 98.38% |
| 20 | 0.08% | 98.46% |
| 21 | 0.07% | 98.53% |
| 22 | 0.03% | 98.56% |
| 23 | 0.01% | 98.58% |
| 24 and greater | 0.03% | 98.60% |
| Unknown | 1.40% | 100.00% |
| Total | 109,649 | |

(See ITOP Chart, Ex. I, Lefler Decl., ¶ 6.) This data shows that on average nearly half of abortions in Tennessee already occur before 8 weeks gestational age, and the overwhelming majority occur before 12 weeks. On average in the past decade, for example, 73.27% of abortions occurred before

---

[19] This chart reflects the cumulative data from 2009 to 2018. Year-by-year breakdowns are available in the chart attached to the Declaration of Dr. Vanessa Lefler. (ITOP Chart, Ex. I, Lefler Decl.)

10 weeks, 86.01% occurred before 12 weeks, and 96.03% occurred before 15 weeks. (See ITOP Chart, Ex. I.) Significantly, on average fewer than 4% of abortions performed over the past decade occurred after 15 weeks gestational age. (See ITOP Chart, Ex. I.)

Given what the data show about the gestational ages at which abortions are obtained in Tennessee, Plaintiffs cannot establish that any of the gestational-age provisions poses a substantial obstacle to abortion access for a "large fraction" of affected women. Moreover, even if this Court were to determine that the earliest of the gestational-age provisions—those restricting abortion after a "fetal heartbeat" is detected or after 8 weeks gestational age—pose a substantial obstacle, Plaintiffs still could not prevail on their facial challenges to the later gestational-age provisions. Those provisions present an obstacle to, at most, only a small percentage of women. To the extent any women are actually burdened by the later gestational-age provisions, they must seek as-applied relief. *See Gonzales*, 550 U.S. at 167 (noting preference for as-applied challenges).

> **D**.     **The Bill Is Not Unconstitutionally Vague.**

Plaintiffs also challenge the non-discrimination provision and the medical-emergency affirmative defenses in both the non-discrimination and gestational-age provisions as violative of the Due Process Clause on the theory that they are unconstitutionally vague. Plaintiffs cannot succeed on either challenge.

To satisfy the Due Process Clause, a criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Gonazles*, 550 U.S. at 148-49 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The non-discrimination provision and medical-emergency affirmative defenses easily satisfy this standard.

### 1. The non-discrimination provision is not vague.

Plaintiffs argue that the non-discrimination provision is vague because they allegedly cannot understand what the terms "knows" and "because of" mean. (D.E. 1, PageID # 27-32; D.E. 7, PageID # 118-123.) Plaintiffs first complain that they do not know whether "because of" requires race, sex, or Down syndrome diagnosis to be "the patient's sole reason, a primary reason, or one motivating factor among any." (D.E. 7, PageID # 118-120.) The ordinary meaning of "because of" is "by reason of" or "on account of." *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (citing *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 176 (2009)). When, as here, the phrase "because of" is not expressly limited by terms like "solely" or "only," that ordinary meaning applies. *See Bostock v. Clayton County*, --- S. Ct. ---, 2020 WL 3146686, at *9 (2020) 590 U.S. ____, at *6 (2020) (the term "because of sex" in Title VII indicates that "sex need not be the sole or primary cause" absent additional language to that effect). As other courts have concluded, this common definition of "because of" is not unconstitutionally vague. *See, e.g., In re M.S.*, 896 P.2d 1365, 1476 (Cal. 1995) (holding that the phrase "because of" in California's hate crime statute was not unconstitutionally vague because it was a term of "common usage").

Plaintiffs' argument that the term "knows" is unconstitutionally vague fares no better. In fact, that the non-discrimination provision includes a "knowing" scienter requirement vitiates Plaintiffs' vagueness argument. The Supreme Court has "made clear that scienter requirements alleviate vagueness concerns." *Gonzales*, 550 U.S. at 124. Under Tennessee law, moreover, the term "knowing" in a criminal statute means that the defendant "is aware of the nature of the conduct or that the circumstances [surrounding the conduct] exist." Tenn. Code Ann. § 39-11-302(b). To be sure, because there is seldom direct proof of a defendant's mental state, a

defendant's knowledge may be proven by circumstantial evidence. *See, e.g.*, *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). But that circumstantial evidence must still show that the defendant was "aware" of the circumstances that made his conduct unlawful. Applied to the non-discrimination provision, that means that a physician must be "aware" that the abortion is being sought because of the unborn child's race, sex, or Down syndrome diagnosis.

The hypothetical situations Plaintiffs bring up—oblique references to race, sex, or advanced maternal age—would be insufficient to establish knowledge under this standard because they would not make a physician "aware" of the reason the abortion is being sought. And because the "knowing" mental state—in contrast to "recklessness"—does not impose liability when a defendant merely "should have known" certain circumstances existed, such oblique references do not obligate a physician to further inquire about a patient's reasons. *Cf.* Tenn. Code Ann. § 39-11-302(c) (defining "reckless" to include situations when "the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist").

Plaintiffs' unfounded speculation that the non-discrimination provision will be enforced in an arbitrary manner is just that—speculation. This is a pre-enforcement challenge, and Plaintiffs have produced no actual evidence of discriminatory enforcement. *See Gonzales*, 550 U.S. at 150 (rejecting concerns about arbitrary enforcement in a pre-enforcement challenge because they were "somewhat speculative"). For the same reasons that the non-discrimination provision gives persons of ordinary intelligence notice of what conduct is prohibited, the provision is also sufficiently clear to limit prosecutorial discretion. *See id.* at 150 (explaining that scienter requirements "limit prosecutorial discretion").

### 2. The medical-emergency affirmative defenses are not vague.

Plaintiffs contend that the Bill's affirmative defenses for medical emergencies are

unconstitutionally vague because they allegedly require a provider to be "reasonable" in determining that a medical emergency exists. But it is exceedingly common for criminal liability to turn on the "reasonableness" of a defendant's conduct. For example, "self-defense" requires an evaluation of whether the person "reasonably believes that force is necessary" or whether the person has a "reasonable belief" of bodily harm or of imminent danger. Tenn. Code Ann. § 39-11-611(b).

Traditional state tort laws and other regulations also require physicians to conform their conduct to objective reasonableness standards to avoid liability or discipline. Because there is no evidence that these laws and regulations chill physicians from performing emergency procedures in those contexts, there is no basis to fear that physicians will be chilled from performing abortions that are medically necessary. *See Karlin v. Foust*, 188 F.3d 446, 465-67 (7th Cir. 1999) ( observing that "physicians have a duty to exercise due care, i.e., act reasonably, in treating all their patients and thus duty extends to a physician's decision to perform an emergency abortion.")

Other circuits have upheld medical-emergency exceptions containing both subjective and objective standards. In *Karlin v. Foust*, 188 F.3d 446, 459-68 (7th Cir. 1999), for example, the Seventh Circuit upheld a medical-emergency definition that included the objective standard of the physician's exercise of "reasonable medical judgment." *See also Hope Clinic v. Ryan*, 195 F.3d 857, 866 (7th Cir. 1999) (en banc).

Even if the Bill's medical-emergency affirmative defenses could be viewed as unconstitutionally vague standing alone, Tennessee's criminal law imposes a scienter requirement if one is not specifically provided for within the plain language of a statute. *See* Tenn. Code Ann. § 39-11-301(b)-(c) ("If the definition of an offense within [Title 39] does not plainly dispense with a mental element, intent, knowledge, or recklessness suffices to establish the culpable mental state.") The Bill's medical-emergency defenses do not clearly dispense with a mental element, so

30

Section 39-11-301 would require that a mental state of "intent, knowledge, or recklessness" to be proven beyond a reasonable doubt to impose criminal liability.

That Tennessee's criminal law imposes a scienter requirement if one is not specifically provided for within the plain language of a statute easily distinguishes this case from *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997).[20] In *Voinovich*, the Sixth Circuit held Ohio's medical necessity exception unconstitutionally vague because it lacked a scienter requirement, but it was critical to the Court's analysis that "Ohio law d[id] not provide for the importation of a scienter requirement." *Id.* at 205. The Court cited with approval the Eighth Circuit's decision in *Fargo Women's Health Organization v. Schafer*, 18 F.3d 526 (8th Cir. 1994), which rejected a vagueness challenge because "North Dakota law mandated that a requirement of willfulness be imported into the statute." *Voinovich*, 130 F.3d at 205 (quoting *Schafer*, 18 F.3d at 534-35). Because Tennessee law imposes a scienter requirement, Plaintiffs' vagueness challenge fails.

## II.      Plaintiffs Are Unlikely to Suffer Irreparable Injury Absent the Injunction.

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable harm is likely in the absence of the requested injunction. *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). The showing of likely irreparable harm is the single most important prerequisite for issuance of a preliminary injunction. *See* 11A C. Wright, A. Miller, & M. Kane, Fed. Practice and Procedure § 2948.1 (3d ed.). Speculative injury is not sufficient. *Id.* A preliminary injunction is not warranted to prevent the possibility of some remote future injury— a presently existing actual threat must be shown. *Id.* "Issuing a preliminary injunction based only

---

[20] As Judge Boggs explained in his dissent in *Voinovich*, "the majority's reliance on *Colautti v. Franklin*, 439 U.S. 379 (1979), for the proposition that a statute without a scienter requirement is vague [was] misplaced." *Voinovich*, 130 F.3d at 215-16 (Boggs, J., dissenting).

31

on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mazurek*, 520 U.S. at 972.

Plaintiffs are all abortion clinics or providers who claim that, "[w]ithout an injunction, the Bans will prohibit Plaintiffs from providing pre-viability abortion care to nearly all of their patients." (D.E. 7, PageID # 108.) However, because there is no constitutional right to perform abortions, *see Hodges*, 917 F.3d at 913 (6th Cir. 2019), those asserted harms are not constitutionally cognizable and do not justify preliminary relief.

Plaintiffs claim that their patients who are not able to get abortions within the prescribed time limits "will either be forced to travel out or state" for their abortion, or "continue their pregnancies against their will," or "resort to unsafe means to terminate their pregnancies." (D.E. 7, PageID # 114.) According to Plaintiffs, "[b]eing denied an abortion will harm patients' health, from abusive and unsafe circumstances." (D.E. 7, PageID # 114.)

Even assuming that Plaintiffs have standing to assert the constitutional rights of their patients, these allegations are unsupported; they are merely speculation, hearsay, and generalization. (*See, e.g.*, Looney Decl., D.E. 8-1, PageID# 151-52; Rovetti Decl., D.E. 8-4, PageID# 241,242, 243; Terrell Decl., D.E. 8-5, PageID# 254.) Such speculative harm is insufficient to establish an entitlement to preliminary relief. And even if Plaintiffs could establish that some subset of patients was at imminent risk of experiencing these harms, the proper remedy would be a narrow injunction tailored to those patients. Harms that could be experienced by a few do not justify the broad facial injunctive relief that Plaintiffs request.

As for the non-discrimination provision, Plaintiffs have not identified *any* woman whom the provision would prevent from obtaining an abortion or estimated how many women seek

abortions for discriminatory reasons.  They do not even allege that patients have ever sought—or will seek in the future—an abortion because of the race or sex of the unborn child.  Plaintiffs have failed to show that the non-discrimination provision poses any risk of harm to their patients, let alone irreparable harm that is *likely*.

Finally, the hypothetical harms alleged by Plaintiffs ignore the medical protections in Tennessee law.  The Bill does not restrict abortion access where the mother has a condition that "so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create."  Tenn. Code Ann. § 39-15-211.

## III.    Issuance of an Injunction Would Harm the State and the Public Interest.

An injunction that prevents a State from enforcing a duly enacted law necessarily irreparably harms the State.  *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (citation omitted); *Detroit Newspaper Publisher Ass'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), *cert. denied*, 411 U.S. 967 (1973); *MLZ, Inc. v. Fourco Glass Co*., 470 F. Supp. 273, 278 (M.D. Tenn. 1978).  And where the party opposing equitable relief is the government, consideration of the public interest "merge[s]" with irreparable harm to the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also, e.g., Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  The public has a strong interest in laws duly passed by its representative branch of government, and thus the public interest and harm to the state militate against injunctive relief.  *Abbott*, 734 F.3d at 419.

33

Discrimination because of race, sex, or disability should be no more acceptable in the abortion context than in any other area of society. *See General Tel. Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission*, 446 U.S. 318, 326 (1980) (identifying a public interest in preventing discrimination); *see also National Ass'n for Advancement of Colored People v. Federal Power Commission*, 425 U.S. 662, 666 (1976) ("elimination of discrimination from our society is an important national goal.") Thus, the non-discrimination provision, in particular, undeniably serves the public interest by preventing discrimination based upon race, sex, or Down syndrome diagnosis.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' motion for a temporary restraining order and/or preliminary injunction.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/*Alexander S. Rieger*
ALEXANDER S. RIEGER
Assistant Attorney General
Public Interest Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-2408
BPR No. 029362
Alex.rieger@ag.tn.gov

/s/*Charlotte Davis*
CHARLOTTE DAVIS
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 532-2500

34

BPR No. 034204
Charlotte.davis@ag.tn.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Response has been served on the following counsel of record through the Electronic Filing System on this 6th day of July, 2020:

Thomas H. Castelli
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

Jessica Sklarsky
Rabia Muqqadam
Francesca Cocuzza
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Tel: (917) 637-3600
Fax: (917) 637-3666
jsklarsky@reprorights.org
rmuqqadam@reprorights.org
fcocuzza@reprorights.org

Susan Lambiase
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4405
Fax: (212) 247-6811
susan.lambiase@ppfa.org

Anjali Dalal
Andrew Beck
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
adalal@aclu.org
abeck@aclu.org

/s/*Alexander S. Rieger*
ALEXANDER S. RIEGER