## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MEMPHIS CENTER FOR**<br>**REPRODUCTIVE HEALTH, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **NO. 3:20-cv-00501** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **HERBERT H. SLATERY, et al.,** | ) | **MAGISTRATE JUDGE FRENSLEY** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court are Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. No. 6), Defendants' Response (Doc. No. 27), and Plaintiffs' Reply (Doc. No. 34). The Court issued a Temporary Restraining Order on July 13, 2020 (Doc. No. 33), which expires on July 27, 2020, at noon. The parties filed a Joint Notification Regarding Preliminary Injunction Hearing (Doc. No. 39) on July 17, 2020, stating they have jointly agreed to submit the Motion to the Court based on the filings alone, without a hearing. Plaintiffs' request for a preliminary injunction is, therefore, ripe for decision.

### I. Introduction

> The judiciary ... has ... no direction either of the strength or of the wealth of the society and can take no active resolution whatever. It may truly be said to have neither Force nor Will, but merely judgment ... The Federalist No. 78

Tennessee lawmakers recently passed laws that expose healthcare providers to criminal sanctions for performing abortions under certain circumstances. Plaintiffs ask the Court to prevent the State from enforcing those new laws on the basis that they are unconstitutional. The State argues that the laws are constitutional and should be allowed to be enforced.

The Supreme Court found in *Roe v. Wade,* 410 U.S. 113 (1973), that a woman's decision to have an abortion was constitutionally protected under the right to privacy found – not expressly, but implicitly among various provisions – in the U.S. Constitution. That central holding was affirmed by a plurality in *Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833 (1992). In the almost thirty years since *Casey*, the Court – often by close votes or in plurality opinions – has not deviated from its framework that centers around the questions of fetal viability and when state regulation constitutes an "undue burden" on a woman's right to an abortion. *See generally, Casey*.[1]

To be sure, the *Roe* and *Casey* opinions did not disclaim any state interest in regulating abortions. Indeed, *Casey* affirmed that "there is a substantial state interest in potential life throughout the pregnancy" and found constitutional several state regulations at issue in that case. *Casey*, 505 U.S. at 876. And states continue to pass laws concerning abortion and argue policy concerning that procedure, as is their right, which then become subject to judicial scrutiny. As Justice Scalia noted in his *Casey* partial concurrence, *Roe* created a "mandate for abortion on demand [that] destroyed the compromises of the past, rendered compromise impossible for the future, and required the entire issue to be resolved uniformly, at the national level." *Casey*, 505 U.S. at 995.

*Casey* established an "undue burden" framework for courts to use when balancing a woman's right to a pre-viability abortion and the state's interests: "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the *purpose or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877

---

[1]   That central holding was affirmed recently by a plurality opinion in *June Medical Services, LLC v. Russo*, Nos. 18-1323 & 18-1460, 2020 WL 3492640 (June 29, 2020).

2

(emphasis added). This Court is duty bound to apply the holding of *Casey* to the facts of this case.[2]

This Court leaves debate about *Roe*, *Casey* and their progeny to the learned jurists on the Supreme Court, legal scholars, legislators and the public — a debate that remains lively and important. The Tennessee General Assembly passed, and Governor Lee ultimately signed, a law that criminalizes the provision of abortions in Tennessee once a fetal heartbeat[3] is detected or when an abortion is sought for specified reasons. Applying binding Supreme Court precedent and the factors required for the extraordinary remedy of an injunction under Federal Rule of Civil Procedure 65, the Court concludes that an injunction should issue.

## II. The Challenged Statute and Plaintiffs' Claims

Plaintiffs request the Court issue a preliminary injunction prohibiting the enforcement of two provisions relating to pre-viability abortions recently enacted by the Tennessee General Assembly in House Bill 2263/Senate Bill 2196 ("HB 2263"). The two provisions in HB 2263 challenged by Plaintiffs are to be codified at Tennessee Code Annotated Sections 39-15-216 and 39-15-217.[4]

---

[2] "[V]ertical *stare decisis* is absolute, as it must be in a hierarchical system with 'one supreme Court.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part). As former Chief Justice Rehnquist correctly observed, "unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982).

[3] Plaintiffs refer to the "cardiac activity" of a fetus. Differing semantics are common in the abortion debate. But given that the challenged Tennessee statute uses the term "fetal heartbeat," the Court will use the terms of the statute at issue.

[4] In addition to Sections 39-15-216 and -217, HB 2263 adds Section 39-15-214, which includes extensive legislative findings; Section 39-15-215, which includes definitions and other provisions; and 39-15-218, which regulates abortions in which mifepristone is used. Plaintiffs are not challenging these provisions.

3

Section 216(c)(1) provides that a person who performs or induces an abortion "upon a pregnant woman whose unborn child has a fetal heartbeat" commits a Class C felony.[5] Section 216(c)(2) criminalizes abortions when the "unborn child is six weeks gestational age[6] or older" unless there is no "fetal heartbeat." Sections (c)(3) through (12) criminalize the provision of an abortion at various intervals from eight weeks through 24 weeks gestational age. Section 216(b) criminalizes abortions performed without first determining the gestational age of the unborn child. Section 216(e) provides an affirmative defense to criminal prosecution where "in the physician's reasonable medical judgment, a medical emergency prevented compliance with the provision," and certain other conditions are satisfied. "Medical emergency" is defined as "a condition that, in the physician's good faith medical judgment, based upon the facts known to the physician at the time, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create." Tenn. Code Ann. §§ 39-15-216(a)(4); 39-15-211(a)(3).[7] A physician who is criminally charged under this section must report the charge to the board of medical examiners. Tenn. Code Ann. § 39-15-216(g). Section 216(h) contemplates the severability of any provision found to be unenforceable, leaving any enforceable provisions intact. Plaintiffs refer to the

---

[5]   Class C felonies are punishable by three to 15 years of imprisonment and a fine of up to $10,000. Tenn. Code Ann. § 40-35-111(b)(3).

[6]   "Gestational age" is defined as "the age of an unborn child as calculated from the first day of the last menstrual period of a pregnant woman." Tenn. Code Ann. §§ 39-15-216(a)(3); 39-15-211(a)(2).

[7]   "Medical emergency" does not include "a claim or diagnosis related to the woman's mental health or a claim or diagnosis that the woman will engage in conduct which would result in her death or substantial and irreversible impairment of a major bodily function." Tenn. Code Ann. § 39-15-216(a)(4).

provisions of Section 216 as the "Cascading Bans," and Defendants refer to them as the "Gestational-Age Provisions."

Sections 217(b) and (c) provide that a person who performs or induces an abortion upon a pregnant woman "if the person knows that the woman is seeking the abortion because of the sex of the unborn child" or the "race of the unborn child" commits a Class C felony. Section 217(d) criminalizes the provision of an abortion "if the person knows that the woman is seeking the abortion because of a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome in the unborn child." Section 217(e) provides an affirmative defense to criminal prosecution where "in the physician's reasonable medical judgment, a medical emergency prevented compliance with the provision," and certain other conditions are satisfied. "Medical emergency" is defined the same as in Section 216(a)(4). Tenn. Code Ann. § 39-15-217(a)(3). A physician who is criminally charged under this section must report the charge to the board of medical examiners. Tenn. Code Ann. § 39-15-217(h). Section 216(i) contemplates the severability of any provision found to be unenforceable, leaving any enforceable provisions intact. Plaintiffs refer to the provisions of Section 217 as the "Reason Bans," and Defendants refer to them as the "Non-Discrimination Provisions."

Because Tennessee law currently prohibits abortion after viability, Tenn. Code Ann. § 39-15-211(b)(1), the prohibitions in Sections 216 and 217 apply to pre-viability abortions. "Viability," for purposes of HB 2263 and under current Tennessee law, is defined as "that stage of fetal development when the unborn child is capable of sustained survival outside of the womb, with or without medical assistance." Tenn. Code Ann. §§ 39-15-216(a)(6); 39-15-211(a)(7). Tennessee law currently creates a rebuttal presumption of viability at 24 weeks gestational age. Tenn. Code Ann. § 39-15-211(b)(5). Tennessee law also currently prohibits abortion, except in a

medical emergency, after the beginning of the twentieth week of gestational age, unless the physician determines the unborn child is not viable, as measured by gestational age, weight, biparietal diameter, "and other factors that the physician in the physician's good faith medical judgment would consider in determining whether an unborn child is viable." Tenn. Code Ann. § 39-15-212(a).

Plaintiffs are Memphis Center for Reproductive Health, Planned Parenthood of Tennessee and North Mississippi, Knoxville Center for Reproductive Health, and carafem, all health care centers providing reproductive health services, including abortions; as well as Dr. Kimberly Looney and Dr. Nikki Zite, physicians who perform abortions. (Doc. No. 1). Defendants are Attorney General Herbert H. Slatery III; Dr. Lisa Piercey, Commissioner of the Tennessee Department of Health; Dr. Rene Saunders, Chair of the Board for Licensing Health Care Facilities; Dr. W. Reeves Johnson, Jr., President of the Tennessee Board of Medical Examiners; District Attorney General for Knox County Amy Weirich; District Attorney General for Nashville Glenn R. Funk; District Attorney General for Knox County Charme P. Allen; and District Attorney for Wilson County Tom P. Thompson, Jr. (*Id.*)

Plaintiffs allege Sections 216 and 217 are unconstitutional bans on pre-viability abortions in violation of Fourteenth Amendment substantive due process. (*Id.*) Plaintiffs also allege Section 217 is unconstitutionally void for vagueness. (*Id.*) In addition, Plaintiffs allege Sections 216 and 217 are unconstitutional because they lack a valid medical-emergency exception. Plaintiffs argue the medical-emergency affirmative defense provisions are invalid because they are unconstitutionally void for vagueness.

To support their requests for injunctive relief, Plaintiffs filed the Declarations of Dr. Looney (Doc. No. 8-1), Mary Norton, M.D. (Doc. No. 8-2), Dr. Zite (Doc. No. 8-3), Corinne

Rovetti, FNP, APRN-BC (Doc. No. 8-4), Rebecca Terrell (Doc. No. 8-5), and Melissa Grant (Doc. No. 8-6).

A. Plaintiffs' Declaration Testimony

Dr. Looney, a board-certified obstetrician and gynecologist, is the Chief Medical Officer of Planned Parenthood Tennessee and North Mississippi ("PPTNM"), which operates four health centers: one in Nashville, one in Knoxville, and two in Memphis. (Doc. No. 8-1 ¶¶ 1-2). According to Dr. Looney, the centers provide a wide range of reproductive and sexual health services to patients, including wellness visits, cancer screenings, birth control counseling, Human papillomavirus vaccines, annual gynecological exams, pregnancy care, contraception, adoption referral, miscarriage management, and abortion procedures. (*Id.* ¶ 2). Dr. Looney states that there are two main methods of abortion: medication abortion and procedural, or "surgical," abortion. (*Id.* ¶ 14). All four centers provide medication abortions through 11 weeks, as measured from the first day of the patient's last menstrual period ("LMP"), and two of the centers (Nashville and Memphis) provide procedural abortions, through 19 weeks, 6 days LMP. (*Id.* ¶¶ 2, 18). A full-term pregnancy is approximately 40 weeks LMP. (*Id.* ¶ 2) Dr. Looney opines that the "Cascading Bans" and the "Reasons Bans" in the Act "will effectively eliminate access to abortion care in Tennessee . . ." (*Id.* ¶ 13).

Dr. Looney states that, at six weeks of fetal development, the heartbeat is simply a group of cells with electrical activity and an embryo does not develop into a fetus until nine weeks LMP. (*Id.* ¶ 9). She opines that no fetus is viable at 20 weeks LMP or at any earlier gestational age, that viability occurs weeks later, and that viability must be determined on a case-by-case basis. (*Id.* ¶¶ 19, 20). According to Dr. Looney, PPTNM performed 4,742 abortions in Tennessee in 2019, including 4,651 at or after 6 weeks LMP. (*Id.* ¶ 21). In January through March 2020,

PPTNM performed 1,700 abortions in Tennessee, including 1,649 at or after 6 weeks LMP. (*Id.* ¶ 22).

If the "Cascading Bans" take effect, Dr. Looney states, PPTNM will be forced to stop providing pre-viability abortion procedures in order to avoid criminal, monetary, and medical licensure penalties for its physicians and potential licensure actions against the health centers themselves. (*Id.* ¶ 23). Dr. Looney states that the overwhelming majority of abortions in Tennessee occur during the first trimester. (*Id.* ¶ 25). If abortion is banned after 6 weeks LMP, a patient would have a mere two weeks after a missed period to learn they are pregnant, confirm that the pregnancy is in the uterus, decide whether to have an abortion, and seek and obtain an abortion. (*Id.* ¶ 27). The majority of PPTNM's patients, according to Dr. Looney, are low wage-earners and people of color facing daunting economic and logistical challenges to abortions. (*Id.* ¶¶ 30-32). Dr. Looney points out that patients are already required to make two separate trips to the health center, at least 48 hours apart, under current law. (*Id.* ¶ 33). Dr. Looney states that some patients seek an abortion later in their pregnancies because of maternal health conditions that worsen during the course of pregnancy, or they discover a fetal condition or diagnosis, which generally occurs at 15 to 20 weeks LMP. (*Id.* ¶¶ 34-35).

A physician who performs an abortion based on a "medical emergency" will be subject to prosecution, relying on the affirmative defense "that may or may not be accepted depending on whether the physician's good faith medical judgment is deemed 'reasonable' by others after the fact." (*Id.* ¶ 37). This is problematic, Dr. Looney states, because "medical emergency situations are often complex and easily subject to disagreement." (*Id.*) Dr. Looney opines that this uncertainty will likely lead to decisions not to perform abortions or to delay inappropriately the procedure, putting the patient's long-term health in serious jeopardy. (*Id.*)

Dr. Looney states that patients seek abortion for a multitude of complicated and personal reasons, and although some patients disclose information about their reasons, the medical providers at PPTNM do not require the patients to do so. (*Id.* ¶¶ 39-41). According to Dr. Looney, complying with the "Reasons Ban" is problematic because it is not clear if the banned reason must be the only reason, the main reason, one of many reasons, or simply a factor the individual considered. (*Id.* ¶ 45). Dr. Looney states:

> 46. Additionally, there may be instances when patients mention race or sex in counseling with our staff. For example, some patients inquire about the sex of the fetus during a pre-abortion ultrasound and in my experience I have found that some patients who choose abortion want to know the sex of the fetus as part of their process—not (to my knowledge) because it alters their decision but because they simply want to know. The Bans discount the amount of effort a pregnant person puts into their decision and assumes because they have made the decision to have an abortion that they are disconnected from the pregnancy when in fact the opposite may be true. It is unclear whether performing an abortion after a patient makes that inquiry will be deemed an abortion 'because of' the sex of the fetus. In other cases, if race comes up, typically the patient desires the abortion because they fear racism from their families and communities. It is unclear how the law might be implicated if a patient discusses such a situation with PPTNM staff.
>
> 47. We have also seen older patients who express that they have older children, or that it is not the right time in their life to have more children—and have also expressed concern for the health of the pregnancy due to the patient's age, including due to a potential fetal diagnosis, including Down syndrome. It is unclear if these patients would be deemed to be seeking an abortion 'because of' a potential for Down syndrome, as this ban is phrased.
>
> 48. We also see patients who may mention a concern based on maternal age over a possible fetal Down syndrome diagnosis or who may come to us with an early indication of a possible fetal Down syndrome diagnosis. I don't know if such instances or conversations mean that the patient is seeking an abortion 'because of' a possible diagnosis of Down syndrome.
>
> 49. If the Reason Bans take effect, given this lack of clarity and the fact that our physicians are at risk of up to 15 years in prison along with up to $10,000 in fines, whenever race, sex, or the potential for fetal conditions like Down syndrome are ever raised by the patient, PPTNM will be forced to stop providing safe and effective pre-viability abortion care that our patients want, need, and may not be able to access elsewhere.

9

(*Id.* ¶¶ 46-49).

Dr. Norton is board-certified in obstetrics and gynecology, clinical genetics, and maternal-fetal medicine, and a professor in those fields. (Doc. No. 8-2 ¶¶ 1-2). Dr. Norton states that her medical practice focuses on women whose pregnancies are classified as high-risk. (*Id.* ¶ 3). Dr. Norton opines that the "Cascading Bans" prohibit physicians from performing abortions before viability. (*Id.* ¶¶ 9, 20). Dr. Norton defines "viable" as meaning "in the judgment of the attending physician on the particular facts of the case before him or her, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support." (*Id.* ¶ 8). Dr. Norton states that, although there have been rare, exceptional cases where an infant born between 21.4 and 23 weeks has survived, "these are outliers that do not reflect a reasonable likelihood of sustained survival outside the womb." (*Id.*) "[U]nder optimal circumstances and with extraordinary medical intervention," Dr. Norton states, a small percentage of infants born between 23 and 24 weeks may survive, but fetal and maternal health conditions can significantly reduce or eliminate the likelihood of survival for the fetus. (*Id.*) According to Dr. Norton, it is very rare for an infant born at 23 to 24 weeks LMP to survive even with the highest level of care. (*Id.* ¶ 12). In Dr. Norton's opinion, the "legislative findings" in HB 2263 (Section 214) are misleading and/or incorrect in suggesting otherwise. (*Id.* ¶¶ 21-23).

Dr. Zite is a board-certified obstetrician and gynecologist, Professor at the University of Tennessee Graduate School of Medicine within the Department of Obstetrics and Gynecology, and Vice Chair of Education and Advocacy for the Department. (Doc. No. 8-3 ¶ 1). Dr. Zite states that, as part of her practice, she provides pre-viability pregnancy termination, including after 19.6 weeks LMP, in the hospital when the patient and/or fetus are in extremely grave circumstances. (*Id.* ¶¶ 8-11). Those circumstances include cases in which "the fetus lacks organs

10

or organs that sufficiently develop for survival, such as when a fetus would be born without kidneys or with lungs that never develop; or if the fetus has anencephaly, a lack of brain development, a hypoplastic left heart, catastrophic amniotic band syndrome, and severe skeletal dysplasia." (*Id.* ¶ 11). Pursuant to hospital practice, Dr. Zite states, she does not perform terminations for pregnancies solely on the basis of a diagnosis of Down syndrome. (*Id.* ¶ 12). In cases where grave medical circumstances exist, and the fetus also has Down syndrome, Dr. Zite states that it is unclear to her whether such an abortion would be prohibited under the "Reasons Ban." (*Id.* ¶ 12). As for grave maternal conditions, Dr. Zite states, hospital policy requires that two physicians agree that the patient has a sufficiently "severe" health condition, such as severe preeclampsia, maternal heart failure, inevitable abortion, and premature rupture of the membranes. (*Id.* ¶ 15). If the fetus is determined to be viable, the fetus will be delivered and "all life-saving measures will be taken." (*Id.* ¶ 16).

According to Dr. Zite, the "Cascades Ban" will criminalize all abortion procedures she provides unless it qualifies as a "medical emergency" under the statute. (*Id.* ¶ 17). Dr. Zite opines that "[t]here are myriad conditions that could place the pregnant person's health at serious risk, which may not qualify for the limited exception because the condition is not acute enough to 'necessitate' an 'immediate' abortion." (*Id.* ¶ 18). Dr. Zite also states that it is unclear whether the affirmative defense will apply "only based on my good faith determination that a medical emergency existed or whether I will also have to prove that my determination was reasonable." (*Id.* ¶ 19). The uncertainty caused by the medical-emergency defense, according to Dr. Zite, will adversely affect physicians and patients:

> 21. Because medical emergency situations are complex and subject to disagreement, there will be numerous instances where I am unable to provide care to patients in 'medical emergencies' out of fear that other physicians may later challenge my good faith judgment as unreasonable. This fear is particularly acute

11

in Tennessee because so many physicians here openly oppose abortion. For example, if I and another physician judge that a woman's neurological condition is so complicated by pregnancy that she might lose entirely the ability to breathe, and I perform a procedure, could another physician look at the patient's chart after the fact and think that we overestimated the danger, or that we should have delayed the abortion to see whether the patient's condition deteriorated? What if I perform a procedure on a patient with cancer so the patient can begin urgently-needed chemotherapy? Given the severe penalties, it will be too risky to provide abortion care even when I—along with one of my colleagues—make good-faith determinations that there is a medical emergency. This will subject these patients to extreme health risks with potentially dire consequences and force physicians to deviate from the standard of care and their best medical judgment.

22. Some patients who need a termination due to maternal health conditions will be unable to access care unless they deteriorate to the point where the abortion becomes immediately necessary. The fear of post-hoc disagreement—and prosecution—will intimidate physicians into not providing abortion care at all, even in the limited circumstances in which we are currently able to provide pre-viability abortion care at the hospital for maternal health indications. For example, presently, we would perform a termination for a woman experiencing heart failure when there is a high likelihood that the damage to her heart will become permanent. Under the Bans, I would be afraid to provide a termination unless permanent damage to the heart or death is imminent.

(*Id.* ¶¶ 21-22; 23-24).

Ms. Rovetti is a family nurse practitioner and Co-Director of the Knoxville Center for Reproductive Health ("KCRH"). (Doc. No. 8-4 ¶ 1). According to Ms. Rovetti, KCRH provides a range of reproductive health services, including procedural abortions up to 14 weeks and 6 days LMP, and medication abortions up to 10 weeks and 6 days LMP. (*Id.* ¶ 2) KCRH is one of two clinics in Knoxville that provide abortions, and the only clinic that provides both procedural and medication abortions. (*Id.*) Ms. Rovetti states that the "Cascading Bans" will make it impossible to provide pre-viability abortions to nearly all KCRH patients. (*Id.* ¶ 9). A small percentage of KCRH patients receive an abortion prior to 6 weeks LMP, Ms. Rovetti states, and many do not realize they are pregnant until well after 4 weeks LMP. (*Id.* ¶¶ 13-14). As a result of Tennessee's telemedicine ban and 48-hour waiting period, "patients are often pushed well

beyond 4 weeks before they are able to arrange for the requisite time off of work, childcare, and transportation to the clinic." (*Id.* ¶ 14). If patients are unable to obtain an abortion in Tennessee because of the Cascading Bans, Ms. Rovetti states, they will suffer real, lasting harm, because most are poor or low-income, and will face logistical and financial impediments to travelling out of state. (*Id.* ¶¶ 15-21).

Ms. Rovetti states that the "Reasons Bans" will prohibit some KCRH patients from accessing pre-viability abortions. (*Id.* ¶ 10). Ms. Rovetti agrees with Dr. Looney that it is not clear if "because of" means the only reason, the main reason, one of many reasons, or simply a factor the individual considered. (*Id.* ¶ 23). It is also unclear if the statute applies when patients mention their advanced age or family members' racial sentiments during counseling sessions. (*Id.*) If these concerns are ever raised or discovered by KCRH staff, Ms. Rovetti states that abortions will not be provided because physicians risk up to 15 years in prison, $10,000 in fines, and the possibility that the clinic could face a licensure action. (*Id.* ¶¶ 24, 22-29).

Ms. Terrell is the Executive Director of CHOICES: Memphis Center for Reproductive Health ("Choices Memphis"). (Doc. No. 8-5 ¶ 1). Choices Memphis provides the full spectrum of reproductive healthcare, including abortion, birthing and midwifery care, and postpartum care. (*Id.* ¶ 3). Choices Memphis provides medication abortion up to 11 weeks LMP and procedural abortion up to 16 weeks LMP. (*Id.* ¶ 8). Ms. Terrell opines that the "Cascading Bans" will prohibit the vast majority of the clinic's patients from receiving an abortion at all. (*Id.* ¶ 7). According to Ms. Terrell, in 2019, only 4.9% of patients received an abortion prior to 6 weeks LMP, and in the first quarter of 2020, only 6.6% were performed prior to 6 weeks LMP. (*Id.* ¶ 14). Ninety-five percent of patients received abortions at or after six weeks LMP in 2019. (*Id.*)

Given that most pregnancies around six weeks LMP have some cardiac activity, the large majority of the clinic's patients would be completely barred from accessing abortion. (*Id.*)

Ms. Terrell opines that the "Reasons Bans" will also prohibit patients from obtaining abortions. (*Id.* ¶ 7). Ms. Terrell states that it would be "challenging, if not impossible, to fully comprehend a patient's reasons for terminating a pregnancy because we can never be in that patient's shoes." (*Id.* ¶ 16). Ms. Terrell states that she does not understand whether the statute's words "because of" means the only reason, the main reason, one of many reasons or simply a factor the individual considered:

> 20. There may be instances when patients mention race or sex in counseling with our staff. For example, although rare, some patients inquire about the sex of the fetus when they have a pre-abortion ultrasound performed. In other cases, we have seen women experiencing racism from their families around a biracial relationship who have discussed their situation with us. It is not clear how the law might be implicated if a patient discusses such a situation with a patient educator.
>
> 21. We have seen patients of advanced maternal age who, among many reasons they express—existing older children, not the right time in life—have also said they are concerned they might have a complicated pregnancy, including the potential diagnosis of a fetal condition. It is unclear to us if this woman would be seeking an abortion 'because of' a potential for a Down syndrome diagnosis.
>
> 22. And, even when those issues are not raised by our patients, it is not clear to us what it means 'to know' that an abortion is being sought 'because of' one of the prohibited reasons. For example, if we have a patient whose chart reflects a recent visit to a Maternal Fetal Medicine specialist—a physician who might diagnose fetal conditions like Down syndrome—is that enough to 'know' that the patient is terminating because of Down syndrome or the potential for it? We have had patients specifically referred to us because they have a diagnosis of chromosomal abnormalities.

(*Id.* ¶¶ 19, 20-22).  Ms. Terrell agrees with Dr. Looney and Ms. Rovetti that, given this lack of clarity, and the criminal sanctions faced by physicians, abortions will not be provided when a patient's chart or circumstances surrounding the patient's visit raise the issue of race, sex, or the potential for Down syndrome. (*Id.* ¶ 23).

14

Ms. Terrell opines that the Act will cause the clinic's patients severe and permanent harm. (*Id.* ¶¶ 24-27). According to Ms. Terrell, the large majority of the clinic's patients are poor or low-income and already parents, and struggle to access transportation, childcare, and time off work, such that most will be unable to travel to another state to access abortions if they are barred from seeking them due to the Bans. (*Id.* ¶ 26).

Ms. Grant is the Chief Operations Officer of FemHealth USA, Inc., which does business as carafem. (Doc. No. 8-6 ¶ 1). Carafem operates a network of health centers, including one located in Mt. Juliet, Tennessee, that provide information and low-cost options for birth control, testing for sexually-transmitted infections, and medication abortions up to and including 11 weeks LMP and procedural abortions up to and including 13 weeks and 6 days LMP. (*Id.* ¶ 2). Ms. Grant opines that the "Cascading Bans" will prohibit the majority of abortions offered at carafem. (*Id.* ¶ 8, 16). The majority of carafem's abortion patients are at or after 7 weeks LMP. (*Id.* ¶ 16). Ms. Grant points out that a significant percentage of carafem's patients are low-income and people of color for whom costs and other logistical challenges will likely preclude traveling out of state for an abortion. (*Id.* ¶ 18).

Ms. Grant opines that the "Reason Bans" are vague, which forces providers to assume the most aggressive reading of the statute to ensure they do not face severe criminal sanctions:

> 21. For example, I do not understand what it means for the abortion to be sought 'because of' race, sex, or diagnosis of or potential for Down syndrome—whether it means the only reason, the main reason, one of many reasons, or simply a factor that the individual considered.
>
> 22. Furthermore, typically, patients do not specifically identify the race, sex, or indication of Down syndrome as among their reasons for wanting to terminate their pregnancy. However, carafem patients have mentioned their advanced age and an increased likelihood of Down syndrome in the course of their counseling session. Similarly, patients have also mentioned family members' sentiments on racial matters or raised the sex of the fetus during counseling sessions. Because we do not offer care after 13.6 weeks LMP, I am not aware that any of our

patients have a confirmed Down syndrome diagnosis. It is my understanding that most patients do not receive a confirmed diagnosis of Down syndrome until later in pregnancy. Similarly, patients rarely know the sex of the fetus at the time they select termination. However, patients nonetheless express concerns related to the sex of the fetus and Down syndrome. It is not clear how the law might be implicated if a patient discusses such a situation with one of our clinicians.

(*Id.* ¶¶ 20-22). As with the other Declarants, Ms. Grant states that, given the lack of clarity and the risk of severe sanctions, the clinic will be unable to provide abortions if issues regarding the sex, race, or potential for Down syndrome are ever discovered by the clinic's staff. (*Id.* ¶ 23).

B. Defendants' Declaration Testimony

In response to Plaintiffs' Motion, Defendants filed the Declarations of Farr A. Curlin, M.D. (Doc. No. 27-2), Dennis M. Sullivan, M.D. (Doc. No. 27-3), O. Carter Snead, J.D. (Doc. No. 27-4), Amelia Platte (Doc. No. 27-5), Dana Bythewood (Doc. No. 27-6), Maureen L. Condic (Doc. No. 27-7), Robin Pierucci, M.D., M.A. (Doc. No. 27-8), and Vanessa A. Lefler (Doc. No. 27-9).

Dr. Curlin, a physician and bioethicist, opines that Plaintiffs' position that abortion is a common and safe medical procedure like any other, is flawed. (Doc. No. 27-2 ¶10). The better-supported view, Dr. Curlin states, is that "abortion involves intentionally killing a human being at the fetal stage of development." (*Id.*) Under that view, the challenged restrictions are consistent with well-established norms of medical ethics. (*Id.*) Indeed, Dr. Curlin states that the Act will help preserve the integrity of the medical profession. (*Id.* ¶¶ 48-60).

Dr. Curlin opines that "contemporary policies permitting abortion indicate that some professional and medical organizations have gone astray ethically . . ." (*Id.* ¶ 13). In Dr. Curlin's view, abortion kills a human fetus because "[i]t is an uncontroversial scientific holding that an organism is a living thing that has an organized structure . . ." (*Id.* ¶ 16). There is abundant

evidence of societal consensus, according to Dr. Curlin, that it is reasonable and ethical to show moral regard for the fetus. (*Id.* ¶¶ 11-24).

Dr. Curlin supports the non-discrimination provisions of the Act, stating that abortion often involves unjustified discrimination, and is "often motivated by implicit judgments about the quality of life for disabled people." (*Id.* ¶ 27; ¶¶ 25-31; 38-47). According to Dr. Curlin, recent studies estimate that two-thirds of all fetuses diagnosed with Down syndrome in the United States are aborted, and the proportion is even higher in other countries. (*Id.* ¶ 42).

The gestational-age provisions are reasonable, Dr. Curlin opines, because "(a) fetuses with heartbeats are innocent human beings; (b) it is unjust to intentionally kill innocent human beings even if they are very small and have not yet developed all of their capacities; and (c) the state has the authority to prohibit the killing of innocent human beings." (*Id.* ¶ 32). The restrictions on abortions after 15 weeks gestation are also supported by the ethical concern for "killing a fetus in a way that is cruel and inhumane." (*Id.* ¶ 34). Dr. Curlin also states that abortion carries real risks, and sometimes women die from abortions. (*Id.* ¶ 37).

Dr. Sullivan, a physician, bioethicist, and pharmacist, expresses concern that recent developments in prenatal testing have led to justifications for induced abortion where certain genetic abnormalities are found, such as Down syndrome. (Doc. No. 27-3 ¶ 4). According to Dr. Sullivan, a non-invasive prenatal test "can be used to screen for various genetic abnormalities and can also determine the sex of the fetus." (*Id.*) Dr. Sullivan states that Down syndrome is the most common chromosomal abnormality today, affecting about one in every 700 babies. (*Id.* ¶ 5). The condition occurs when a child has a partial or complete extra copy of the 21st chromosome – often called Trisomy 21. (*Id.*) Dr. Sullivan cites studies revealing that 61 to 91% of women terminate their pregnancies when Trisomy 21 is discovered on a prenatal test. (*Id.* ¶ 8).

Dr. Sullivan opines that the medical profession's bias for abortion after a diagnosis of Down syndrome is a serious problem. (*Id.* ¶ 14). The statute's non-discrimination provisions are necessary, according to Dr. Sullivan, to protect the most vulnerable. (*Id.* ¶ 36).

Mr. Snead, an attorney and professor of bioethics and medical ethics, describes the events giving rise to the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, which "clearly recognized that even unborn children destined to be aborted have interests that must be respected and honored." (Doc. No. 27-4 ¶¶ 17, 11-16). That conclusion, according to Mr. Snead, is reflected in statutes and regulations governing protections for human subjects of federally funded research, including unborn children. (*Id.* ¶¶ 18-21). Mr. Snead opines that avoidance of invidious discrimination against vulnerable populations is a foundational principle of American public bioethics, and avoidance of cruel, inhumane, and degrading treatment is a foundational principle of medical ethics/bioethics. (*Id.* ¶¶ 22-27). Mr. Snead further opines that the provisions of the challenged statute seeks to advance these principles. (*Id.* ¶¶ 28-33).

Amelia Platte, a resident of Wilson County, Tennessee, states that during her pregnancy with her fourth child, her obstetrician informed her that an ultrasound had revealed markers for Down syndrome and she had three to four weeks to make a decision about whether the abort the fetus. (Doc. No. 27-5 ¶¶ 1-3). According to Ms. Platte, neither the obstetrician nor the maternal fetal medicine provider discussed the positive aspects of having a Down syndrome child, and they gave her outdated materials about Down syndrome. (*Id.* ¶¶ 3-4). Ms. Platte states that her daughter, Penny, was born in 2014 with Down syndrome, and at age 6, is happy and healthy. (*Id.* ¶ 8).

During a pregnancy in 2016, Mrs. Platte states that testing revealed she had a 70% chance of having a child with "Trisomy 18." (*Id.* ¶ 10). According to Ms. Platte, her health care providers provided outdated information about the condition, and encouraged her to abort the fetus. (*Id.* ¶¶ 10-12). Ms. Platte also states her health care providers pressured her to induce early, and believes that if she had followed that advice, her baby would not have survived, because she weighed only 4 lbs. 11 oz. when she was born at 40 weeks and 2 days. (*Id.* ¶¶ 13-14).

Dana Bythewood, a resident of Williamson County, Tennessee, states that during her pregnancy with her daughter, Emily Hope, in 2018, her health care provider advised her prenatal testing revealed her daughter was 87% likely to have Trisomy 21. (Doc. No. 27-6). A subsequent ultrasound revealed other medical difficulties, and Ms. Bythewood was offered the option of terminating the pregnancy more than once, but she declined. (*Id.* ¶¶ 5-7). According to Ms. Bythewood, her health care providers never presented her with resources about Down syndrome and did not present any positive aspects to the condition. (*Id.* ¶¶ 8-12). Ms. Bythewood subsequently saw health care providers at Vanderbilt who were more encouraging. (*Id.* ¶¶ 13-14). Ms. Bythewood states that Emily is doing well physically, and is a joy and gift to her family and Tennessee. (*Id.* ¶¶ 15-20).

Maureen Condic is a professor specializing in issues concerning human embryology, science policy, and ethics. According to Professor Condic, scientific evidence indicates that "by 8-10 weeks post sperm-egg fusion (10-12 weeks as dated from the last menstrual period; LMP), a human fetus develops neural circuitry capable of detecting and responding to pain." (Doc. No. 27-7 ¶ 8). "During the period from 12-18 weeks of development (14-20 weeks post LMP), spinothalamic (subcortical) circuitry develops that is capable of supporting a conscious

19

awareness of pain." (*Id.*) Professor Condic states that evidence also strongly supports the conclusion that cortical connections developing only after 22 weeks are not obligatory for consciousness or a psychological perception of suffering. (*Id.*)

Professor Condic opines that it is universally accepted that a fetus can detect and respond to pain by 8 to 10 weeks; the debate is over whether there is a conscious experience of pain, which she refers to as "suffering." (*Id.* ¶ 24). In Professor Condic's view, the evidence does not support the conclusion that the fetus does not experience pain in a meaningful sense until the third trimester. (*Id.* ¶¶ 24-42; 48-51). According to Professor Condic, research indicates that "our conscious experience of suffering depends almost entirely on subcortical brain regions that develop very early in the human fetus." (*Id.* ¶ 40). She believes this view is supported by the clear consensus among professional anesthesiologists who use medications to relieve pain in cases of fetal surgery. (*Id.* ¶¶ 43-47).

Professor Condic disputes Dr. Looney's Declaration and states that at six weeks LMP, the heart "has achieved far greater structural and functional sophistication" than "'a group of cells with electrical activity.'" (*Id.* ¶ 52). Professor Condic also disputes the statements of Drs. Looney and Norton that no fetus is viable at 20 weeks LMP, pointing out that between 23% and 60% of infants born at 22 weeks LMP who receive active hospital treatment survive, many without immediate or long-term neurologic impairment. (*Id.* ¶ 53).

Dr. Pierucci, board-certified in pediatrics and neonatology, is the medical director of the NICU at Bronson Children's Hospital in Kalamzoo, Michigan, and has been actively involved in perinatal palliative care, care for babies born at the edge of viability, and medical ethics. (Doc. No. 27-8 ¶¶ 2-9). Dr. Pierucci states that the "edge of viability" has decreased to approximately 22-23 weeks gestation, with a number of cases of intervention at 21 weeks gestation, though she

20

explains that gestational age is not the only variable that determines viability. (*Id.* ¶¶ 11-12). According to Dr. Pierucci, gestational age is not always measured correctly, and prenatal diagnoses of defects can be wrong. (*Id.* ¶¶ 12-18).

Dr. Pierucci opines that a completely new person is present at conception, and therefore, treating the baby humanely at every gestational age is mandatory. (*Id.* ¶¶ 19-21). In cases where resuscitation of the baby is not possible, Dr. Pierucci describes the palliative care she provides. (*Id.* ¶¶ 22-24). According to Dr. Pierucci, the evidence does not support those denying the existence of fetal pain. (*Id.* ¶¶ 25-42).

Vanessa Lefler, the Director of Vital Statistics in the Tennessee Department of Health, collects and compiles reports of "Induced Termination of Pregnancy (ITOP)" events from healthcare providers in Tennessee. (Doc. No. 27-9 ¶ 1). Attached to Ms. Lefler's Declaration is a report summarizing data for ITOP events, from 2009 to 2018, by gestational age of the fetus at the time of pregnancy termination categorized according to the stages identified in the challenged legislation.

C. Plaintiffs' Rebuttal Declaration Testimony

By way of Reply, Plaintiffs filed the Declarations of Steven J. Ralston, M.D., M.P.H. (Doc. No. 34-2), and Owen Phillips, M.D., M.P.H. (Doc. No. 34-3), along with supplemental Declarations of Dr. Looney (Doc. No. 34-1) and Dr. Norton (Doc. No. 34-4).

Dr. Phillips is a board-certified obstetrician/gynecologist and reproductive geneticist, who specializes in testing for fetal genetic conditions as well as preconception and prenatal counseling of pregnant patients. (Doc. No. 34-3 ¶¶ 1-8). He is also a Professor in the Department of Obstetrics and Gynecology at the University of Tennessee Health Science Center in Memphis. (*Id.*) Dr. Phillips opines that prenatal screening and testing for fetal conditions, including Down

syndrome, offer a variety of benefits and are consistent with the recommendations of the leading medical organizations in the field. (*Id.* ¶¶ 10, 12-26). Genetic testing can benefit patients by helping them and their families feel less anxious about potential outcomes and prepare for the child; and can help ensure successful pregnancy and delivery through referral for more specialized care, increased frequency of prenatal visits, increased use of ultrasound to monitor fetal growth and development, and arranging delivery in a hospital equipped to handle the delivery. (*Id.*)

Dr. Phillips states that, unlike the defense witnesses who specialize in other fields, he regularly provides prenatal screening and testing and counseling about genetic and other fetal conditions, including Down syndrome. (*Id.* ¶ 13). Dr. Phillips disagrees with the assertions of Dr. Sullivan, Dr. Curlin, and Mr. Snead that prenatal genetic screening and testing are administered for the purpose of targeting fetuses with Down syndrome for abortion, and that abortions violate medical ethics. (*Id.* ¶¶ 10, 27-46). The standard medical practice around a fetal diagnosis of Down syndrome requires the provision of objective information and individualized, non-directive counseling. (*Id.*) In counseling his patients with a Down syndrome diagnosis, Dr. Phillips explains, he is not unduly negative, and points out the positive potential of children and adults with Down syndrome, and provides referrals to families of children with Down syndrome and supporting organizations. (*Id.*) If they ask, he also provides patients with information about pregnancy termination, which he does not offer. (*Id.*) Dr. Phillips states that the experiences of Ms. Platte and Ms. Bythewood are inconsistent with the standard of care for genetic counseling. (*Id.*)

Dr. Ralston is a board-certified obstetrician/gynecologist, with an expertise in medical ethics. (Doc. No. 34-2 ¶¶ 1, 6-12). Dr. Ralston opines that the consensus in the medical

community is that a fetus is not able to experience pain before at least 24 weeks from a patient's LMP because key connections to the brain do not develop before that time; and scientific evidence indicates a fetus never experiences pain in utero. (*Id.* ¶¶ 2-3, 14-36). Where anesthesia or analgesia is administered to a fetus for fetal surgery and procedures, Dr. Ralston explains, it is done to prevent fetal movement, not to ensure a fetus remains unconscious or to reduce pain. (*Id.*) According to Dr. Ralston, the assertions of Dr. Condic and Dr. Pierucci that fetal pain is possible before 24 weeks LMP do not reflect the medical consensus and are not well-supported. (*Id.*). Dr. Ralston also points out that Dr. Condic is not a medical doctor and lacks clinical experience in providing pain management. (*Id.*)

Dr. Ralston also disagrees with the assertions of Dr. Curlin and Mr. Snead, who is not a medical doctor, that abortion procedures are contrary to medical ethics. (*Id.* ¶¶ 4, 37-45). The leading authorities on medical ethics, Dr. Ralson states, "are clear that access to safe and legal abortion is an important aspect of reproductive health care, that a clinician's basic obligations are to the pregnant patient, and that it is unethical to impose personal moral values or judgments on a patient." (*Id.* ¶ 4).

Dr. Ralston strongly disagrees with Dr. Sullivan's opinion that medical practitioners are biased to recommend abortion for patients who have received a diagnosis of Down syndrome in the fetus. (*Id.* ¶¶ 5, 37-45). Dr. Ralston states that in his own practice and in training other physicians, he follows the recommendations of the leading authorities on medical ethics to engage in a non-directive, non-judgmental approach to patient treatment and counseling. (*Id.*)

Dr. Norton disagrees with Defendants' positions regarding viability, Down syndrome counseling, abortion safety, and medical ethics. As for Drs. Condic and Pierucci's assertions that infants become viable around 22 weeks post LMP, Dr. Norton points out that viability is

determined by a multitude of factors in addition to gestational age. (Doc. No. 34-4 ¶¶ 3, 7-17). She states that the assertion that most fetuses reach viability at 22-23 weeks LMP is not medically supportable, as the most up-to-date research contradicts the assertion. (*Id.* ¶¶ 8-17). Dr. Norton also disagrees with Dr. Sullivan's assertion that counseling on Down syndrome is biased in favor of abortion: "Non-directive counseling is the standard of care and is what all obstetrician-gynecologists are taught to provide." (*Id.* ¶¶ 4, 18). Dr. Norton explains that she provides patients receiving a Down syndrome diagnosis with resources conveying a very positive message about people with Down syndrome and their families, as well as counseling regarding the health risks associated with the diagnosis. (*Id.* ¶¶ 19-23). Contrary to Dr. Curlin's opinions, Dr. Norton opines that abortion procedures are part of standard medical care and is consistent with medical ethics as reflected by the professional ethical organizations in the field. (*Id.* ¶¶ 6, 27-29). Finally, Dr. Norton disagrees with the legislative finding suggesting abortion is unsafe, stating that the findings are not medically supported. (*Id.* ¶¶ 5, 24-26).

Dr. Looney disagrees with Defendants' suggestion that patients could still access abortion for one of the prohibited reasons as long as they do not disclose their reasons to the provider. (Doc. No. 34-1 ¶ 1). That approach would undermine the physician-patient relationship and is unworkable. (*Id.* ¶¶ 1-5). Even if a patient does not disclose her reasons, Dr. Looney points out, the patient's file or communications from a referring physician are likely to reveal a Down syndrome diagnosis, or that the patient asked the sex of the fetus during an ultrasound. (*Id.*) Having learned of this information, Dr. Looney believes she would be forced to assume the patient had accounted for such a factor in making her decision, and would not be able to provide an abortion. (*Id.*)

## III. **Analysis**

A. The Preliminary Injunction Factors

In determining whether to issue a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court is to consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *See, e.g., Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).

B. Standing

Defendants argue Plaintiffs lack standing to assert their patients' due process rights. Plaintiffs contend they have standing to sue on their own behalf, and on behalf of their patients, on all of their claims.

The Supreme Court has long established that abortion providers have standing to assert their patients' rights. *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 117, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976); *see also EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 794 n. 2 (6th Cir. 2020); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1395-96 (6th Cir. 1987). In *Singleton,* the Court recognized that abortion providers are "uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against," the patient's decision to have an abortion. 428 U.S. at 117.

The Supreme Court has also recognized the standing of abortion providers to sue on their own behalf when challenged legislation or regulations operate directly against them. In reaching its decision on standing in *Planned Parenthood of Cen. Mo. v. Danforth,* 428 U.S. 52, 62, 96 S.

Ct. 2831, 49 L. Ed. 2d 788 (1976), the Court pointed out the challenged legislation directly operated against the plaintiff physicians in the event they provide an abortion that does not meet the statutory exceptions and conditions. "The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." 428 U.S. at 62; *see also Adams & Boyle, P.C. v. Slatery,* 956 F.3d 913, 924 n. 10 (6th Cir. 2020) (Plaintiff abortion providers "unquestionably have standing to sue on their *own* behalf (because EO-25 potentially threatens them with criminal prosecution) . . ."); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d at 794 n. 2.

These standing principles were recently reaffirmed by the Supreme Court. In *June Med. Servs. L.L.C. v. Russo,* ___ U.S. ___, ___ S. Ct. ___, 2020 WL 3492640 (June 29, 2020), five of nine justices agreed that abortion providers have standing to assert the constitutional rights of their patients. *Id.,* at *13 ("We have long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations."); *Id.,* at 26 n.4 (Roberts, C.J., concurring in judgment) ("For the reasons the plurality explains, *ante,* at 11-16, I agree that the abortion providers in this case have standing to assert the constitutional rights of their patients.") In addition, the Court pointed out that plaintiffs have also been permitted to assert third-party rights in cases where enforcement of the challenged restriction "against the litigant" would also result in indirect violation of the third party's rights. *Id.,* at * 14.

As with the plaintiffs in *June Medical,* the plaintiffs here bring this action to assert the constitutional rights of their patients and to challenge a law that subjects them to potential criminal sanctions.

26

While recognizing authority to the contrary, Defendants argue Plaintiffs have not identified any specific patients who will be harmed by HB 2263, nor have they established a "close" relationship with those patients. Defendants also argue Plaintiffs have not shown their patients are hindered in their ability to protect their own interests, pointing out that patients have been plaintiffs in other cases. Neither of these requirements have been adopted by the Supreme Court as a basis for denying standing in similar cases, and the Court must decline Defendants' invitation to ignore well-established law on this issue. Until the Supreme Court overturns its precedents recognizing the standing of abortion providers to challenge abortion legislation, this Court is bound to follow them.[8]

C. Section 216

Plaintiffs argue the heartbeat and gestational-age bans in Section 216 are unconstitutional based primarily on the Supreme Court's decisions in *Roe v. Wade, supra*, and *Planned Parenthood of Southeastern Pa. v. Casey, supra.*

In *Roe,* the Supreme Court held the Due Process Clause of the Fourteenth Amendment provides constitutional protection to a woman's decision to terminate her pregnancy in its early stages. 410 U.S. at 153. The Court also recognized the right is not absolute, and must be considered against important state interests, such as protection of health, medical standards, and prenatal life. *Id.,* at 154-55. In balancing those interests, the Court adopted a trimester framework. *Id.,* at 164-65.

---

[8] Citing only a law review article from 1981, Defendants argue the language of Section 1983 prevents third-party standing. *See* David P. Currie, *Misunderstanding Standing,* 1981 Sup. Ct. Rev. 41, 45. In the absence of any authority recognizing such a limitation in Section 1983 cases, especially given that most abortion challenges are brought under Section 1983, *see, e.g., Planned Parenthood Ass'n of Cincinnati,* 822 F.2d at 1392, the Court declines the invitation to apply Defendants' novel theory here.

27

In *Casey,* the Supreme Court abandoned the trimester framework of *Roe,* while reaffirming *Roe's* "essential holding":

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.

505 U.S. at 846. The *Casey* Court balanced these interests by employing an "undue burden analysis:" "An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." 505 U.S. at 878; *see also June Med. Servs. L. L. C. v. Russo,* 2020 WL 3492640 (June 29, 2020) (applying *Casey*); *Whole Woman's Health v. Hellerstedt,* ___ U.S. ___, 136 S. Ct. 2292, 2309, 195 L. Ed. 2d 665 (2016) (applying *Casey*).

The Court defined viability as "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb. . ." *Casey,* 505 U.S. at 870. Because viability may differ with each pregnancy, the Court has held that "neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus." *Colautti v. Franklin*, 439 U.S. 379, 388–89, 99 S. Ct. 675, 682, 58 L. Ed. 2d 596 (1979); *see also Isaacson v. Horne,* 716 F.3d 1213 (9th Cir. 2013) (holding statute prohibiting abortions at 20 weeks gestational age violates long-standing Supreme Court authority identifying viability as the critical point in considering abortion rights).

The Eighth Circuit considered a North Dakota law similar to Section 216 – one which prohibited abortions of unborn children who possess a detectable heartbeat – and held the law was unconstitutional under binding Supreme Court precedent:

> Here, because the parties do not dispute that fetal heartbeats are detectable at about 6 weeks, it is clear that H.B. 1456 generally prohibits abortions after that point in a pregnancy. Whether such a prohibition is permissible under the principles we accept as controlling in this case depends on when viability occurs: if viability occurs at about 24 weeks, as the plaintiffs maintain, then H.B. 1456 impermissibly prohibits women from making the ultimate decision to terminate their pregnancies; but if viability occurs at conception, as the State argues, then no impermissible prohibition ensues.

> Just as we are bound by the Supreme Court's assumption of *Casey's* principles, we are also bound by the Court's statement that viability is the time 'when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.' *Colautti v. Franklin,* 439 U.S. 379, 388, 99 S. Ct. 675, 58 L.Ed.2d 596 (1979); *see also Casey,* 505 U.S. at 870, 112 S. Ct. 2791 (plurality opinion) ('[T]he concept of viability ... is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb....'); *Roe,* 410 U.S. at 160, 163, 93 S. Ct. 705 (stating that a fetus becomes viable when it is 'potentially able to live outside the mother's womb, albeit with artificial aid' and that viability is the point at which the fetus 'presumably has the capability of meaningful life outside the mother's womb').

> * * *

> Because there is no genuine dispute that H.B. 1456 generally prohibits abortions before viability—as the Supreme Court has defined that concept—and because we are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions, we must affirm the district court's grant of summary judgment to the plaintiffs.

*MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015). More recently, the Fifth Circuit enjoined the enforcement of a Mississippi law criminalizing abortions after the detection of a fetal heartbeat. *Jackson Women's Health Org. v. Dobbs,* 951 F.3d 246, 248 (5ᵗʰ Cir. 2020); *see also SisterSong Women of Color Reprod. Justice Collective v. Kemp,* ___ F. Supp. 3d ___, 2020 WL 3958227, at *10-11 (N.D. Ga. July 13, 2020) (granting summary judgment to plaintiffs

29

challenging Georgia law prohibiting abortions after detection of fetal heartbeat); *Edwards v. Beck,* 786 F.3d 1113, 1116-17 (8th Cir. 2015) (affirming permanent injunction against enforcement of Arkansas statute prohibiting abortions if heartbeat was detected and gestational period was 12 weeks or more).

While acknowledging that courts in other circuits have struck down such provisions, Defendants point out that the Sixth Circuit has not yet addressed the issue. Although that is true, application of *Casey* and other Supreme Court authority lead this Court to the same conclusion reached by other appellate courts. As *Casey* has established, a state may not prohibit abortions before viability. And the definition of viability this Court must apply was provided by the *Casey* Court -- "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb." As discussed above, the Supreme Court has also specifically rejected the idea that a legislature or court may define viability by gestational age alone. Section 216 does not comply with this authority because it prohibits abortions based solely on gestational age rather than viability.

Although Defendants' witnesses, Professor Condic and Dr. Pierucci, cite rare instances where a fetus has survived at 21-23 weeks, they do not suggest all fetuses in that age category meet the *Casey* definition of viability. Dr. Pierucci even acknowledges that gestational age is not the only variable that determines viability. Even if the witnesses explicitly tied viability to a certain gestational age, this Court is not free to adopt such a definition in light of *Casey. See MKB Management,* 795 F.3d at 773 (holding that state's declaration does not create a genuine dispute as to when viability occurs because the declarant's definition of viability differs from the Supreme Court's definition). Given that Tennessee law already prohibits post-viability abortions,

the effect of Section 216 is to ban pre-viability abortions after six weeks or the presence of a fetal heartbeat.

Defendants argue the provisions of Section 216 do not prohibit pre-viability abortions; they merely regulate the *timing* of the decision to have an abortion. According to Defendants, "[t]he Bill's gestational-age provisions do not 'prohibit' a woman from deciding *whether* to seek a pre-viability abortion; they merely regulate *when* she must make that decision." (Doc. No. 27, at 19).

As the Court understands Defendants' argument, as long as a woman makes the *decision* to have an abortion *before* a fetal heartbeat is heard, or before the unborn child is six weeks old, the abortion provider would not be prohibited from *performing* the abortion up to the time a fetus is viable. In other words, Section 216 would not prohibit an abortion before viability if the patient has announced, perhaps before she learns she is pregnant, that she has made the decision to terminate her pregnancy. The Court is not persuaded that the plain language of the statute, or the legislative findings, support such a creative interpretation. The plain language of Section 216 prohibits an abortion provider from *performing* an abortion where the unborn child is six weeks gestational age (unless there is no fetal heartbeat) through 24 weeks gestational age. Thus, as discussed above, Plaintiffs have shown a likelihood of success on the merits of their claim that Section 216 violates long-standing Supreme Court precedent prohibiting bans on pre-viability abortions that this Court is bound to follow. *See Bosse v. Oklahoma,* ___ U.S. ___, 137 S. Ct. 1, 2, 196 L. Ed. 2d 1 (2016) ("[I]t is this Court's prerogative alone to overrule one of its precedents."); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989) (holding lower courts should leave "to this Court the prerogative of overruling its own decisions.")

D. <u>Section 217</u>

Plaintiffs argue Section 217 also operates as an unconstitutional ban on pre-viability abortions, and at least two courts have struck down similar statutes on those grounds. In *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 888 F.3d 300, 306 (7th Cir. 2018), *cert denied in part and granted in part, judgment rev'd in part on other grounds sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.,* 139 S. Ct. 1780 (2019), the Seventh Circuit considered an Indiana law that prohibited abortions for certain reasons, such as race, sex, color, national origin, ancestry, or Down syndrome, and held it was unconstitutional under *Casey.* In addition, the district court for the Eastern District of Arkansas enjoined enforcement of a statute prohibiting abortion based on the belief that the unborn child has Down syndrome. *Little Rock Family Planning Srvcs. v. Rutledge,* 397 F. Supp. 3d 1213, 1271-72 (E.D. Ark. 2019).

As yet, the Sixth Circuit has not directly addressed the constitutionality of similar legislation. In *Preterm-Cleveland v. Himes*, 940 F.3d 318, 320 (6th Cir. 2019), a panel of the Sixth Circuit addressed a challenge to an Ohio law prohibiting abortion providers from performing an abortion with the knowledge that the decision to abort arises from a diagnosis or indication that the unborn child has Down syndrome. The panel held the statute operated as an unconstitutional ban on pre-viability abortions in violation of *Casey. Id.*, at 323-25. A majority of Sixth Circuit judges subsequently voted for rehearing *en banc* and vacated the panel opinion. 944 F.3d 630 (6th Cir. 2019). Given the status of this case before the Sixth Circuit, and this Court's conclusion, as discussed below, that Section 217 is unconstitutionally void for vagueness, the

32

Court finds it unnecessary to address Plaintiffs' argument that Section 217 operates as an unconstitutional ban on pre-viability abortions.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S. Ct. 2294, 2298–99, 33 L. Ed. 2d 222 (1972). The prohibition on vagueness recognizes that laws should "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* The void-for-vagueness doctrine also guards against arbitrary and discriminatory enforcement because: "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.; Kolender v. Lawson,* 461 U.S. 352, 357-58, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) ("Where the legislature fails to provide such minimal guidelines [to government law enforcement], a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'") For that reason, "the doctrine is a corollary of the separation of powers – requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, ___ U.S. ___, 138 S. Ct. 1204, 1212, 200 L. Ed. 2d 549 (2018).

Section 217 implicates both principles underlying the void-for-vagueness doctrine. A physician attempting to comply with the statute must determine what it means to "know" that his or her patient is seeking an abortion "because of" the sex or race of the unborn child, or a diagnostic test indicating Down syndrome (or "the potential" for Down syndrome) in the unborn child. These terms are not defined in the statute, and lead to several pivotal questions. Will the physician be subject to criminal sanction only where the patient explicitly states she seeks an

33

abortion for a prohibited reason, or could the physician be arrested for providing an abortion where the patient's file or a referring physician includes a reference to a prohibited reason? Will the prohibition apply where the patient indicates a prohibited reason is the only reason she seeks an abortion, or does it apply where the prohibited reason is the motivating reason, a significant factor, or one of several reasons? Will the prohibition apply where the patient simply makes a reference to the sex of her fetus, the race of the father, or her age in one of her conversations with the physician? As Plaintiffs' Declarations reflect, these questions – left unanswered by Section 217 – make it impossible for a person of ordinary intelligence to know what conduct constitutes a crime. The lack of precision by the legislative body that approved its language also impermissibly delegates the task of answering these questions to law enforcement officers, prosecutors, and the courts or juries.

Relying on the Supreme Court's decisions defining the phrase "because of" in the employment discrimination context, *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350, 133 S. Ct. 2517, 2527, 186 L. Ed. 2d 503 (2013), Defendants argue the provisions of Section 217 are not unconstitutionally vague. Defendants do not point to any provision in this *criminal* statute, however, limiting the definition of "know" or "because of" in a similar fashion. More importantly, Defendants fail to acknowledge the aspect of Section 217 that makes it unique – the statute requires one individual to know the motivations underlying the actions of another individual, and subjects the first individual to criminal sanctions if he or she reaches the "wrong" conclusion.

Defendants cite a 1995 California Supreme Court case holding the phrase "because of," used in the state's hate crime statute,[9] is not unconstitutionally vague because it is a term of

---

[9]  The statute provided:

common usage. *See In re M.S.*, 896 P.2d 1365, 1376 (Cal. 1995). Again, the distinction between Section 217 and California's hate crime statute is that Section 217 requires an individual to know the motivations underlying the action of *another* person to avoid prosecution. The hate crime perpetrator knows what is in his or her own mind, and is presumably able to curb his behavior to avoid criminal sanction. The criminal sanction in Section 217, by contrast, is directed at the physician, who must make judgments about the state of mind of a patient and is possibly subject to a loss of liberty if he or she reaches the "wrong" conclusion.

Defendants also argue the term "knows" in the statute is a scienter requirement that defeats Plaintiffs' vagueness argument. According to Defendants, "a physician must be 'aware' that the abortion is being sought because of the unborn child's race, sex, or Down syndrome diagnosis." (Doc. No. 27, at 29). In the Court's view, requiring the physician to be "aware" of the intent of the patient does not cure the vagueness of the statute. Although Defendants state their belief that the statute would not impose liability where a patient simply makes reference to a prohibited reason, their "belief" is not supported by the imprecise language of the statute, nor does it guarantee individual prosecutors will agree with their interpretation. When a law threatens criminal sanctions, such vague provisions and potential varied interpretations cannot stand. Plaintiffs have established, therefore, a substantial likelihood of success in their challenge of Section 217.

E. The Affirmative Defense

---

(a) No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States because of the other person's race, color, religion, ancestry, national origin, or sexual orientation.

896 P. 2d at 1368 n. 1.

Finally, relying on *Women's Med. Prof'l Corp. v. Voinovich,* 130 F.3d 187, 205 (6th Cir. 1997), Plaintiffs argue that, even if Sections 216 and 217 do not apply to *pre*-viability abortions, they are still unconstitutional because they lack valid exceptions for medical emergencies. In *Voinovich,* the court reviewed *Casey's* holding that *post*-viability, the State may regulate and even proscribe abortion "'except where it is necessary in appropriate medical judgment, for the preservation of the life or health of the mother.'" 130 F.3d at 203 (quoting *Casey,* 505 U.S. at 879). In addressing the plaintiffs' argument that an Ohio statute banning post-viability abortions was unconstitutional because it did not contain a valid medical necessity exception,[10] the court agreed, noting the lack of a scienter requirement:

> The term 'scienter' means 'knowingly' and is used to signify a defendant's guilty knowledge. BLACK'S LAW DICTIONARY 1345 (6th ed.1990). It requires that a defendant have some degree of guilty knowledge or culpability in order to be found criminally liable for some conduct. Statutes imposing criminal liability without a mental culpability requirement are generally disfavored. *See Staples v.*

---

[10] The Ohio statute defined "medical emergency as follows:

> [A] condition that a pregnant woman's physician determines, in good faith and in the exercise of reasonable medical judgment, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create.

"Serious risk of the substantial and irreversible impairment of a major bodily function" was defined as:

> any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function, including, but not limited to, the following conditions:
>
> (1) Pre-eclampsia;
> (2) Inevitable abortion;
> (3) Prematurely ruptured membrane;
> (4) Diabetes;
> (5) Multiple sclerosis.

130 F.3d 187, 191 n. 2.

36

*United States,* 511 U.S. 600, 605–06, 114 S. Ct. 1793, 1797, 128 L.Ed.2d 608 (1994).

The Act's 'medical emergency' definition requires the physician to determine 'in good faith and in the exercise of reasonable medical judgment' whether an emergency exists. OHIO REV.CODE ANN. § 2919.16(F). Similarly, the medical necessity exception to the post-viability ban requires that the physician determine 'in good faith and in the exercise of reasonable medical judgment' that the abortion is necessary. *See id.* § 2919.17(A)(1). Thus, both of these provisions contain subjective and objective elements in that a physician must believe that the abortion is necessary *and* his belief must be objectively reasonable to other physicians. This dual standard as written contains no scienter requirement. Therefore, a physician may act in good faith and yet still be held criminally and civilly liable if, after the fact, other physicians determine that the physician's medical judgment was not reasonable. In other words, a physician need not act willfully or recklessly in determining whether a medical emergency or medical necessity exists in order to be held criminally or civilly liable; rather, under the Act, physicians face liability even if they act in good faith according to their own best medical judgment.

130 F.3d at 203–04.

The medical-emergency affirmative defense in Sections 216 and 217 requires the physician to determine that, in the exercise of his or her "*reasonable* medical judgment," a "medical emergency" prevents compliance. And "medical emergency" is defined as "a condition that, in the physician's *good faith* medical judgment, based upon the facts known to the physician at the time, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create." Like the provision in *Voinovich,* the statute does not contain a scienter requirement, and a physician acting in "good faith" may still be held criminally liable if, after the fact, other physicians disagree about the "reasonableness" of his or her medical judgment.

The resulting uncertainty created by such language led the *Voinovich* court to conclude

the provision was unconstitutionally vague:

> The determination of whether a medical emergency or necessity exists, like the determination of whether a fetus is viable, is fraught with uncertainty and susceptible to being subsequently disputed by others. Moreover, the lack of scienter is compounded by the fact that this Act requires that a physician meet both an objective and a subjective standard in order to avoid liability. While we need not decide whether employment of an objective standard with a scienter requirement would be constitutional, an objective standard without one is especially troublesome in the abortion context. In an area as controversial as abortion, the need for a scienter requirement is, as the Supreme Court pointed out, particularly important. In this area where there is such disagreement, it is unlikely that the prosecution could not find a physician willing to testify that the physician did not act reasonably. Under the Act, a physician who performs a post-viability abortion under either the medical emergency or medical necessity exception may be held liable, even if the physician believed he or she was acting reasonably, and in accordance with his or her best medical judgment, as long as others later decide that the physician's actions were nonetheless unreasonable. . . . Thus, the combination of the objective and subjective standards without a scienter requirement renders these exceptions unconstitutionally vague, because physicians cannot know the standard under which their conduct will ultimately be judged.

130 F.3d at 205.

As in *Voinovich,* the medical-emergency affirmative defense in Sections 216 and 217

includes both an objective and a subjective standard, and does not have a scienter requirement.

Consequently, as Plaintiffs' Declarations reflect, application of the medical-emergency defense

is "fraught with uncertainty and susceptible to being subsequently disputed by others."

Acknowledging the Sixth Circuit's *Voinovich* decision, Defendants argue the medical-

emergency defense is not unconstitutionally vague because it includes a scienter requirement that

imposes criminal liability only where the physician's conduct is "unreasonable." As the

*Voinovich* Court explained, however, scienter requires a defendant to have some degree of guilty

knowledge or culpability to be held criminally liable, and the court did not consider "reasonableness" – an objective standard – to fulfill that requirement.[11]

Defendants alternatively argue the statute incorporates a mental state of "intent, knowledge or recklessness" through operation of Sections 39-11-301(b), (c), which provide:

> (b) A culpable mental state is required within this title unless the definition of an offense plainly dispenses with a mental element.
>
> (c) If the definition of an offense within this title does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state.

Defendants cite to *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 534-35 (8th Cir. 1994), where the court upheld a medical-emergency exception to a vagueness challenge because North Dakota law incorporated a "willfulness" *mens rea* to the exception. But the language of the North Dakota exception did not include a requirement that the physician's judgment be "reasonable" as measured by other physicians. The North Dakota exception "allow[ed] the physician to rely on his or her 'best clinical judgment' in determining whether a condition constitutes a medical emergency." *Id.* That language, the court concluded, "certainly places in the physician's hands the medical judgment that would satisfy the requirements of the statute." *Id.*

Defendants do not explain how the incorporation of "intent, knowledge, or recklessness" would work where the statute looks both to the physician's "good faith medical judgment" on the one hand, and yet requires that medical judgment to be "reasonable" as measured by others, on the other hand. *See Women's Medical Prof. Corp. v. Voinovich,* 911 F. Supp. 1051, 1085-87

---

[11] Defendants also rely on the Seventh Circuit's decisions in *Karlin v. Foust,* 188 F.3d 446, 465-68 (7th Cir. 1999) and *Hope Clinic v. Ryan,* 195 F.3d 857, 866 (7th Cir. 1999), *cert. granted, judgment vacated,* 530 U.S. 1271, 120 S. Ct. 2738, 147 L. Ed. 2d 1001 (2000). Neither court sanctioned the same problematic language at issue here.

(S.D. Ohio 1995) (explaining that importing a *mens rea* of "recklessness" would essentially require the court to rewrite the statute because "recklessness" conflicts with "reasonableness.") Thus, the vagueness of the language cannot be remedied by that approach. Unless and until the Sixth Circuit overturns its decision in *Voinovich*, this Court is bound to follow it, and hold the medical-emergency affirmative defense is unconstitutionally vague. Plaintiffs have shown a likelihood of success on the merits of their challenge to this provision.

## F.   Application of the Preliminary Injunction Factors

For the reasons described above, the Court concludes Plaintiffs have established a strong likelihood of success on the merits of their constitutional challenges to Sections 216 and 217.

As for the other Rule 65 considerations, the Court is persuaded Plaintiffs have demonstrated they will suffer immediate and irreparable injury, harm, loss, or damage if injunctive relief is not granted pending final resolution of this case. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). A plaintiff can also demonstrate denial of an injunction will cause irreparable harm if the claim is based on a violation of constitutional rights. *Id.; Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d at 1400 (finding irreparable harm in case where abortion clinic challenged ordinance on behalf of itself and its patients). First, as explained above, Plaintiffs have demonstrated a strong likelihood of success on the merits in showing that Sections 216 and 217 are unconstitutional. Second, as Plaintiffs' Declarations attest, enforcement of the provisions of Sections 216 and 217 will immediately impact most patients in Tennessee who seek pre-viability abortions, and the time-sensitive nature of the procedure adds to that impact.[12] Despite

---

[12]  Plaintiffs' Declarations state that most patients seeking abortions are poor or low-income; are already parents; struggle to access transportation, childcare, and time off work; and will face logistical and

Defendants' arguments to the contrary, a finding of irreparable harm does not require Plaintiffs to disclose the identity of specific patients. Third, enforcement of Sections 216 and 217 will likely result in criminal sanctions, including prison and fines, as well as licensing implications, for abortion providers.

This threatened harm outweighs any harm to Defendants or to the public interest. Neither Defendants nor the public have a strong interest in enforcing an unconstitutional statute. *Planned Parenthood Ass'n of Cincinnati,* 822 F.2d at 1400 (explaining validity of city's interest in enforcing likely unconstitutional ordinance is "questionable"). Moreover, enjoining enforcement of Sections 216 and 217 will simply preserve the status quo pending trial.

For these reasons, Plaintiffs' Motion for Preliminary Injunction (Doc. No. 6) is **GRANTED,** as follows: Pursuant to Rule 65, it is ORDERED that Defendants, their officers, agents, employees, servants, attorneys, and all persons in active concert or participation with them, are hereby enjoined and restrained from enforcing Tennessee Code Annotated Sections 39-15-216 and 39-15-217.

As for the question of posting a bond, given that Defendants are unlikely to incur damages or costs from this injunctive relief, the Court exercises its discretion to waive the security required by Rule 65(c). *See, e.g., Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co*., 714 F.3d 424, 431 (6th Cir. 2013) (observing that the rule in Sixth Circuit has long been that the district court possesses discretion over whether to require the posting of security under Rule 65).

This Preliminary Injunction Order shall remain in effect pending further order of the Court.

---

financial impediments to travelling out of Tennessee to obtain services. (Rovetti Declaration ¶¶ 14-21; Terrell Declaration ¶¶ 24-27; Grant Declaration ¶ 18).

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

42